## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MD

FARDOES KHAN )
9716 Dameron Drive )
Silver Spring, MD 20910-1403, )
                        ) No. 405614-V
      Plaintiff )
                        )
v. )
                        )
CHILDREN'S NATIONAL ) **COMPLAINT**
HEALTH SYSTEM, )
111 Michigan Avenue, NW, )
Washington, D.C. 20010 )
                        )
      Defendant. )

**RECEIVED**

JUN 0 1 2015

Clerk of the Circuit Court
Montgomery County, Md.

      Plaintiff, Fardoes Khan by her undersigned attorneys, brings this action on behalf of

herself and all others similarly situated against Children's National Medical Center.

### INTRODUCTION

      1.    Plaintiff, individually and on behalf of all other similarly situated persons (i.e., the

Class Members) bring this class action seeking to redress Defendant's reckless violations of their

privacy rights. Plaintiff and Class Members are consumers of health care and services and/or

medications who entrusted their personally identifiable information ("PII") and medical records

and private health information ("PHI") (together, "PII/PHI") to Defendant.

      2.    The wrongfully disclosed PII/PHI included, *inter alia*, Plaintiff's and Class

Members' Social Security numbers, addresses, dates of birth, telephone numbers and personal

health data—including diagnosis, treatment received, medical record number, medical record

service codes, and health insurance information. This type of PII/PHI disclosure is the most

harmful because it generally takes a significant amount of time for a victim to become aware of

the disclosure and misuse. Improper use of PII also can result in an adverse impact on a victim's credit rating and finances. This disclosure also is particularly harmful when it occurs against minor children as happened here.

3.      Defendant betrayed Plaintiff's trust by failing to properly safeguard and protect her PII/PHI and publicly disclosing her PII/PHI without authorization in violation of numerous laws.

2.      Defendant, failing to maintain secured patient information, suffered a data breach from July 26, 2014 until December 26, 2014.

3.      As a result of the data breach, sensitive personal information including patient demographics and clinical information were leaked.

4.      Defendant failed to maintain a secure data network and consequently, data hackers were able to access confidential patient information.

5.      On February 26, 2015, Defendant wrote to Plaintiff to inform her of the data breach impacting her PII/PHI and that it was taking the breach "very seriously." Therein, Defendant suggests that Plaintiff and the Class undertake timely monitoring of their Explanation of Benefits and inform them of any entries that are incorrect. Defendant fails to inform Plaintiff and the Class of the serious risk to their credit, credit rating, and financial accounts.

### JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action, and venue is appropriate in this Court, pursuant to D.C. Code § 11-921 and §28-3905(k)(1).

7.      Venue is proper in this District. The claims asserted in this complaint arise within this district. Plaintiff resides in this District and seeks to represent residents of this District who have used Defendant's hospital services. Many of the victims of the data breach of the

Defendant's network reside within the District of Columbia. The Defendant has transacted business in the District of Columbia; caused tortious injury in the District of Columbia via acts or omissions occurring therein; and derived substantial revenue from services rendered in the District of Columbia.

8.     Furthermore, Defendant transacts substantial business in and perpetuated its unlawful conduct from the District of Columbia. Defendant will not be prejudiced or inconvenienced by the maintenance of this class action in this forum.

## PARTIES

9.     Plaintiff, Fardoes Khan, has been a patient at Children's Hospital in Washington .D.C.– a hospital part of Defendant's network—since her birth in 1986.  Plaintiff regularly underwent, and continues to undergo, surgery and treatment at Children's Hospital for medical issues which she has taken great pains to keep confidential and private.  Since receiving the notice letter from Defendant, Plaintiff has contacted her bank and credit card providers and placed passwords on the accounts.  She cannot put passwords on her social security number, remaining PII or PHI.

10.    Children's National Medical Center is a not-for-profit medical institution with multiple locations across the District of Columbia, Maryland, and Virginia.

## FACTUAL BACKGROUND

*Nature of the Action*

11.    Defendant has been operating as a medical facility in Washington, D.C since 1870.

12.     Defendant is the only exclusive provider of pediatric care in the Washington, D.C. area and is the only freestanding children's hospital between Philadelphia, Pittsburg, Norfolk, and Atlanta.

13.     On December 26, 2014, Defendant learned that certain employee email accounts had been potentially exposed in a way that may have allowed hackers to access information contained in those email accounts. These employees responding to "phishing" scams[1] which allowed access to Defendant's systems by outside third parties.

14.     Despite the fact that Defendant became aware of the data breach on December 26, 2014, the unauthorized access may have started as early as July 26, 2014. In other words, these outside third parties spent five months on Defendant's systems before being discovered.

15.     Information hacked included patient demographic information such as names, dates of birth, addresses, social security numbers, and telephone numbers, as well as clinical information such as diagnoses, treatment received, medical record numbers, medical service codes, and health insurance information. Included in that stolen information was the data of minor children.

16.     In short, what was stolen was information crucial for identify theft, credit fraud and medical fraud.

_____

[1] "Phishing" is an attempt to acquire information (and sometimes, indirectly, money), such as usernames, passwords and credit card details by masquerading as a trustworthy entity through an electronic communication.

Communications purporting to be from popular social websites, auction sites, online payment processors or IT administrators are commonly used to lure the unsuspecting public. Phishing emails may contain links to websites that are infected with malware. Phishing is typically carried out by e-mail spoofing or instant messaging, and often directs users to enter details at a fake website that looks and feels almost identical to the legitimate one. When criminals have access to PII/PHI from a large group of similarly situated victims, it is much more feasible to develop a believable phishing spoof email that appears realistic. They can then get this group of victims to reveal additional private information, such as credit cards, bank accounts, and the like.

17.     On February 14, 2015, Defendant began sending letters in the mail to affected patients, and established a dedicated call center to answer questions patients may have.

18.     The incident was added to Health and Human Services' public breach tool. The entry indicates that 18,000 people were either affected or notified

19.     Defendant acknowledges its profound responsibility of protecting sensitive client information noting in the March 17, 2015 press release relating to this breach, "Defendant confidentiality of patient personal and medical information is of the utmost importance."

20.     Upon information and belief, the information accessed through the phishing scam was unencrypted and unsecured by any passwords or other security measures.

21.     Defendant disregarded Plaintiff's and Class Members rights and privacy by intentionally, willfully and recklessly failing to take the necessary precautions required to safeguard and protect their PII/PHI from unauthorized disclosure.

22.     Plaintiff's and Class Members PII/PHI was unencrypted or unsecured, unprotected, readily able to be copied by data thieves and not kept in accordance with basic security protocols.

23.     Plaintiff is concerned about her finances, credit, identity and PII/PHI and, as such, generally monitors her credit, monitors her financial accounts and/or carefully stores and disposes of her PII/PHI and any other documents containing components of her PII/PHI.  In fact, Plaintiff is so careful about her security that she rarely uses her credit cards and will not divulge her email address to anyone but trusted individuals.

*The real harm of data breaches*

24.     Data breaches can lead to identity theft,[2] identity fraud, medical fraud,[3] lost

medical identities and records, fraudulent credit card activity, the opening or reopening of new

credit card accounts in their name, phishing, increased calls from telemarketers and/or increased

mailers marketing products and services including, *inter alia*, medical products, medical services

and/or prescription drugs specifically targeted at their medical conditions.

25.     According to the FTC, "the range of privacy-related harms is more expansive than

economic or physical harm or unwarranted intrusions and that any privacy framework should

recognize additional harms that might arise from unanticipated uses of data."[4] Furthermore,

"there is significant evidence demonstrating that technological advances and the ability to

combine disparate pieces of data can lead to identification of a consumer, computer or device

even if the individual pieces of data do not constitute PII."[5]

---

[2] According to the United States Government Accounting Office (GAO), the terms "identity theft" or "identity fraud" are broad terms encompassing various types of criminal activities. Identity theft occurs when a person's personally identifying information, such as that person's name, Social Security number, or credit card number is used without his/her permission to commit fraud or other crimes. *See* Federal Trade Commission, *Fighting Back Against Identity Theft*, http://www.ftc.gov/bcp/edu/microsites/idtheft/consumers/about-identitytheft.html These crimes include, *inter alia*, credit card fraud, phone or utilities fraud, bank fraud and government fraud (theft of government services).

[3] Medical fraud (or medical identity theft) occurs when a person's personal information is used without authorization to obtain, or receive payment for, medical treatment, services or goods. *See* www.ftc.gov/bcp/edu/microsites/idtheft/consumers/resolving-specific-id-theft-problems.html. For example, as of 2010, more than 50 million people in the United States did not have health insurance according to the U.S. census. This, in turn has led to a surge in medical identity theft as a means of fraudulently obtaining medical care.

[4] *Protecting Consumer Privacy in an Era of Rapid Change* FTC, Report March 2012 (http://www.ftc.gov/os/2012/03/120326privacyreport.pdf).

[5] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, 35–38 (Dec. 2010), *available at* http://www.ftc.gov/os/2010/12/101201privacyreport.pdf; *Comment of Center for Democracy & Technology*, cmt. #00469, at 3; *Comment of Statz, Inc.*, cmt. #00377, at 11-12.

26.     A fraudster can easily research the email address of a data breach victim. When a fraudster has access to PII/PHI from a large group of similarly situated victims, it is much more feasible to develop a believable phishing spoof email that appears realistic. The fraudsters can then convince the group of victims to reveal additional private banking account and credit card information.

27.     Moreover, as the FTC notes: "Victims of medical identity theft may find that their medical records are inaccurate, which can have a serious impact[6] on their ability to obtain proper medical care and insurance benefits." *See* FN 3, *supra.* This problem is facilitated by the proliferation of online sharing of medical and pharmaceutical records between hospitals and physicians.

28.     A person whose personal information has been compromised may not see any signs of identity theft for years. According to the GAO's June 2007 report on Data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

29.     PII/PHI is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for a number of years.[7] Identity thieves and other cyber criminals openly post stolen credit card

---

[6] For example, an individual rushed to the hospital for a heart condition may be denied lifesaving drugs because someone else using his medical record is allergic to that drug. A healthy individual with no health problems could be rated a higher premium for his health insurance because someone using his medical identity has a slew of health problems. http://www.kptv.com/clip/10937544/thieves-stealing-medical-identities

[7] Companies, in fact, also recognize PII/PHI as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand created a software application that values a person's identity on the black market. Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html; *see also* T. Soma, *et al, Corporate Privacy*

numbers, Social Security numbers and other PII/PHI directly on various Internet websites,

thereby making the information publicly available.

30.     In one study, researchers found hundreds of websites displaying stolen PII/PHI.

Strikingly, none of these websites were blocked by Google's safeguard filtering mechanism—the

"Safe Browsing list." The study concluded:

> It is clear from the current state of the credit card black-market that cyber criminals
> can operate much too easily on the Internet. They are not afraid to put out their email
> addresses, in some cases phone numbers and other credentials in their advertisements.
> It seems that the black market for cyber criminals is not underground at all. In fact,
> it's very "in your face."[8]

31.     "[H]ealth information is far more valuable than Social Security numbers" on the

cyber black market according to Dr. Deborah Peel, founder and chairwoman of Patient Privacy

Rights.[9] An ABC News search uncovered one internet seller offering medical record database

dumps for $14 to $25 per person. ABC News was then sent, unsolicited, 40 individuals' private

health information, including their names, addresses and body mass index. Another inquiry

yielded an offer of more than 100 records including everything from Social Security numbers to

whether someone suffered from anxiety, hypertension, and their HIV status. Plaintiff's and Class

Members' PII/PHI would similarly be valued and traded on the cyber black market.

32.     Plaintiff has standing because as a direct and/or proximate result of Defendant's

wrongful actions and/or inaction and the resulting data breach, Plaintiff has incurred (and will

continue to incur) harm in the form of, *inter alia*, (i) loss of privacy, (ii) out-of-pocket expenses

---

*Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009).

[8] http://www.stopthehacker.com/2010/03/03/the-underground-credit-cardblackmarket/.

[9] http://abcnews.go.com/Health/medical-records-private-abc-newsinvestigation/story? id=17228986&page =2#.UGRgtq7yBR4.

to purchase credit monitoring, internet monitoring, identity theft insurance and/or other data breach risk mitigation products, (iii) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the data breach, and/or (iv) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the data breach.

33.    As a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting data breach, Plaintiff and Class Members also have been deprived of the value of their PII/PHI, for which there is a well-established national and international market.[10]

34.    For example, stolen PII/PHI is sold on the cyber black market for $14 to $25 per medical record to (i) individuals needing or wanting a new identity or healthcare, or focused on committing fraud, (ii) medical service providers, medical device manufacturers and drug manufacturers for targeted marketing and advertising campaigns for their products and services, and (iii) health insurers for targeted marketing and advertising campaigns for their health insurance products and to monitor their insureds' medical conditions for purposes of adjusting their health insurance premiums. These companies use Plaintiff's and Class Members' own wrongfully disclosed PII/PHI (including the data of minors) to market medical products and services to Plaintiff and Class Members and invade the privacy of Plaintiff and Class Members to monitor their personal situations.

35.    Aside from the criminal element, frequent purchasers of purloined PHI include pharmacies, drug manufacturers, medical device manufacturers, hospitals and insurance companies who use the information to market their products and services directly to the data

---

[10] *Id.; see also* Soma, *supra* ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.").

breach victims and/or to adjust the victims' medical insurance premiums. Plaintiff and Class Members, not data thieves, should have the right to sell their PII/PHI (should they choose) to these "non-criminal" third parties and receive the corresponding financial benefits.

36.    Additionally, as a result of Defendant's failure to follow contractually-agreed upon, federally-prescribed, industry standard security procedures, Plaintiff and Class Members received a diminished value of the services they paid Defendant to provide. Upon information and belief, a portion of the fees paid by Plaintiff and Class Members to Defendant is for the provision of healthcare-related services, such as data management and data security. In fact, Defendant wrote to Plaintiff and informed her that "[m]aintaining information security is part of our commitment to providing high quality and safe healthcare for children." The Plaintiff and Class Members who purchased their health care from Defendant contracted for a service that included a guarantee by Defendant to safeguard and protect their PII/PHI, but instead, received services devoid of these important protections. Despite failing to implement or inadequately implementing policies to safeguard and protect their PII/PHI, Defendant has the beneficial use and enjoyment of the full amount of the service fees without providing the full complement of promised services.

37.    Defendant's wrongful actions and/or inaction and the resulting data breach have also placed Plaintiff and Class Members at an imminent, immediate and continuing increased risk of identity theft, identity fraud and medical fraud. Indeed, Javelin Strategy & Research ("Javelin"), a leading provider of quantitative and qualitative research, released its 2012 Identity Fraud Report ("the Javelin Report"), quantifying the impact of data breaches. According to the Javelin Report, individuals whose PII/PHI is subject to a reported data breach—such as the one at issue here—are approximately 9.5 times more likely than the general public to suffer identity

fraud and/or identity theft. Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported, and a high probability that criminals who may now possess Plaintiff's and Class Members' PII/PHI and not yet used the information will do so at a later date or re-sell it.

38.     Accordingly, Plaintiff and Class Members seek redress against Defendant for, *inter alia*, violations of common law torts, breach of an implied-in-fact contract, violations of various state consumer statutes, including the Maryland Consumer Protect Act (MD Code Ann. §13-301 *et seq.*), the D.C. Consumer Protection Procedures Act (D.C. Code §28-3901, *et seq.*), the Virginia Health Records Privacy Act (Va. Code. Ann. § 32.1-127.1.1:03), Maryland Medical Records Act Health-General Article §4-301 *et seq*, and unjust enrichment.

39.     Plaintiff, therefore, on behalf of herself and Class Members, seek (i) actual and other economic damages, nominal damages, statutory damages, liquidated damages and/or treble damages, (ii) punitive damages, (iii) injunctive relief, (iv) declaratory relief,  and (v) attorneys' fees, litigation expenses and costs of suit.

*Legal Landscape*

40.     In marketing to Plaintiff and the Class, Defendant pledges, in its Notice of Privacy Practices and Patient Bill of Rights effective October 1, 2014, to maintain the privacy of its members' PII/PHI pursuant to its obligations under federal law, including the Health Information Portability and Accountability Act ("HIPAA").  In the Notice of Privacy Practices and Patient Bill of Rights, Defendant also states that they are required by HIPAA to do the following: (i) Make sure your private information is kept private (ii) Give you this Notice that

explains how we use your information (iii) Do what we say in this Notice (iv) Tell you about any changes we make to the information in this Notice.[11]

41.     In marketing to Plaintiff and the Class, Defendant pledges, *in its Notice of Privacy Practices and Patient Bill of Rights effective October 1, 2014*, to maintain the privacy of its members' PII/PHI pursuant to its obligations under federal law, including the Health Information Portability and Accountability Act ("HIPAA"). *In the Notice of Privacy Practices and Patient Bill of Rights,* Defendant also states that they are required by HIPAA to do the following: (i) Make sure your private information is kept private (ii) Give you this Notice that explains how we use your information (iii) Do what we say in this Notice (iv) Tell you about any changes we make to the information in this Notice.

42.     The Notice of Privacy Practices, further describes **how we can use our patient's private health information, how it can be shared, the safeguards we have in place to protect the information,** your rights of access, and the requirements we have to follow as a provider of health care. (Emphasis added)

43.     Moreover, in the Acknowledgement of the Receipt of this Notice, it states that: **You will be given a Notice** when you come to Children's National, on your first visit. Our intent is to **make you aware of the possible uses and disclosures of your child's protected health information** and **your privacy rights.** (Emphasis added)

44.     Under, "Who Will Follow this Notice of Privacy Practices?," Defendant states" "**Children's National Health System** (Children's National, including all corporate entities, **the hospital,** and off-site locations, **its employees, contractors, and volunteers**, will comply with the protections of privacy as described in this Notice." (Emphasis added)

---

[11] http://childrensnational.org/~/media/cnhs-site/files/about/notice-of-privacy.ashx?la=en

45. Defendant further defines Protected Health Information (PHI) as "individually identifiable health information. This information **includes demographics** (such as your child's name, address, age, or phone number) and **medical care information** (such as the name of an illness, health services we provide, or your child's medications)" and promises that "**Past, present, and future information is protected.**" Emphasis added.

46. Defendant admits that under HIPAA, it is required to:

* Make sure your private information is kept private.

* Give you this Notice that explains how we use your information.

* Do what we say in this Notice.

* Tell you about any changes we make to the information in this Notice.

47. Defendant also discuss a few examples that it considers permitted uses and disclosure of information (i.e. disclosing child's information to the parents, disclose the child's treatment with other physicians to coordinate care etc. It does not include lax security and training allowing unauthorized access to PII and PHI.

48. Under "What are Your **Patient Rights**?" Defendant states that patients have

a. The right to request a report of each time your child's health information has been shared with anyone other than for uses related to treatment, payment or healthcare operations as described in this Notice.

b. The right to be notified upon a breach of any of your child's unsecured protected health information.(…)We will notify you if your child's protected information has been breached as required by state and federal law.

c. The right to file a complaint if you believe your child's unsecured protected health info

49.     HIPAA's Security Rules set out a list of business processes and technical requirements that Defendant must follow to ensure the security of private healthcare information, including (i) administrative safeguards to manage security measures and conduct of personnel that access, view, process and distribute electronic protected health information, (ii) physical safeguards which includes protecting physical equipment and related buildings from physical intrusions, and (iii) technical safeguards which includes protecting, controlling and monitoring access to information.[12]

50.     In addition, the Health Information Technology for Economic and Clinical Health Act (HITECH), part of the 2009 American Recovery and Reinvestment Act, requires healthcare organizations to ensure that patient information in health records is unusable, unreadable, or indecipherable to unauthorized individuals.

51.     In August 2009, the U.S. Department of Health and Human Services (HHS) published an interim final rule requiring either encryption or destruction to ensure the security of health records.[13]

*Climate of medical data breach*

52.     Recently, there has been a rash of attacks on hospitals, including children's hospitals.  Sadly Children's Hospital in San Diego experienced a data breach between July 1, 2012 and June 30, 2013 that reportedly affected 14,121 patients. Lucile Packard Children's Hospital at Stanford reported two data breaches in one year. One breach in January of 2014 that affected 57,000 patients and another breach between May 2, 2014 and May 8, 2014 that affected

---

[12] http://www.hhs.gov/ocr/privacy/hipaa/administrative/securityrule/security101.pdf.

[13] http://www.gpo.gov/fdsys/pkg/FR-2009-08-24/pdf/E9-20169.pdf.

13,000 patients. Boston Children's Hospital's data breach in May of 2012 affected more than 2,100 patients. Boston Children's Hospital agreed to settle allegations related to the data breach.

53.     Defendant knew, or should have known, that its information security was at risk yet took no steps to ensure data safety until *after* the data breach. According to the letter sent to patients after the data breach, Children's National re-enforced the educational training staff receive regarding phishing or suspicious emails. They also implemented enhancements to the existing technical safeguards and initiated a review of the systems to further protect patient information.

54.     The data breach was a direct and/or proximate result of Defendant's ongoing failure to implement and maintain appropriate and reasonable security procedures and practices to safeguard and protect Plaintiff's and Class Members' PII/PHI from unauthorized access, destruction, use, modification and/or disclosure, as required by various state regulations and industry practices.

55.     Upon information and belief, Defendant was fully aware of recurring, systemic and fundamental deficiencies in its information security procedures, but has failed and refused to remedy the situation and properly safeguard and protect the PII/PHI in its custody and control— including Plaintiff's and Class Members' PII/PHI.

*The notice letter was untimely and misleading*

56.     The February 16, 2015 letter came approximately 6 weeks after Defendant first learned of the data breach that started five months prior.

57.     Defendant's lax security and oversight meant that thieves had access to Plaintiff's records for a full five months before Plaintiff was alerted. Plaintiff was alerted nearly seven months after the breach first occurred.

58.     In this intervening seven months, neither Plaintiff, nor the Class, had any reason to be monitoring their credit reports or medical identity for suspicious activity.

59.     Defendant's untimely and inadequate notification—including their failure to provide Plaintiff and Class Members with any meaningful protection or relief from the data breach— substantially increased Plaintiffs' and Class Members' risk of identity theft, identity fraud and/or medical fraud.

60.     Defendant placed the burden on Plaintiff to address the wrongs perpetrated by Defendant's actions and inactions. Defendant failed to provide any monitoring as a means of mitigating the harm and placed the burden on Plaintiff and Class Members to do so.

61.     Under federal law (the Fair Credit Reporting Act) only one credit report per year is free to the consumer. Thereafter, each request costs consumers between $5.00 and $12.00.[14]

62.     Third party credit monitoring services can run between $13.00 and $40.00 a month.[15]

63.     Third party medical identity monitoring services can run between $14.00 and $16.00 per month.

64.     According to the Javelin Report, in 2011, the mean consumer cost of rectifying identity fraud was $354 while the mean resolution time of identity fraud was 12 hours. *Id.* at 6. In 2011, the consumer cost for new account fraud and existing non-card fraud increased 33% and 50% respectively. *Id.* at 9. Consumers who received a data breach notification had a fraud incidence rate of 19% in 2011 and, of those experiencing fraud, 43% reported their credit card

---

[14] http://www.transunion.com/personal-credit/customer-support/faqs/credit-reports-and-disclosures.page and http://www.consumerfinance.gov/askcfpb/1281/how-much-does-it-cost-get-copy-my-credit-report-if-ive-already-received-all-my-free-credit-reports.html

[15] http://personalfinance.costhelper.com/credit-report.html

numbers were stolen and 22% of the victims reported their debit card numbers were stolen. *Id.*at 10. More important, consumers who were notified that their PII/PHI had been breached were 9.5 times more likely to experience identity fraud than consumers who did not receive such a notification. *Id.* at 39.

65.     Victims and potential victims of identity theft, identity fraud and/or medical fraud—such as Plaintiffs and Class Members—typically spend hundreds of hours in personal time and hundreds of dollars in personal funds to resolve credit and other financial issues resulting from data breaches. See Defend: Recover from Identity Theft, http://www.ftc.gov/bcp/edu/microsites/idtheft//consumers/defend.html; Fight Identity Theft, www.fightidentitytheft.com. According to the Javelin Report, not only is there a substantially increased risk of identity theft and identity fraud for data breach victims, those who are further victimized by identity theft or identity fraud will incur an average fraud-related economic loss of $1,513 and incur an average of $354 of out-of-pocket expenses attempting to rectify the situation. *Id.* at 6.

66.     The letter also was misleading in that it provided vague descriptions of what was stolen and falsely implied that there was no risk from the data breach.

67.     However, as discussed above, leading industry authorities peg the risk as at least a 9.5 times increased risk of identity theft and medical fraud.

68.     Other statistical analyses are in accord with Javelin. The GAO found that identity thieves use PII/PHI to open financial accounts and payment card accounts and incur charges in a victim's name. This type of identity theft is the "most damaging" because it may take some time for the victim to become aware of the theft, in the meantime causing significant harm to the

victim's credit rating and finances. Moreover, unlike other PII/PHI, Social Security numbers are incredibly difficult to change and their misuse can continue for years into the future.

69.     Identity thieves also use Social Security numbers to commit other types of fraud, such as obtaining false identification cards, obtaining government benefits in the victim's name, committing crimes and/or filing fraudulent tax returns on the victim's behalf to obtain fraudulent tax refunds. Identity thieves also obtain jobs using stolen Social Security numbers, rent houses and apartments and/or obtain medical services in the victim's name. Identity thieves also have been known to give a victim's personal information to police during an arrest, resulting in the issuance of an arrest warrant in the victim's name and an unwarranted criminal record. The GAO states that victims of identity theft face "substantial costs and inconvenience repairing damage to their credit records," as well the damage to their "good name."

70.     The unauthorized disclosure of a person's Social Security number can be particularly damaging since Social Security numbers cannot be easily replaced like a credit card or debit card. In order to obtain a new Social Security number, a person must show evidence that someone is using the number fraudulently or is being disadvantaged by the misuse. *See* Identity Theft and Your Social Security Number, SSA Publication No. 05-10064, October 2007, ICN 46327 (http://www.ssa.gov/pubs/10064.html). Thus, a person whose PII/PHI has been stolen cannot obtain a new Social Security number until the damage has already been done.

71.     Obtaining a new Social Security number also is not an absolute prevention against identity theft. Government agencies, private businesses and credit reporting companies likely still have the person's records under the old number, so using a new number will not guarantee a fresh start. For some victims of identity theft, a new number may actually create new problems.

Because prior positive credit information is not associated with the new Social Security number, it is more difficult to obtain credit due to the absence of a credit history.

72.     Plaintiff and Class Members were thus not only injured as a result of the increased risk of identity theft, identity fraud and/or medical fraud to which they are now subjected, but have also been injured by virtue of the materially misleading statements downplaying the seriousness of the data breach.

*The Harm Defendant Perpetrated on Plaintiff and Class Members*

73.     As discussed above, Defendant flagrantly disregarded and/or violated Plaintiff's and Class Members' privacy rights, and harmed them in the process, by not obtaining their prior written consent to disclose their PII/PHI to any other person as required by HIPAA, HITECH, and other pertinent state laws and regulations, industry standards and/or internal company standards.[16]

74.     Defendant flagrantly disregarded and/or violated Plaintiff's and Class Members' privacy rights, and harmed them in the process, by failing to (a) safeguard and protect and, in fact, wrongfully disseminating their PII/PHI to the world; (b) keep or maintain an accurate accounting of the PII/PHI wrongfully disclosed in the data breach; and (c) establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' PII/PHI to protect against anticipated threats to the security or integrity of such information.

75.     Defendant's security deficiencies allowed individuals to access, remove from its systems, transport, disclose and/or compromise the PII/PHI of thousands of patients.  Its unwillingness or inability to establish and maintain the proper information security procedures

---

[16] *See also* http://childrensnational.org/~/media/cnhs-site/files/careers-and-training/physicians/ gme/residency/orientation_booklet_revised__fy13.ashx?la=en

and controls is an abuse of discretion and confirms their willful failure to observe procedures required by law, industry standards and/or their own internal policies and procedures.

## CLASS ALLEGATIONS

76.     Pursuant to Rule 2-231 of the Maryland Rules of Civil Procedure, Plaintiffs bring this action against Defendant as a class action on behalf of herself and all members of the following class of similarly situated individuals:

> All natural persons who were sent a letter by Defendant regarding the data breach wherein Social Security numbers, addresses, telephone numbers, medical diagnoses, medical treatment information, medical record numbers, diagnoses codes and other highly confidential and private personally identifying information and personal health information (PII/PHI) were accessed from July 26, 2014 to and through December 26, 2014. Excluded from the Class are Defendant, any entity in which any Defendant has a controlling interest, Defendant's officers, directors, agents and legal representatives, the Court and Court personnel.

77.     Certification of Plaintiff's claims for class-wide treatment is appropriate because she can prove the elements of her claims on a class-wide basis using the same exclusive and common evidence as would be used to prove those elements in individual actions alleging the same claims.

78.     All members of the proposed classes are readily ascertainable. Defendant has access to addresses and other contact information for all members of the Class, which can be used for providing notice to many class members.

79.     **Numerosity.** The class is so numerous that joinder of all members would be impracticable. While the precise number of class members has not yet been determined, Defendant has admitted that about 18,000 potential victims were either affected by or notified of the data breach.

80.     **Commonality**. Questions of law and fact common to all Class members exist and predominate over any questions affecting only individual Class members, including, but not limited, to the following:

i.   Whether Defendant adequately designed, adopted, implemented, controlled, directed, oversaw, managed, monitored and/or audited the appropriate data security processes, controls, policies, procedures and/or protocols to safeguard and protect Plaintiff's and Class Members' PII/PHI disclosed without authorization in the data breach;

ii.  Whether the Defendant's failure to properly safeguard and protect Plaintiff's and Class Members' PII/PHI was willful, reckless, arbitrary, capricious and/or otherwise not in accordance with the applicable protocols, procedures, guidelines, laws and/or regulations;

iii. Whether Defendant failed to inform Plaintiff and Class Members of the data breach and the unauthorized disclosure of their PII/PHI in a manner and within the time period required by their own internal policies and procedures and/or the applicable laws;

iv.  Whether Defendant's actions and/or inaction that caused the data breach and the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI violated the applicable laws;

v.   Whether Plaintiff's and Class Members were harmed by Defendant's actions and/or inaction that caused the data breach and the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI; and

vi.   Whether Plaintiff's and Class Members suffered damages as a direct result of

Defendant's actions and/or inaction that caused the data breach and the

unauthorized disclosure of Plaintiff's and Class Members' PII/PHI.

81.   **Typicality**. Plaintiff's claims are typical of the claims of the Class. Plaintiff and

all Class members were injured through Defendant's actions and inactions and their claims are

identical to those that give rise to the claims of every other Class member because Plaintiff and

Class member is a person that has suffered harm as a direct result of the same conduct engaged

in by Defendant and resulting in the Defendant data breach.

82.   **Adequacy**. Plaintiff and her counsel will fairly and adequately represent the

interests of the Class members. Plaintiff has no interest antagonistic to, or in conflict with, the

interests of the Class members. Plaintiff's lawyers are highly experienced in the prosecution of

consumer class actions and complex commercial litigation.

83.   **Superiority**. A class action is superior to all other available methods for fairly

and efficiently adjudicating the claims of Plaintiffs and the Class members. Plaintiff and the

Class members have been harmed by Defendant.  A class action provides methods for fairly and

efficiently adjudicating the claims of Plaintiffs and the Class members.

84.   A class action is an appropriate method for the fair and efficient adjudication of

this controversy. There is no special interest in the members of the Class individually controlling

the prosecution of separate actions. The loss of money and other harm sustained by many

individual Class members will not be large enough to justify individual actions, especially in

proportion to the significant costs and expenses necessary to prosecute this action. The expense

and burden of individual litigation makes it impossible for many members of the Class

individually to address the wrongs done to them. Class treatment will permit the adjudication of

claims of Class members who could not afford individually to litigate their claims against Defendant. Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single form simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

85.     Class certification, therefore, is appropriate under Rule 2-231(a) and (b)(3). The above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

86.     Class certification is also appropriate under Rule 2-231(a) and (b)(2), because Defendant has acted or has refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

87.     The expense and burden of litigation will substantially impair the ability of Plaintiffs and Class members to pursue individual lawsuits to vindicate their rights. Absent a class action, Defendant will retain the benefits of its wrongdoing despite its serious violations of the law.

## COUNTS

**One: Violation of §13-301 *et seq.* of the Maryland Commercial Law Code: The Maryland Consumer Protections Act**

88.　　Defendant engaged in unfair practices ad defined by Md. Code, Comm. Law § 13-303 by seeking PHI and PII from Plaintiff, and the Class, while failing to provide adequate security measures to protect same while in its custody.

89.　　This practice is unfair as it causes Plaintiff, and the Class, substantial injury in that criminals now have access to their PHI and PII.

90.　　There are no countervailing benefits to the consumers from the theft of their PHI and PII. In fact, there is only detriment to consumers.

91.　　Plaintiff and the Class could not have reasonably avoided the theft as Defendant was in control over its (albeit lax) data security parameters and its employee training.

92.　　Plaintiff and the Class are therefore entitled to recover for injury or losses sustained as a result of the unfair practice.

93.　　Plaintiff seek equitable relief, in the form of future credit and medical identity monitoring, recovery of damages for out-of-pocket expenditures spent in mitigation, attorneys fees and costs of this suit.

**Two: D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code §28-3901, *et seq.***

94.　　D.C. Code § 28-3904 makes it an unlawful trade practice "whether or not any consumer is in fact misled, deceived or damaged thereby," to,:

(a)　　represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;

(d)　　represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(h)     advertise or offer goods or services without the intent to sell them
as advertised or offered;

95.     Defendant, by the facts alleged herein, represented that its services complied with

data security measures mandated by industry and federal standards, and thus had a certain

characteristic, quality or standard, without an intent or ability to provide the services as offered.

96.     Moreover, the CPPA also recognizes the violation of other District of Columbia

laws to serve as a predicate violation. Therefore, Defendant's violations of HIPPA, HITECH,

and the other common law causes of action also serve as a violation of the CPPA.

97.     Plaintiff, and the Class, hereby seek restitution, equitable and injunctive relief,

and treble damages or statutory damages in the amount of $1,500 per violation, whichever is

greater, pursuant to D.C. Code § 28-3905(k)(2).  Plaintiff and the Class further seek reasonable

attorneys' fees and costs plus interest.

**Three: Common Law Negligence**

98.     Defendant had a duty to exercise reasonable care in safeguarding and protecting

Plaintiff's and Class Members' PII/PHI.

99.     Defendant had (and continues to have) a duty to use ordinary care in activities

from which harm might be reasonably anticipated (such as in the storage and transfer of private,

nonpublic PII/PHI within its possession, custody and control), as well as an affirmative duty

expressly imposed upon Defendant from other sources as enumerated herein.

100.    Defendant had a duty to hire and supervise trustworthy employees, as well as to

design, adopt, implement, control, direct, oversee, manage, monitor and/or audit appropriate data

security processes, controls, policies, procedures and/or protocols of their agents in order to

safeguard and protect the PII/PHI entrusted to them—including Plaintiff's and Class Members'

PII/PHI.

101.    As described above, Defendant's duty arise from, inter alia, FTC standards, HIPAA, HITECH, state data protection statutes and/or its contract with Plaintiff.

102.    The standards and duties outlined above are for the express purpose of protecting Plaintiff's, Class Members and their PII/PHI.

103.    Defendant violated these standards and breached duties by failing to exercise reasonable care by failing to safeguard and protect Plaintiff's and Class Members' PII/PHI.

104.    It was reasonably foreseeable that Defendant's failure to exercise reasonable care in safeguarding and protecting PII/PHI would result in an unauthorized third party gaining access to such information and disseminating such information to the world for no lawful purpose.

105.    Defendant, by and through its above negligent actions and/or inaction, unlawfully breached its duties to Plaintiff and Class Members by, among other things, failing to exercise reasonable care in safeguarding and protecting their PII/PHI within its possession, custody and control.

106.    Defendant, by and through its above negligent actions and/or inaction, further breached its duties to Plaintiff and Class Members by failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit its processes, controls, policies, procedures and protocols for complying with the applicable laws and safeguarding and protecting Plaintiff's and Class Members' PII/PHI within its possession, custody and control.

107.    The third party access was without Plaintiff's and Class Members' authorization or consent.

108.    But for Defendant's negligent and wrongful breach of its duties owed to Plaintiff and Class Members, their PII/PHI would not have been disseminated to the world and compromised.

109.    Plaintiff's and Class Members' PII/PHI was compromised, viewed, and/or stolen as the direct and/or proximate result of Defendant's failure to design, adopt, implement, control, direct, oversee, manage, monitor and audit its processes, controls, policies, procedures and protocols for complying with the applicable laws and safeguarding and protecting Plaintiff's and Class Members' PII/PHI within its possession, custody and control.

110.    Plaintiff and Class Members suffer (and continue to suffer) damages as a direct and/or proximate result of Defendant's failure to secure and protect their PII/PHI in the form of, *inter alia*, (i) loss of privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other data breach risk mitigation products, (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the data breach, (v) the value of their time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the data breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vii) the diminished value of the services they paid Defendant to—for which they are entitled to compensation.

111.    Defendant's wrongful actions and/or inaction (as described above) constituted (and continue to constitute) negligence and negligence per se under common law.

**Four: Breach of Implied Contract**

112.    In order to benefit from their underlying healthcare services, Plaintiff and Class Members must provide their PII/PHI to Defendant.

113.    Defendant benefits from receiving and storing Plaintiff's and Class Members' PII/PHI electronically as it can more economically process health claims and provide related services.

114.    By providing their PII/PHI to Defendant, and upon Defendant's acceptance of such information, Plaintiff and Class Members, on the one hand, and Defendant, on the other hand, entered into implied contracts pursuant to which Defendant was (and continues to be) obligated to take reasonable steps to safeguard and protect Plaintiff's and Class Members' PII/PHI.

115.    Implicit in the implied contract between the parties is a covenant requiring Defendant to take reasonable efforts to safeguard and protect PII/PHI and promptly notify them in the event their information is wrongfully disseminated, lost and/or compromised.

116.    Notwithstanding the obligations imposed on Defendant by its implied contract with Plaintiff and Class Members, Defendant knowingly breached the contract and failed to safeguard and protect the PII/PHI by, *inter alia*:

a.    failing to protect the databases containing Plaintiff's and Class Members' PII/PHI;

b.    failing to ensure the confidentiality and integrity of Plaintiff's and Class Members' PII/PHI it created, received, maintained and/or transmitted in violation of 45 CFR §164.306(a)(1);

c.    failing to implement technical policies and procedures for electronic information systems that maintain electronic PII/PHI in a manner that only allows access to persons and/or software programs with valid access rights in violation of 45 CFR §164.312(a)(1);

    d.   failing to implement policies and procedures to prevent, detect, contain and/or correct security violations in violation of 45 CFR §164.308(a)(1);

    e.   failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic PII/PHI in violation of 45 CFR 164.306(a)(2);

    f.   failing to protect against reasonably anticipated uses or disclosures of electronic PII/PHI that are not permitted under the privacy rules regarding PII/PHI in violation of 45 CFR §164.306(a)(3);

    g.   failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 CFR §164.306(a)(94);

    h.   impermissibly and improperly using and disclosing PII/PHI to unauthorized persons in violation of 45 CFR §164.502 et seq.;

    i.   failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures pertaining to safeguarding and protecting PII/PHI in violation of 45 CFR §164.530(b) and 45 C.F.R. §164.308(a)(5);

    j.   failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit its processes, controls, policies, procedures and protocols for complying with the applicable laws and safeguarding and protecting Plaintiff's and Class Members' PII/PHI entrusted to it in compliance with 45 CFR §164.530(c); and

    k.   otherwise failing to safeguard and protect Plaintiff's and Class Members' PII/PHI.

117.   As a direct and/or proximate result of Defendant's wrongful actions and/or inaction that breached its implied contract with Plaintiff and Class Members, Plaintiff and Class Members have suffered (and will continue to suffer) damages in the form of, *inter alia*, (i) loss of

privacy, (ii) the imminent, immediate and continuing increased risk of identity theft, identity

fraud and/or medical fraud, (iii) out-of-pocket expenses to purchase credit monitoring, internet

monitoring, identity theft insurance and/or other data breach risk mitigation products, (iv) out-of-

pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or

medical fraud pressed upon them by the data breach, (v) the value of their time spent mitigating

the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the

data breach, (vi) deprivation of the value of their PII/PHI, for which there is a well-established

national and international market, and/or (vii) the diminished value of the services they paid

Defendant —for which they are entitled to compensation.

**Five: Unjust Enrichment**

118.   Plaintiff and Class Members conferred a monetary benefit on Defendant in the

form of a portion of the payments they made for the medical services.

119.   Defendant appreciated (and continues to appreciate) such monetary benefit.

120.   A portion of the payments made by Plaintiff and Class Members was used to pay

for the administrative costs of electronic data management services and cyber security services.

121.   In light of the data breach, and under principles of equity and good conscience,

Defendant should not be permitted to retain that portion of the payments made by Plaintiff and

Class Members supposedly used to pay for the administrative costs of electronic data

management services and cyber security services that Defendant, in fact, failed to provide.

122.   Accordingly, Plaintiff, on behalf of herself and the Class Members, seek to

impose a constructive trust over (and recover) all amounts by which Defendant has been (and

continues to be) unjustly enriched. Plaintiff and Class Members are entitled to restitution and/or

the disgorgement of Defendant's ill-gotten gains pursuant to common law.

**Six: Invasion of Privacy**

123.    The acts allege herein constitute an unreasonable intrusion upon the seclusion of Plaintiff and the putative Class.

124.    The acts alleged herein allowed unauthorized third parties to appropriate Plaintiff's, and the putative Class's, name, identity and medical identity.

125.    The data breach has unreasonably given publicity to Plaintiff's, and the putative Class's, private life, medical diagnoses and treatment.

126.    As a proximate result of the invasive acts, Plaintiff and the putative Class have suffered economic and pecuniary damages, emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays for judgment against the Defendant, and in favor of Plaintiffs and grant the following relief:

A) Compensatory, statutory and punitive damages as permitted by law;

B) Equitable relief in the form of improved training and security protocols and the provision of credit, medical data and internet monitoring services;

C) Recovery of costs of this action, including attorney's fees;

D) Certification of this case as a class action;

E) Granting such other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

June 1, 2015                    Respectfully submitted,

                               REZVANI VOLIN, P.C.

                               By: /s/ *Tracy D. Rezvani*
                               Tracy D. Rezvani (#464293)
                               1050 Connecticut Avenue, N.W.
                               Tenth Floor
                               Washington, D.C. 20036
                               Tel: (202) 350-4270 x101
                               Fax: (202) 351-0544
                               trezvani@rezvanivolin.com

                               Kevin I. Goldberg
                               **Goldberg, Finnegan & Mester, LLC**
                               8401 Colesville Road
                               Suite 630
                               Silver Spring, Maryland 20910
                               Tel: (301) 589-2999 ext. 102
                               Fax: (301) 589-2644
                               kgoldberg@gfmlawllc.com

                               Mila F. Bartos
                               **Finkelstein Thompson LLP**
                               James Place
                               1077 30th Street, N.W., Suite 150
                               Washington, D.C. 20007
                               Tel: (202) 337-8000
                               mbartos@finkelsteinthompson.com

## CERTIFICATE OF SIGNING ATTORNEY

I, Tracy D. Rezvani, pursuant to Rule 1-313, I certify that that I am admitted to practice

law in this State.