**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

| | |
|---|---|
| FARDOES KHAN, *et al.*,<br><br>                        Plaintiffs,<br><br>      vs.<br><br>CHILDREN'S NATIONAL HEALTH SYSTEM,<br><br>                  Defendant. | Case No. 8:15-CV-02125-TDC<br><br>Judge Theodore D. Chuang |

## <u>DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS</u>

### INTRODUCTION

Plaintiff filed this lawsuit after receiving notification that the email accounts of certain Children's National Health System ("CNHS") employees were compromised. The accounts were compromised as a result of a phishing attack in which the employees were tricked into providing information to third party criminals sufficient to gain access to their email accounts. Emails in the affected accounts contained personally identifiable and/or medical information relating to CNHS patients, and access to those accounts created the possibility that unauthorized persons could also access this personally identifiable information. Plaintiff alleges that she was notified that she was one of the patients whose information may have been compromised. Plaintiff attempts to assert six causes of action in her Complaint against CNHS: a Maryland Consumer Protection Act claim; a D.C. Consumer Protection Procedures Act claim; common law negligence; breach of implied contract; unjust enrichment; and invasion of privacy.

Plaintiff does not allege, nor can she, that she—or anyone else—has suffered identity theft, fraud, or any other loss as a result of the data breach, or that her—or anyone else's— personal information was improperly accessed during the data breach. Instead, all of Plaintiff's

claims and legal theories turn on allegations of possible future identity theft or other future harm. As numerous courts have held, the inability to allege any actual injury resulting from the incident leaves Plaintiff unable to meet the injury-in-fact requirement needed to support standing.

Plaintiff has also failed to plead facts sufficient to satisfy essential elements of each of her causes of action. CNHS's alleged conduct in failing to prevent a phishing attack by third party criminals is not a "trade practice," nor does it constitute misleading conduct of the type that could constitute a violation of the consumer protection statutes of Maryland and the District of Columbia. Plaintiff has also failed to plead facts sufficient to satisfy her other common law claims for negligence, breach of implied contract, unjust enrichment, and invasion of privacy.

Although there are equally meritorious grounds for dismissal under Rule 12(b)(1) for lack of standing and under Rule 12(b)(6) for failure to state a claim, CNHS requests that the Court evaluate the motion on both grounds and enter a dismissal *with* prejudice.

## STATEMENT OF ALLEGED FACTS

In February 2015, CNHS notified approximately 18,000 patients of a data security incident involving certain CNHS employees' individual email accounts. Shortly thereafter, Plaintiff filed this lawsuit, alleging that she is one of the 18,000 patients who received a notice letter. (*See, e.g.,* Compl. ¶¶ 5, 9, 13-17, 53, 56-60, 76.)

Plaintiff does not allege any source of knowledge regarding the scope, cause, or effect of the incident other than the information in the notice letter. Notwithstanding the notice letter's central role as both the impetus and source of allegations for this lawsuit, Plaintiff did not attach a copy of the notice letter to her Complaint. Because Plaintiff has clearly incorporated the letter

by reference into her Complaint, CNHS attaches a true and correct copy of the notice letter to this brief as Exhibit A.[1]

As described in the notice letter, certain CNHS employees responded to "phishing" emails, which are scam emails designed to look legitimate.  (Ex. A at 1; Compl. ¶ 13 n. 1.)  By responding to the phishing emails, the CNHS employees inadvertently "may have created an opportunity for unauthorized access to [their] individual email accounts from July 26, 2014 to December 26, 2014."  (Ex. A. at 1.)

Upon learning of this incident, CNHS "secured the affected email accounts . . . and began an investigation into the phishing attack . . . including hiring an outside expert forensics firm." (Ex. A at 1.)  The investigation found that, while some emails in the affected email accounts "may have included" some patients' personal or medical information, there was "no evidence that the information in the emails has been misused or even accessed."  (Ex. A at 1.)  The investigation also found that "neither patient charts nor [CNHS's] medical records system were compromised."  (Ex. A at 1.)  In other words, "[o]nly the discrete information contained in the [compromised] email accounts was potentially affected," and the investigation turned up no evidence that it actually was affected.  (Ex. A. at 1.)

Nonetheless, "as a precaution," CNHS provided a phone number for patients to call with questions regarding the data breach and recommended that patients regularly review their insurance statements for irregularities.  (Ex. A at 1.)  CNHS also reported the criminal phishing attack to appropriate law enforcement authorities.  (Ex. A at 1.)

---

[1] *See In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 20 and n. 2 (D.D.C. 2014) (considering notice letter on motion to dismiss in a data breach case because the complaint "relies on it heavily"); *Polanco v. Omnicell, Inc.*, 988 F. Supp. 2d 451, 469 (D.N.J. 2013) (dismissing case and not crediting allegations of lost data that were "directly contradicted by the December 31, 2012 [notice] letter from [defendant]" on which complaint was based).

Plaintiff alleges that, prior to the data security incident, CNHS made statements concerning patients' privacy rights in CNHS's Notice of Privacy Practices and Patient Bill of Rights (the privacy notice). (*See* Compl. ¶¶ 40-48, 95.) CNHS attaches a true and correct copy of the privacy notice to this brief as Exhibit B.[2] The privacy notice contains numerous statements concerning CNHS's use and disclosure of patient information for certain permitted purposes, but does not address CNHS's data security measures or standards. (*See* Ex. B.)

Regarding the potential for unauthorized data breaches, the privacy notice warns that "no one can guarantee that unlawful or inappropriate use by third parties will not happen." (Ex. B. at 3.) The privacy notice also states that "[CNHS] will notify you if your child's protected information has been breached as required by state and federal law." (Ex. B. at 4.) Plaintiff does not allege CNHS made any statements concerning data security outside of the privacy notice. Plaintiff also does not allege that she ever read the privacy notice, let alone relied on it, before seeking medical services from CNHS.

Plaintiff does *not* allege any facts supporting the conclusion that she has suffered actual harm as a result of the security incident. She also does not allege that her personal or medical information or that of any other patient was improperly accessed or misused following the incident. Plaintiff also does not allege that she or any other patient experienced identity theft or any manner of medical or financial fraud, let alone as a result of the data breach incident.

---

[2] As with the notice letter, Plaintiff does not attach the privacy notice to her Complaint, despite relying heavily on both documents. By relying on the privacy notice as the basis for her consumer fraud claims, Plaintiff has incorporated the document into the Compliant by reference. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) ("We note that although the stockholders failed to attach that article to their complaint (LCI attached it to its motion to dismiss), a court may consider it in determining whether to dismiss the complaint because it was integral to and explicitly relied on in the complaint and because the plaintiffs do not challenge its authenticity.").

**ARGUMENT**

I.    **LEGAL STANDARDS.**

A.    **Dismissal for lack of Article III standing under Rule 12(b)(1).**

To satisfy Article III's standing requirements, a plaintiff has the burden to prove that "'(1) [she] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Lane v. Holder*, 703 F.3d 668, 671 (4th Cir. 2012) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). The injury-in-fact "must be concrete in both a qualitative and temporal sense." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). In other words, "[a]llegations of possible future injury are not sufficient to satisfy Article III." *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) (quotation marks and citation omitted).

A plaintiff's standing may not be "inferred argumentatively from averments in the pleadings" but rather a plaintiff must clearly "allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Spencer v. Kemna*, 523 U.S. 1, 10-11 (1998) (quotation marks and citations omitted).

B.    **Dismissal for failure to a state a claim under Rule 12(b)(6).**

A plaintiff bears the burden of pleading facts from which the court can reasonably infer that the defendant is liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must be dismissed if it does not "'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Ballard v. Bank of Am., N.A.*, 734 F.3d 308, 310 (4th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). Plausibility means "more than a sheer possibility that a defendant has acted unlawfully"—the court must be able to infer liability from the allegations

5

alone. *Iqbal*, 556 U.S. at 678. Pleading facts that could conceivably support a finding of liability is insufficient. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 547 (2007). Neither formulaic recitations of legal elements nor naked assertions devoid of factual enhancement will do. *Iqbal*, 556 U.S. at 678.

Moreover, allegations must be stated in terms that are neither vague nor conclusory. *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 220-21 (4th Cir. 1994). In considering a motion to dismiss, the Court "need not accept the legal conclusions drawn from the facts," and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (citations omitted).

## II.    PLAINTIFF HAS NOT PLED ANY COGNIZABLE INJURY.

Plaintiff has not alleged any actual injury arising from the security incident at CNHS. She does not, for example, claim to be the victim of identity theft or other fraud as a result of the misuse of any information compromised because of the incident. The inability to allege any cognizable injury prevents her from establishing the injury-in-fact element of Article III standing. Federal courts routinely hold that plaintiffs in data breach cases cannot establish a cognizable injury-in-fact without alleging actual identity theft or fraud, especially where, as here, the plaintiff does not allege that their own confidential information was even accessed during the data breach. *See, e.g., Reilly,* 664 F.3d at 43 (collecting cases).

Recognizing that she has not suffered any actual harm, Plaintiff offers several other theories of injury, all of which have been rejected by other courts.

**Increased Risk of Identity Theft Theory.** First, Plaintiff argues that the incident puts her at an "increased risk of identity theft." (Compl. ¶ 37.) However, a mere increased risk of identity theft is not enough. Instead, a plaintiff must allege that the risk of identity theft is

"certainly impending" as opposed to merely possible and speculative.  *See, e.g.*, *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 25-28 (D.D.C. 2014) (collecting cases).  Accordingly, "most courts" that have considered "whether the 'risk of future harm' posed by data security breaches confers standing on persons whose information may have been accessed . . . have held that such plaintiffs lack standing because the harm is too speculative." *Reilly,* 664 F.3d at 43 (collecting cases).  *See also In re Zappos.com, Inc.*, No. 3:12-CV-00325-RCJ-VP, 2015 WL 3466943, at *4-9 (D. Nev. June 1, 2015) (same) (collecting cases); *Galaria v. Nationwide Mut. Ins. Co.*, 998 F. Supp. 2d 646, 654-57 (S.D. Ohio 2014) (same) (collecting cases).

       In *Reilly*, a factually analogous case, the Third Circuit Court of Appeals affirmed the dismissal of a data breach case for lack of standing because the plaintiffs' claims of injury "rel[ied] on speculation that the hacker: (1) read, copied, and understood their personal information; (2) intends to commit future criminal acts by misusing the information; and (3) is able to use such information to the [plaintiffs'] detriment."  664 F.3d at 42.  The Third Circuit reasoned that "unless and until these conjectures come true, [plaintiffs] have not suffered any injury; there has been no misuse of the information, and thus, no harm."  *Id.*[3]

---

[3] A few courts have taken the minority view that a given potential future injury may be sufficient to confer Article III standing.  However, those cases are all factually distinguishable from this one, and most of them also ultimately held that the threat of future injury was not sufficient to satisfy the plaintiffs' claims on the merits in any event, and ordered dismissal on the merits instead.  *See, e.g., Krottner v. Starbucks Corp.*, 406 Fed. App'x 129, 131 (9th Cir. 2010); *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 640 (7th Cir. 2007). *See also In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 963 (S.D. Cal. 2012) ("While Plaintiffs have currently alleged enough to assert Article III standing . . . without specific factual statements that Plaintiffs' Personal Information has been misused . . . the mere danger of future harm . . . will not support a negligence action.") (California law) (quotation marks and citations omitted); *Hammond v. The Bank of New York Mellon Corp.*, No. 08 CIV. 6060 RMB RLE, 2010 WL 2643307, at *10 (S.D.N.Y. June 25, 2010) (concluding both that plaintiff lacked standing and that the claims failed on the merits).

**<u>Mitigation Expenses Theory.</u>**  Plaintiff also asserts that she has elected to incur "out-of-pocket expenses" for credit monitoring services and expend time "mitigating the increased risk of identity theft."  (Compl. ¶ 32.)  However, "costs incurred to watch for a speculative chain of future events based on hypothetical future criminal acts are no more 'actual' injuries than the alleged 'increased risk of injury' which forms the basis for [plaintiffs'] claims."  *Reilly*, 664 F.3d at 45 (collecting cases).  *See also SAIC*, 45 F. Supp. 3d at 26 (same) (collecting cases); *Zappos.com, Inc.*, 2015 WL 3466943 at *10 (same); *Galaria,* 998 F. Supp. 2d at 657-58 (same); *Storm v. Paytime, Inc.*, No. 14-CV-1138, 2015 WL 1119724, at *7 (M.D. Pa. Mar. 13, 2015) (same).  Therefore, because the alleged risk of future identity theft alleged in the complaint is not one that is "certainly impending," alleged costs incurred to mitigate that risk are also insufficient to establish an injury-in-fact.

**<u>Loss of Privacy Theory.</u>**  Plaintiff's next theory of injury is that she has suffered an abstract "loss of privacy" as a result of the compromise of her personally identifiable information.  (Compl. ¶ 32.)  This theory does not support standing because Plaintiff does not allege that anyone actually accessed or viewed her confidential information.  As the U.S. District Court for the District of Columbia held recently, "[U]ntil Plaintiffs can aver that their records have been viewed (or certainly will be viewed), any harm to their privacy remains speculative."  *SAIC*, 45 F. Supp. 3d at 28-29.  *See also Storm*, 2015 WL 1119724 at *8 (same).

**<u>"Overpayment" Theory.</u>**  Plaintiff argues that even though she has not suffered any actual financial harm as a result of the incident, CNHS's alleged failure to sufficiently protect her data from the phishing attack means that she has overpaid for medical services.  (Compl. ¶ 36.)  This "overpayment" theory has been rejected repeatedly as a basis for standing, especially when the plaintiff has not alleged to have suffered actual identity theft.  As the court in *SAIC* reasoned,

"[t]o the extent that Plaintiffs claim that some indeterminate part of their [fees] went toward paying for security measures, such a claim is too flimsy to support standing." *SAIC*, 45 F. Supp. 3d at 30; *accord Carlsen v. GameStop, Inc.*, No. CIV. 14-3131 DWF/SER, 2015 WL 3538906, at *5-6 (D. Minn. June 4, 2015); *In re Horizon Healthcare Servs., Inc. Data Breach Litig.*, No. CIV.A. 13-7418 CCC, 2015 WL 1472483, at *5 (D.N.J. Mar. 31, 2015); *Austin-Spearman v. AARP*, No. 14-CV-1288 (KBJ), 2015 WL 4555098, at *9 (D.D.C. July 28, 2015).

**Loss of Value of Personal Information Theory.**  Finally, Plaintiff argues that as a result of the phishing attack, she was "deprived of the value of her" personal and medical information. (Compl. ¶¶ 33-35.)  This theory has also been rejected by multiple courts as a basis to establish Article III standing when the Plaintiff cannot plausibly allege that she intended to sell her personal or medical information.  *See, e.g., SAIC*, 45 F. Supp. 3d at 30 (rejecting plaintiff's claim that lost value of personal or medical information that could be "sold on the cyber black market for $14 to $25 per medical record" conferred standing); *Zappos.com, Inc.*, 2015 WL 3466943 at *3 (same).  Because Plaintiff has not alleged that she intended to sell her personal or medical information to third parties, and because she has not alleged that anyone else (including the criminals who committed the phishing attack) has sold her information, she has not alleged facts sufficient to establish that she has been deprived of the economic value of her information.

## III.   PLAINTIFF HAS ALSO FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

### A.   Plaintiff Has Failed to Allege an "Unfair Trade Practice" and Has Not Alleged a Substantial Injury Sufficient to State a Claim Under the Maryland Consumer Protection Act (Count One of the Complaint).

In Count One, Plaintiff asserts an "unfair trade practice" claim under the Maryland Consumer Protection Act (MCPA).  (*See* Compl. ¶¶ 88-93.)  To state an unfair trade practice claim under the MCPA, a plaintiff must allege a "trade practice" that results in "(1) substantial

injury; (2) that is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces; and (3) it must not be the type of injury that a consumer could reasonably have avoided." *Hibdon v. Safeguard Properties*, LLC, No. CIV. PJM 14-591, 2015 WL 4249525, at *4 (D. Md. July 9, 2015) (citations omitted). [4]

Plaintiff has challenged conduct that does not qualify as a "trade practice." For purposes of the MCPA, a "trade practice" refers to the "operating policy or customary practice of [the] business." *Hibdon,* 2015 WL 4249525 at *7. In her MCPA claim, Plaintiff alleges that CNHS "engaged in unfair practices" by "failing to provide adequate security measures" to safeguard patient data. (Compl. ¶ 88.) However, Plaintiff has not alleged, and cannot plausibly allege, that an isolated instance of CNHS employees falling victim to deceptive phishing emails represents CNHS's customary practice or operating policy. *See Hibdon,* 2015 WL 4249525 at *7 ("[W]hat matters is whether Plaintiffs have plausibly alleged . . . a 'practice' of the trade under the MCPA, not merely an 'act' that occurs in the course of trade activities, even if it may harm the consumer.") Because the conduct being alleged here does not amount to an "operating policy or customary practice" of CNHS, it does not support a claim under the MCPA.

Plaintiff has also failed to plead facts sufficient to satisfy the substantial injury element of an MCPA claim, for the same reasons that she has not satisfied the Article III injury-in-fact requirement. Any claim brought by a private consumer under the Act—in contrast to a

---

[4] The MCPA encompasses distinct causes of action for "unfair" and "deceptive" trade practices. *See Consumer Prot. Div. v. Luskin's, Inc.*, 120 Md. App. 1, 31 (1998) ("*Legg* was the first case in which a Maryland court split unfairness and deception into two distinct bases for action."), *aff'd in part, rev'd in part and remanded*, 353 Md. 335, 726 A.2d 702 (1999). Here, Plaintiff purports to state only a claim for "unfair practices." (*See* Compl. ¶¶ 88-93.) In any event, a claim for deceptive trade practices under the MCPA would fail for the same reasons that Plaintiff has failed to allege deceptive conduct under the D.C. Consumer Protection Procedures Act. *See* Section III.B., *infra*; *Bank of Am., N.A. v. Jill P. Mitchell Living Trust*, 822 F. Supp. 2d 505, 532 (D. Md. 2011) ("Consumers must prove that they relied on the misrepresentation in question to prevail on a damages action [for deceptive trade practices] under the MCPA.").

government enforcement action under the same Act—must allege "actual injury or loss sustained as a result of a practice prohibited under the [Act]." *Legg v. Castruccio*, 100 Md. App. 748, 757 (1994) (citations omitted). "[C]onjectural or potential injury" of the type that Plaintiff alleges is "far from the 'actual' injury required by the [MCPA]." *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 365 (2012) (affirming dismissal of MCPA claim for failure to plead actual injury). *See also Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 622 (D. Md. 2014) (holding that allegation that consumer should have paid less for misrepresented services is "simply not the type of tangible injury appropriately recognized in a private MCPA action, as virtually any misrepresentation could support such a claim of 'injury.'") (citation and internal quotation marks omitted).

Additionally, because Plaintiff does not allege *any* actual injury, Plaintiff also necessarily fails to allege the type of *substantial* injury required to state an MCPA claim specifically for unfair trade practices. *See Hibdon,* 2015 WL 4249525 at *5 ("[S]ubstantial injury. . .is not concerned with trivial or merely speculative harms.") (citation and quotation marks omitted).

### B.    The Alleged Facts Do Not Support a Cause of Action Under the DCCPPA (Count Two of the Complaint).

Plaintiff also fails to state an unlawful trade practice claim under the D.C. Consumer Protection Procedures Act (DCCPPA). Plaintiff asserts that CNHS misrepresented "a certain characteristic, quality, or standard" of its data security measures, and "advertise[d] . . . services without the intent to sell them as advertised." (Compl. ¶¶ 94-95 (citing D.C. Code § 28-304(a), (d), and (h)).) This claim fails for four equally dispositive reasons.

#### 1.    Plaintiff Has Not Alleged a Trade Practice Under the DCCPPA.

The DCCPPA defines a trade practice to mean "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or

offer for or effectuate, a sale, lease or transfer, of consumer goods or services." *Ihebereme v. Capital One, N.A.*, 933 F.Supp.2d 86, 106-07 (D.D.C. 2013) (quoting D.C. Code § 28–3901(a)(6)).  In support of her DCCPPA claim, Plaintiff asserts that CNHS made promises in the privacy notice that Plaintiff claims were violated when CNHS employees' email boxes were compromised through a phishing scam committed by unknown third parties.  (Compl. ¶¶ 95-96.) However, the privacy notice does not relate, even indirectly, to a "sale, lease or transfer" of consumer services.  Instead, it is a disclosure that is required by federal regulations to be provided to healthcare patients, informing them about their rights regarding information privacy. 45 CFR 164.520.  Statements made to comply with HIPAA regulations mandating issuance of a notice of privacy practices do not fit the definition of a "trade practice" under the DCCPPA.

2.    <u>Plaintiff Has Not Alleged any Misrepresentation of Fact.</u>

To allege a misrepresentation under the DCCPPA, Plaintiff must point to a representation that would mislead a "reasonable consumer."  *See Whiting v. AARP*, 701 F. Supp. 2d 21, 29-30 (D.D.C. 2010) *aff'd*, 637 F.3d 355 (D.C. Cir. 2011).  Here, Plaintiff relies exclusively on statements in CNHS's privacy notice.  (*See* Compl. ¶¶ 40-48.)

The privacy notice does not contain any representations whatsoever (let alone any *mis*representations) concerning the quality of CNHS's data security measures.  *See* Exhibit B. *See also SAIC*, 45 F. Supp. at 20 (considering notice letter on motion to dismiss in a data breach case because the complaint "relies on it heavily"); *Polanco*, 988 F. Supp. 2d at 469 (dismissing case and not crediting allegations of lost data that were "directly contradicted by the December 31, 2012 [notice] letter from [defendant]" on which complaint was based).  As an initial matter, the privacy notice pertains primarily to CNHS's own use and disclosure of patient information for certain permitted purposes, and does not address CNHS's specific data security measures or standards.

Far from guaranteeing protection against data breaches, the privacy notice's only statements concerning data security actually warn patients that data breaches are possible and that data protection *cannot* be guaranteed.  Specifically, the privacy notice contains the following statements:

- Patients' rights include "[t]he right to be notified upon a breach of any of your child's unsecured protected health information.  A breach may be an unauthorized use or disclosure of unsecured protected health information.  We will notify you if your child's protected information has been breached as required by state and federal law."  (Ex. B. at 4.)

- "This information [transmitted through the website] is encrypted to ensure that your private information is transmitted in a secure fashion, but please understand that no one can guarantee that unlawful or inappropriate use by third parties will not happen."  (Ex. B at 3.)

A reasonable consumer would not conclude from these statements that CNHS represented any particular quality of data security, but would instead be on notice that a breach of her personal information was a possibility.  Plaintiff therefore cannot state a DCCPPA claim based on these statements.  *See, e.g, Floyd v. Bank of Am. Corp.*, 70 A.3d 246, 254 (D.C. 2013) ("[T]he fatal defect in these claims is that appellants have not pointed to any [relevant] representation(s) that the Bank made.").

### 3.    Plaintiff Has Failed to State a DCCPPA False Advertising Claim.

Plaintiff's assertion that CNHS violated the DCCPPA by falsely advertising its services also fails.  (*See* Compl. ¶ 94.)  To allege false advertising under the DCCPPA, Plaintiff must allege both the existence of an advertisement and CNHS's "unlawful intent" to not provide services as advertised.  *Grayson v. A T & T Corp.*, 15 A.3d 219, 252 (D.C. 2011) (dismissing false advertising claim under DCCPPA because plaintiff did not "identify any advertisement" or "provide any facts that show the unlawful intent" of defendant).  Here, Plaintiff has not alleged

13

having received an advertisement at all, let alone any facts supporting the conclusion that CNHS intended to not provide services as advertised.

4.     Alleged Violations of HIPAA Do Not Support a DCCPPA Claim.

In Paragraph 96 of the Complaint, it appears that Plaintiff is attempting to bootstrap a DCCPPA claim based on a purported violation of HIPAA (as modified by HITECH) or the common law.  "It is well established . . . that no private right of action exists under HIPAA." *Atkinson-Bush v. Baltimore Washington Med. Ctr., Inc.*, No. CIV. L-10-2350, 2011 WL 2216669, at *3 (D. Md. May 25, 2011) *aff'd sub nom. Atkinson-Bush v. Baltimore Washington Med. Ctr., Inc.*, 585 F. App'x 161 (4th Cir. 2014).  Furthermore, the undersigned are aware of no case where a court has held that an alleged HIPAA violation may serve as the basis for a DCCPPA claim, and at least one court in another jurisdiction has rejected a similar attempt to apply an alleged HIPAA violation as the factual predicate for a consumer fraud claim.  *See Polanco v. Omnicell, Inc.*, 988 F. Supp. 2d 451, 471 n. 24 (D.N.J. 2013) ("Plaintiff attempts to rely on the New Jersey Consumer Fraud Act ("CFA") to argue that Defendants' alleged HIPAA violations with respect to the 'loss' of her information constitute an unconscionable commercial practice in violation of the CFA.  Plaintiff cites no case law in support of that proposition, and the Court's research reveals no case where any state or federal court in New Jersey interpreted the CFA to serve as a backdoor remedy for HIPAA violations.").

Even if a HIPAA violation could support a DCCPPA claim in theory, Plaintiff's claim would nonetheless fail because she does not allege any facts sufficient to support a violation of HIPAA.  Plaintiff's only seemingly relevant assertion is that CNHS did not use encryption. (Compl. ¶ 20.)  But HIPAA regulations do not require encryption.  *See* 45 C.F.R. §§ 164.312(a)(2)(iv), 164.306(d)(3)(i).  *See also* Dep't of Health and Human Services Health Information Privacy FAQs,  http://www.hhs.gov/ocr/privacy/hipaa/faq/securityrule/2001.html

("Is the use of encryption mandatory in the [HIPAA] Security Rule?  Answer: No.").  The other provisions of HIPAA referred to in the complaint set forth general standards, not objective prohibitions or requirements that could reasonably form the basis of a consumer protection claim.  More importantly, the Complaint utterly fails to specify how Plaintiff believes CNHS failed to comply with these standards.  (*See* Compl. ¶¶ 116(b)-(j) (citing 45 CFR § 164.306(a)(1)-(4) (general requirement regarding ensuring confidentiality of protected information, protecting against threats to data security, and ensuring workforce compliance); 45 CFR § 164.308(a)(1), (5) (general standards regarding preventing and correcting security violations, as well as implementing security awareness training); 45 CFR § 164.312(a)(1) (general standard regarding preventing unauthorized access to electronic information systems); 45 CFR § 502 (general standards regarding using and disclosing protected information); 45 CFR § 530(b)-(c) (general standards regarding training workforce and safeguarding protected information)).)

### C.    Plaintiff's Negligence Claim Also Fails as a Matter of Law Because of Plaintiff's Failure to Allege any Cognizable Injury (Count Three of the Complaint).

Under both Maryland and District of Columbia law, Plaintiff "must allege more than speculative harm" to state a negligence claim.  *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 708 (D.C. 2009) (D.C. law).  *See also Horridge v. St. Mary's Cnty. Dep't of Soc. Servs.*, 382 Md. 170, 182 (2004) (noting that a negligence claim must allege "actual injury or loss") (Maryland law).  "[T]he threat of future harm . . . does not suffice to create a cause of action for negligence."  *Randolph,* 973 A.2d at 708 (D.C. law).  *See also Exxon Mobil Corp. v. Albright*, 433 Md. 303, 413 ("[Plaintiff] must show more than a possibility of future contamination or mere annoyance in order to recover [on a negligence claim].")*, on reconsideration in part,* 433 Md. 502, (2013), *cert. denied,* 134 S. Ct. 648 (2013).  Accordingly,

courts routinely dismiss negligence claims in data breach cases where, as here, "no Plaintiff alleges that his or her identity has in fact been stolen or used," but instead alleges only "that these harmful events may occur." *Randolph,* 973 A.2d at 708 (dismissing negligence claim in data breach case for failure to allege cognizable injury) (collecting cases). This is true even where, as here, a plaintiff claims "actual harm from expenses they have incurred to undertake credit monitoring," because such expenses are "not the result of any present injury, but rather the result of the anticipation of future injury that has not materialized." *Id.* (quotation marks and citations omitted) (collecting cases).

Moreover, even the future injuries that Plaintiff claims she may suffer are purely economic in nature. Thus, even if she could establish that these were actual injuries, Plaintiff's negligence claim would still be barred by the economic loss rule. *See Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 123 (2007) ("[D]amages for economic loss are not available in a tort action.") (Maryland law); *Aguilar v. RP MRP Washington Harbour, LLC*, 98 A.3d 979, 983 (D.C. 2014) (same) (D.C. law). Numerous courts have dismissed negligence claims in the alleged data breach context on the economic loss doctrine. *See In re Michaels Stores Pin Pad Litig.*, 830 F. Supp. 2d 518, 531 (N.D. Ill. 2011) (Illinois law) (collecting cases reaching the same result).

### D. Plaintiff's Implied Contract Claim Fails for Failure to Plead the Basic Elements of Offer, Acceptance, and Consideration (Count Four of the Complaint).

Plaintiff also fails to state an implied contract claim. "Implied contracts, like all contracts, require mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration." *Goss v. Bank of Am.*, N.A., 917 F. Supp. 2d 445, 451 (D. Md.) (citation and quotation marks omitted) (Maryland law) *aff'd sub nom. Goss v. Bank of Am.*, NA, 546 F. App'x 165 (4th Cir. 2013). *See also Emerine v. Yancey*, 680 A.2d 1380, 1383 (D.C. 1996)

(same) (D.C. law).  To state a claim for breach of contract, a plaintiff must allege, at a minimum, that "the defendant owed the plaintiff a contractual obligation and . . . the defendant breached that obligation."  *Allstate Ins. Co. v. Warns*, No. CIV. CCB-11-1846, 2013 WL 6036694, at *7 (D. Md. Nov. 12, 2013).  *See also Window Specialists, Inc. v. Forney Enterprises, Inc.*, 26 F. Supp. 3d 52, 57-58 (D.D.C. 2014) (similar) (DC law).  Plaintiff's claim fails because she does not allege that the parties' contractual relationship included an enforceable promise guaranteeing data security.

To be sure, the parties had a contractual relationship.  CNHS agreed to provide medical services, and Plaintiff agreed to pay for them.  However, Plaintiff has not alleged, and cannot plausibly allege, that CNHS made any promise to guarantee or ensure a particular level of data security.  The only statements Plaintiff alleges come from CNHS's privacy notice, which does not contain any specific representations or promises regarding data security.  *See* Section III.B., *supra*.  Plaintiffs' implied contract claim is therefore like the contract claims at issue in *Bank  v. Ikon Office Solutions*, Inc., 2011 WL 2633658, at *1 (D. Conn. Jul. 5, 2011), where the plaintiff asserted both express and implied contract claims against Ikon for allegedly failing to delete saved information from leased storage devices.  But like the privacy notice at issue here, the parties' lease agreements in *Bank* "were silent on the issue of data security."  *Id.* at *3.  The court dismissed the express and implied contract claims, explaining:  "Because the amended complaint does not allege any facts establishing the existence of a contract regarding data security, Putnam's claims of breach of contract and breach of implied contract fail."  *Id.  See also Frezza v. Google Inc.*, 2012 WL 5877587, at *4 (N.D. Cal. Nov. 20, 2012) (rejecting implied contract claim where plaintiffs did not "sufficiently plead that Google agreed to and then breached a specific obligation" to comply with data security standards).

Moreover, Plaintiff does not allege she ever read, much less relied on, any statements promising anything about data security when she made the decision to seek healthcare treatment. In *Krottner v. Starbucks Corp.*, 406 Fed. App'x 129, 131 (9th Cir. 2010) (construing Washington law), the court dismissed an implied contract claim based on three corporate documents where the plaintiffs did not allege "they read or even saw the documents or that they understood them as an offer."

Even if CNHS had made promises regarding data security, which it did not, such promises could not give rise to a contract action because they would merely be promises to perform CNHS's pre-existing legal obligations under HIPAA to take steps to safeguard patient data. "A promise to perform a pre-existing legal obligation does not create mutuality of obligation and cannot give rise to an enforceable contract." *Di Lella v. Univ. of D.C. David A. Clarke Sch. of Law*, 570 F. Supp. 2d 1, 11 (D.D.C. 2008) (D.C. law). In *Hoppe v. Coll. of Notre Dame of Maryland*, 835 F. Supp. 2d 26, 34-35 (D. Md. 2011), for example, a student brought breach of contract and other claims against her college based on the college's alleged broken promise to provide certain accommodations for the student's disability; the court dismissed the contract claim on the ground that the college's alleged promise could not give rise to a contract action because the college had a pre-existing legal duty to provide reasonable accommodations. 835 F. Supp. 2d at 35. *See also Di Lella,* 570 F. Supp. 2d at 11 (same).

Likewise, here, Plaintiff alleges that CNHS had pre-existing duties under HIPAA and other data security laws to safeguard patient data. Plaintiff cannot state a contract claim against CNHS for an alleged breach of a promise to perform these pre-existing statutory obligations.

### E.    Plaintiff Has Failed to Plead the Essential Elements of a Claim for Unjust Enrichment (Count Five of the Complaint).

Plaintiff asserts that she is entitled to a partial refund of the fees she paid for medical services under an unjust enrichment theory.  "Unjust enrichment is an equitable doctrine under which a plaintiff may recover when:  (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust."  *Whiting,* 701 F. Supp. 2d at 31 (D.C. Law).[5]

As a threshold matter, Plaintiff cannot plead unjust enrichment, a quasi-contract claim, because CNHS and Plaintiff had a contractual relationship contemplating the payment of fees for medical services.  It is well-established law that "[o]ne who has entered into a valid contract cannot be heard to complain that the contract is unjust, or that it unjustly enriches the party with whom he or she has reached agreement."  *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 64 (D.C. 2005). *See also Bloomgarden v. Coyer*, 479 F.2d 201, 210 (D.C. Cir. 1973) ("There is, of course, no need to resort to [unjust enrichment] when the evidence sustains the existence of a true contract, either express or implied in fact.") (DC law); *Jones v. Pohanka Auto N., Inc.*, 43 F. Supp. 3d 554, 573 (D. Md. 2014) (Plaintiff cannot plead both an actual contract and unjust enrichment without alleging "fraud or bad faith in the formation of the contract.") (Maryland law).  Put simply, contract law governs contractual relationships; a dissatisfied party to a valid contract cannot resort to quasi-contract theories just because her contract claim fails.

---

[5] Maryland law is substantially the same.  In Maryland, "A claim of unjust enrichment is established when: (1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return."  *Benson v. State*, 389 Md. 615, 651-52 (2005).

Here, CNHS does not dispute that Plaintiff and CNHS had an enforceable contract. CNHS agreed to provide medical services, and Plaintiff agreed to pay for them.  The contract simply does not include terms guaranteeing data security.  Rather, protection of patient information is a matter addressed by the statutory and regulatory framework imposed under laws like HIPAA, which do not provide private civil remedies but instead give rise to a regulatory scheme and enforcement by the Office of Civil Rights and similar state regulators.

Even if the existence of an express contract did not prevent Plaintiff from pleading an unjust enrichment claim, she has not pled facts to support the required elements of an unjust enrichment claim.  Plaintiff has not alleged that she conferred any identifiable benefit connected to CNHS's data security measures.  Rather, Plaintiff's unjust enrichment theory relies entirely on her assertion that some "portion of the payments [Plaintiff] made for . . . medical services" went towards "cyber security services."  (Compl. ¶¶ 118-120.)  But Plaintiff alleges no facts establishing that some identifiable amount of her medical bills was earmarked for data security, any more than any portions of her bills would have been earmarked for fulfilling any of CNHS's myriad common law, statutory, or contractual duties to its patients.  Nor does Plaintiff allege that the total amount Plaintiff paid exceeded the value of the medical services she received.  As numerous courts have concluded, such conclusory "overpayment" allegations are insufficient support for a viable cause of action.  *See SAIC*, 45 F. Supp. 3d at 30 ("To the extent that Plaintiff[] claim[s] that some indeterminate part of their [fees] went toward paying for security measures, such a claim is too flimsy to support standing."); *accord Carlsen,* 2015 WL 3538906 at *6; *Austin-Spearman,* 2015 WL 4555098 at *9.

Plaintiff also has not alleged facts sufficient to establish that CNHS unjustly retained a benefit.  Plaintiff's unjust enrichment claim relies on the same alleged conduct as Plaintiff's

contract and negligence claims—namely, that CNHS allegedly failed to provide adequate data security.  Plaintiff cannot plausibly allege that CNHS, a non-profit hospital, hoarded portions of patient medical bills earmarked for data security.

At most, Plaintiff suggests that CNHS should have spent more money than it did on data security, or should have spent the money differently, but these are the same acts and omissions that underlie plaintiffs' negligence claim.  Where an unjust enrichment claim is based on "the same improper conduct alleged in another claim," the unjust enrichment claim "will stand or fall with the related claim."  *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) (construing Illinois law).  *See Whiting,* 701 F. Supp. 2d at 31 ("Having already found that there was no breach of contract and no misrepresentation of coverage in violation of the CPPA, Whiting cannot prevail on her unjust enrichment claim against AARP.") (D.C. law); *Jones,* 43 F. Supp. 3d at 573 ("The unjust enrichment claim premised on a CLEC violation fails because Plaintiffs have not alleged an actionable CLEC claim.") (Maryland law).

As discussed previously, Plaintiff has not adequately pled a negligence claim because she has not pled any cognizable injury.  Therefore, her unjust enrichment claim, which is predicated on the same alleged wrongful acts as her negligence claim, must also fail.[6]

---

[6] If it were otherwise, any consumer could state a "partial refund" unjust enrichment claim against virtually every merchant or service provider with whom they did business by asserting that the business has violated an applicable standard of care, even though the violation has not resulted in any injury.  For example, any grocery store customer could bring such a claim against the grocer who failed to repair a pothole in the parking lot, even if the customer didn't damage her car as a result, on the theory that some portion of the price paid for groceries should have gone towards maintaining the premises.  The possibilities are endless.

**F.    Plaintiff's Invasion of Privacy Claim Fails Because She Has Not Alleged that CNHS Intentionally Disclosed or Publicized Her Personally Identifiable Information (Count Six of the Complaint).**

Plaintiff also fails to state a claim for invasion of privacy under either Maryland or District of Columbia law.[7]  Most fundamentally, Plaintiff's invasion of privacy claim fails because she does not allege that anyone actually accessed, publicized, or appropriated her information during the data breach.  *See Randolph,* 973 A.2d at 711-12 ("Without an allegation that the data involved here were disclosed to and viewed by someone unauthorized to do so, appellants have failed to state a claim for invasion of privacy."); *SAIC,* 45 F. Supp. 3d at 28. Indeed, Plaintiff does not even allege that her private information was contained in a compromised email account where it could have been accessed.

Even if Plaintiff alleged that *a hacker* improperly accessed, publicized, or appropriated her private information after having stolen it from CNHS, which she does not, such an allegation would not state a claim *against CNHS* for invading Plaintiff's privacy.  *See Galaria,* 998 F. Supp. 2d at 662 (dismissing invasion of privacy claim because "the Complaint alleges the [private information] was stolen from Defendant, not that Defendant disseminated it to anyone") (following Restatement).  In other words, invasion of privacy is an intentional tort, and Plaintiff does not allege that CNHS intentionally invaded Plaintiff's privacy.  *See, e.g., Randolph,* 973 A.2d at 711 ("Invasion of privacy is an intentional tort."); *Mitchell v. Baltimore Sun Co.*, 164 Md. App. 497, 522 (2005) (same).  *See also Burton v. MAPCO Exp., Inc.*, 47 F. Supp. 3d 1279, 1288 (N.D. Ala. 2014) ("Even if the defendants were negligent, as alleged, in safeguarding [Plaintiff's] account information, such negligence does not morph into an intentional act of divulging his confidential information.") (Alabama law).

---

[7] Maryland and the District of Columbia both follow the Restatement (Second) of Torts for invasion of privacy law.  *See Barnhart v. Paisano Publications, LLC*, 457 F. Supp. 2d 590, 593 (D. Md. 2006) (Maryland law); *Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989) (D.C. law).

Plaintiff's claim also fails because she does not allege that CNHS (or anyone else) disseminated her private information *to the public*. *See Galaria,* 998 F. Supp. 2d at 662-63 ("While the Complaint alleges [Plaintiffs] face an increased risk . . . their [private information] . . . will become a matter of public knowledge, there is no allegation that that has yet occurred. Moreover, if the hacker(s) . . . disseminate it into the public domain, it would not be Defendant who publicized [it].") (following Restatement). *See also Burton,* 47 F. Supp. 3d at 1288 ("[Plaintiff] offers no legal basis for his claim that a theft of data from a merchant constitutes communication of the information stolen to the public.") (Alabama law).

## IV.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

Although the Article III standing issues could be sufficient to resolve this case on their own, when the "[d]efendant's arguments are more directed at the issues plaintiffs wish to adjudicate, rather than whether plaintiffs have alleged a personal stake in the outcome of [the] action," the "question of whether [p]laintiffs' allegations are sufficient to state a claim under substantive law should be addressed in a motion to dismiss under Rule 12(b)(6), not a challenge to [p]laintiffs' Article III standing." *Willingham v. Global Payments, Inc.*, No. 1:12-CV-01157-RWS, 2013 WL 440702, at *8 (N.D. Ga. Feb. 5, 2013) (recommending dismissing claims under 12(b)(6) and denying 12(b)(1) motion as moot) (citations and quotation marks omitted).

Accordingly, although grounds for dismissal exist both under Rules 12(b)(1) and 12(b)(6), CNHS requests that this Court dismiss this matter with prejudice due to Plaintiff's failure to state cognizable claims under Rule 12(b)(6).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice.

Dated: September 8, 2015   BAKER & HOSTETLER LLP

       By: _/s/ Elizabeth A. Scully_____ _____
        Elizabeth A. Scully (Bar No. 27402)
        Washington Square, Suite 1100
        1050 Connecticut Avenue, NW
        Washington, D.C. 20036-5304
        Tel: 202.861.1698
        Fax: 202.861.1783
        escully@bakerlaw.com

        Paul G. Karlsgodt *Pro Hac Vice*
        1801 California Street, Suite 4400
        Denver, CO  80202
        Tel: 303.861.0600
        Fax: 303.861.7805
        pkarlsgodt@bakerlaw.com

        Douglas L. Shively *Pro Hac Vice*
        1900 E. 9th Street, Suite 3200
        Cleveland, OH  44114
        Tel: 216.861.6486
        Fax: 216.696.0740
        dshively@bakerlaw.com

        *Attorneys for Defendant Children's National Health System*

## CERTIFICATE OF SERVICE

I electronically filed on September 8, 2015, the foregoing *Defendant's Memorandum in Support of Its Motion to Dismiss,* with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following:

> Tracy D. Rezvani
> Rezvani Volin P.C.
> 1050 Connecticut Avenue, N.W., 10th Floor
> Washington, D.C. 20036
> trezvani@rezvanivolin.com
>
> Kevin I. Goldberg
> Goldberg, Finnegan & Mester, LLC
> 8401 Colesville Road, Suite 630
> Silver Spring, MD  20910
> kgoldberg@gfmlawllc.com
>
> Mila F. Bartos
> Finkelstein Thompson LLP
> James Place
> 1077 30th Street, N.W., Suite 150
> Washington, DC  20007
> mbartos@finkelsteinthompson.com

Counsel for Plaintiff.

> ___*/s/ Elizabeth A. Scully*___
> Elizabeth A. Scully (Bar No. 27402)
> Baker & Hostetler LLP
> Washington Square, Suite 1100
> 1050 Connecticut Avenue, NW
> Washington, D.C. 20036-5304
> Tel: 202.861.1698
> Fax: 202.861.1783
> escully@bakerlaw.com
>
> *Attorneys for Defendant Children's National Health System*