## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

|  |  |
|---|---|
| FARDOES KHAN, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>CHILDREN'S NATIONAL HEALTH SYSTEM,<br><br>Defendant. | Case No. 8:15-CV-02125-TDC<br><br>Judge Theodore D. Chuang |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff, Fardoes Khan, ("Plaintiff" or "Khan") by and through her counsel of record, hereby files this Opposition to Defendant's, Children's National Health System ("Defendant" or "CNHS"), Motion to Dismiss.

## INTRODUCTION

Plaintiff's Complaint provides ample and detailed factual allegations to support subject matter jurisdiction and to state a claim for every count.

Defendant's request for dismissal under Rule 12(b)(1) fails for two reasons. *First*, plaintiff has adequately pleaded Article III standing, and *second,* even if the Court lacked subject matter jurisdiction, the case would be remanded to state court, not dismissed. Article III standing requires an injury-in-fact that is fairly traceable to the defendant's conduct and redressable by a favorable ruling. Defendant only challenges injury-in-fact. However, Plaintiff alleges facts to support both actual and imminent injury in multiple forms, including (i) the theft of her Personally Identifiable Information ("PII") and PHI, (ii) the 9.5 times increased risk of identity theft, medical fraud, and other unauthorized use of her PII and Personal Health Information ("PHI") (iii) the specific time and costs associated with the detection and prevention of identity theft, medical fraud, and

unauthorized use of her social security and credit; (iv) overcharges paid for services because she did not receive the data security for which she (in part) paid; (v) the denial of accurate information in the Data Breach Notice and in the Privacy Policy; (vi) impermissibly delaying the notifications of the data breach; (vii) loss of privacy; (viii) violations of state statues and the rights granted thereunder; and (ix) violation of common law.

As detailed below, Defendant's challenges to the sufficiency of Plaintiff's factual allegations regarding "injury-in-fact" are insufficient. Indeed, Defendant only challenges five (5) of these nine (9) avenues to injury-in-fact. Moreover, Defendant's request for dismissal under Rule 12(b)(1) also fails because, even if the Court lacked subject matter jurisdiction, 28 U.S.C. 1447(c) mandates that the case be "remanded," not dismissed. Plaintiff's factual allegations are also sufficient to demonstrate Article I standing in Maryland state court (which has even more lenient standing requirements than Article III courts).

Defendant's request for dismissal under Rule 12(b)(6) is equally deficient. Plaintiff offers ample factual details to support the plausibility of each count in her Complaint. The Complaint adequately pleads a claim under the MCPA, the express language of which allows recovery based on violative conduct relating to even a single transaction. Moreover, Defendant's failure to implement adequate, if any, safeguards against phishing scams, to properly train staff to recognize such scams, or to implement sufficient firewalls to prevent hacks, constitutes a pattern and practice in violation of the MCPA, and that existed *for months* while the scammers downloaded patient data for consumers across the State of Maryland.

The Complaint adequately pleads a claim under the CPPA. A trade practice under the CPPA is broadly defined as "any act" which, *inter alia,* "provides information" in connection with the sale of consumer services. Plaintiff also adequately alleges misrepresentation under the CPPA,

in that Defendant misrepresented the nature and extent of its security measures in connection with the provision of its service, as well as what was actually stolen by the data thieves and the true risk from that breach.  Plaintiff's factual allegations, including as to promises made in Defendant's Privacy Policy, support a claim of false advertising under the CPPA. Even if the Privacy Policy were not an advertisement, it is part of the "offer" for the provision of "services" under §28-3904(h).  Finally, HIPAA is "mandatory floor" for consumer protection that serves as an adequate predicate for state consumer protection claims, including under the broadly construed CPPA. Because Plaintiff provides ample factual allegations to support a HIPAA violation, Plaintiff's CPPA claim predicated on a HIPAA violation is adequately pleaded.  Defendant's protests as to what is required under HIPAA and whether it met such requirements jury questions.

The Complaint adequately pleads an invasion of privacy, detailing how Defendant acknowledged, through its notice letter, its disclosure of Plaintiff's and Class Members' personal information to an unauthorized third party, and that such personal information included the name, identity and medical information of Plaintiff and the Class Members.  Plaintiff provides factual allegations that her PII/PHI was accessed by and publicized to an unauthorized third party over the course of five months, and that the actions of Defendant's employees as well as Defendant's intentional failure to take the necessary precautions required to safeguard the PII/PHI, invaded Plaintiff's privacy. Plaintiff has adequately pleaded an objectively reasonable likelihood that hackers have disseminated or will disseminate the sensitive information to the public, thereby exposing information crucial for identity theft, credit fraud, and medical fraud.

The Complaint adequately pleads unjust enrichment, which requires the retention of a benefit that, in justice and equity, belongs to another. The Complaint alleges that Plaintiff and Class Members conferred a monetary benefit on Defendant in the form of payments for medical

services, including administrative costs such as electronic data management services, and that Defendant appreciated the monetary benefit by accepting the payments.  The factual allegations in the Complaint present a plausible claim that Defendant should not be permitted in justice and equity to retain the portion of the payments made by Plaintiff and Class Members.

The Complaint adequately pleads breach of implied contract, which requires allegations to support a showing that (1) defendant owed the plaintiff a contractual obligation and that (2) defendant breached that obligation. An implied contract exists here between Plaintiff, Class Members and Defendant. Plaintiff and Class Members provided their PII/PHI to Defendant, allowing them to take advantage of Defendant's healthcare services, while storing the PII/PHI of Plaintiff and the Class electronically was economically efficient for Defendant. Implicit in the contract was the covenant requiring Defendant to take reasonable efforts to safeguard the PII/PHI and to promptly notify Plaintiff in the event that her information was wrongfully disseminated. The existence of an implied contract, and the issue raised by Defendant regarding whether it promised to guarantee data security, is a factual question that a jury must determine.

The Complaint adequately pleads negligence.  Defendant had a duty to, but failed to, exercise reasonable care in protecting the PII/PHI. Defendant's opposition to the negligence claim is based on the assertion that dissemination of the PII/PHI to an unauthorized third party over the course of five months fails to constitute a "cognizable injury."  But injury is not speculative or contingent simply because future events may affect its permanency or the amount of monetary damages eventually incurred. Multiple courts have found that the disclosure of personal information to an unauthorized third party constitutes a cognizable injury. Moreover, the economic loss rule does not apply to the breach of an independent duty, as here.

**FACTS**

4

On December 26, 2014, Defendant learned that its email accounts had been exposed for several months in a way that allowed hackers to access critical, personal information of its patients. Compl. at ¶¶ 2, 11-13, 19-22, 40-51. Defendant knew, or should have known, that the security of its data was at risk based on the recent rash of cyber attacks on hospitals, including children's hospitals, as well as recurring, systemic and fundamental deficiencies in Defendant's own information security procedures. *Id.* at ¶¶ 52-55. Despite this knowledge, Defendant failed to take steps (including as required by state regulations, industry practices, and Defendant's own lauded privacy practices) to ensure data safety until *after* the breach. *Id.*

Defendant's data breach exposed precisely the information that facilitates identify theft, credit fraud and medical fraud – including patient demographic information (such as names, dates of birth, addresses, social security numbers, and telephone numbers) and patient clinical information (such as diagnoses, treatment received, medical record numbers, medical service codes, health insurance information). *Id.* at ¶15. Much of the information exposed by Defendant's data breach constitutes PII and PHI (together, "PII/PHI") of Defendant's patients. *Id.* at ¶¶ 1-2, 15.

Defendant admits that about *18,000 individuals* were either affected or notified as to the data breach. *Id.* at ¶¶ 18, 79. Inexplicably, even though Defendant learned of the breach in December 2014, and access may have been continuing from as early as July 26, 2014, Defendant waited until *February 14, 2015,* to begin notifying affected patients. *Id.* at ¶¶ 2, 17. Defendant's notification itself was misleading – providing a vague description of what was stolen and falsely implying that there was no risk from the data breach. *Id.* at ¶ 66. In response to its data breach, Defendant did *not* provide monitoring as a means of mitigating harm; opting instead to place the extensive costs and burden on its affected patients to determine and stave off all the negative consequences from Defendants' data breach. *Id.* at ¶¶ 60-65.

As a result of Defendants actions (and inactions), Plaintiff and Class Members have incurred (and will continue to incur) harm in the form of, *inter alia,* (i) loss of privacy, (ii) out-of-pocket expenses to purchase credit monitoring, internet monitoring, identity theft insurance and/or other data breach risk mitigation products, (iii) out-of-pocket expenses incurred to mitigate the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the data breach, (iv) loss of the value of their own PII/PHI, (v) loss of time spent mitigating the increased risk of identity theft, identity fraud and/or medical fraud pressed upon them by the data breach, and (vi) diminished value of the services that Defendants agreed to provide, including data management and security. *Id.* at ¶¶ 24-36.

## LEGAL STANDARDS

A federal court should analyze questions as to subject matter jurisdiction first because they "concern the court's very power to hear the case." *Owens—Illinois, Inc. v. Meade*, 186 F.3d 435, 442 n.4 (4th Cir. 1999) (internal quotations omitted). Dismissal for lack of subject matter jurisdiction is appropriate "only if the material jurisdictional facts are *not* in dispute" and defendant is "entitled to prevail as a matter of law." *Id.* (emphasis added).

A Rule 12(b)(6) motion to dismiss must be read in conjunction with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," FRCP 8(a)(2), so as to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A district court "must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff." *Kensington Volunteer Fire Dep't v. Montgomery County*, 684 F.3d 462, 467 (4th Cir.2012) (internal quotations omitted). Accordingly, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."

*Twombly*, 550 U.S. at 555 (internal quotations omitted).   A complaint may therefore survive a motion to dismiss "even if it appears that a recovery is very remote and unlikely." *Id.*

## ARGUMENT

## I.   PLAINTIFF HAS STANDING TO BRING HER CLAIMS

Plaintiff filed this lawsuit in the Circuit Court for Montgomery County, MD.  That Court is an Article I court.  Defendant removed the case to this Article III Court only to seek its dismissal for an alleged failure to meet Article III standing.  If true, then the recourse is not *dismissal* but *remand*.  Otherwise, defendant will be able to game the system by improperly removing cases only to have them dismissed.  Regardless, Plaintiff has pled Article III standing.

### A.  Plaintiff Satisfies Article III Standing

Article III standing "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Indeed, on motions to dismiss, courts "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Article III standing requirements are injury-in-fact, which is fairly traceable to the defendant's conduct, and redressable by a favorable ruling. *Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1147 (2013); *Lujan*, 504 U.S. at 560-61. The allegations of the Complaint satisfy all three requirements.

"Injury in fact" reflects the requirement that a person be "adversely affected" or "aggrieved," and serves to distinguish a person with a direct stake in the outcome of a litigation— even though small—from a person with a mere interest in the problem. *U. S. v. Students Challenging Reg. Agency Procedures (SCRAP),* 412 U.S. 669, 690 n. 14 (1973). "The injury may be minimal." *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008). "[S]tanding simply means that the plaintiff is entitled to 'walk through the courthouse door' and raise his grievance before a

federal court." *Wooden v. Bd. Of Regents of the Univ. Sys. of Ga*, 247 F.3d 1262, 1280 (11th Cir. 2001). Courts have consistently held that loss of property or of *a property interest* is sufficient injury to confer Article III standing. *See, e.g., Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1010-12 (1992).

In addition to "traditional" standing analyses, courts also recognize "statutory" standing. Indeed, the injury-in-fact requirement can be satisfied "solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Lujan*, 504 U.S. 555, 578 (1992); *Warth*, 422 U.S. at 514 (the legislature "may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute."); *Lujan*, 504 U.S. at 578; *see also Shaw v. Marriott Int'l, Inc*., 605 F.3d 1039, 1042 (D.C. Cir. 2010); *Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 617-19 (D.C. Cir. 2006).  The Supreme Court has held that "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982).  This principle applies to *common law* rights as well. *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012) (noting that "[t]he invasion of a common-law right (including a right conferred by contract) can constitute an injury sufficient to create standing") (citing *Ala. Power Co. v. Ickes*, 302 U.S. 464, 479 (1938)).

Courts routinely find standing where a plaintiff alleges violation of a consumer privacy statute with a private right of action even absent economic harm. *See e.g., Graczyk v. West Pub. Co*., 660 F.3d 275, 278 (7th Cir. 2011) (Driver's Privacy Protection Act); *Klimas v. Comcast Cable Comms., Inc*., 465 F.3d 271, 275-76 (6th Cir. 2006) (violations of the Cable Act's privacy provisions); *In re Facebook Privacy Litig*., 791 F. Supp. 2d 705, 712 (N.D. Cal. 2011).

In data breach cases, courts have recognized standing even where no actual misuse has occurred. *See, e.g., Remijas v. Neiman Marcus Group, LLC,* 794 F.3d 688, 692 (7th Cir. 2015) (standing found, in part, on "identifiable costs associated with the process of sorting things out."); *Anderson v. Hannaford Bros. Co*., 659 F.3d 151, 162 (1st Cir. 2011); *Ruiz v. Gap, Inc*., 380 Fed. Appx. 689, 690-91 (9th Cir. 2010); *Krottner v. Starbucks Corp*., 628 F.3d 1139, 1142 (9th Cir. 2010); *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007); *see also In re Target Corp. Customer Data Sec. Breach Litig.,* 66 F. Supp. 3d 1154, 1159 (D. Minn. 2014); *In re Sony Gaming Networks and Customer Data Breach Sec. Litig.*, 996 F. Supp. 2d 942, 961 (S.D. Cal. 2014); *In re Adobe Sys., Inc. Privacy Litig.*, 2014 WL 4379916, *8 (N.D. Cal. Sept. 4, 2014); *Moyer v. Michaels Stores, Inc*., 2014 WL 3511500, at *6 (N.D. Ill. July 14, 2014); *McLoughlin v. People's United Bank, Inc*., 2009 U.S. Dist. LEXIS 78065, *13 (D. Conn. Aug. 31, 2009); *Caudle v. Towers, Perrin, Forster & Crosby, Inc*., 580 F. Supp. 2d 273, 280 (S.D.N.Y. 2008)(citing *Denny v. Deutsche Bank AG,* 443 F.3d 253, 264-65 (2d Cir. 2006)("an injury-in-fact need not be capable of sustaining a valid cause of action under applicable tort law. An injury-in-fact may simply be the fear or anxiety of future harm.")).[1]

Adverse effects such as inconvenience, unfairness, mental distress and out-of-pocket expenses for mitigation, such as purchasing credit reports or credit monitoring services, also suffice for purposes of standing. S*ee, e.g., In re Dep't of Veterans Affairs (VA) Data Theft Litig*., 2007 WL 7621261, *3 (D.D.C. Nov. 16, 2007); *Neiman Marcus*, 794 F.3d at 694 ("These credit-

---

[1]  In *Reilly,* the decision principally relied on by CNHS, the court acknowledged that in both *Pisciotta* and *Krottner*, the harms were "significantly more 'imminent' and 'certainly impending'" than the firewall intrusion (with no proof that the data was accessed, much less copied or stolen) before it. *Reilly v. Ceridian Corp*., 664 F.3d 38, 44 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 2395 (2012). Relying on *Reilly, Storm v. Paytime, Inc*., 2015 U.S. Dist. LEXIS 31286, *14-15 (M.D. Pa. Mar. 13, 2015), dismissed for a lack of standing when faced with an unquantified increased risk claim and vague claims of increased costs for monitoring.  Here, there is no question of theft as the phishing scam was aimed to steal data.

monitoring services come at a price that is more than *de minimis*."); *see also Denny, supra*. Despite this wealth of authority from the Circuit and District Courts nationwide, Defendant sweeps these decisions away by referring to them as the "minority view."  Memo. at 7 n.3.

### 1.  Plaintiff pleads Injury-in-fact

The injury component of Article III standing may be satisfied by allegations of either "actual or imminent" injury. *Clapper*, 133 S. Ct. at 1147. The Supreme Court explained post-*Clapper* that "[a]n allegation of future injury may suffice if ... there is a '*substantial risk*' that the harm will occur." *Susan B. Anthony List v. Driehaus,* 134 S. Ct. 2334, 2341 (2014)(emphasis added). Plaintiff suffered both.  Plaintiff suffered actual injury in multiple forms, including (a) the theft of her PII and PHI, (b) the 9.5 times increased risk of identity theft, medical fraud, and other unauthorized use of her PII and PHI (c) the specific time and costs associated with the detection and prevention of identity theft, medical fraud, and unauthorized use of her social security and credit; (d) overcharges paid for services because she did not receive the data security for which she (in part) paid; (e) the denial of accurate information in the Data Breach Notice and in the Privacy Policy; (f) impermissibly delaying the notifications of the data breach; (g) loss of privacy; (h) violations of state statues and the rights granted thereunder; and (i) violation of common law.

Of these nine avenues to injury-in-fact, Defendant only challenges five.  CNHS argues that a "mere increased risk of identity theft is not enough" and that a plaintiff "must allege that the risk of identity theft is "certainly impending" as opposed to merely possible and speculative.  Memo at 6.  However, Plaintiff alleges "substantial risk" arising from the **9.5 times increased risk** of future fraud, identity theft and misuse by criminals who have her PII and PHI.  *Id.* at ¶¶37, 64, 67.[2]

---

[2] *In re Science Applications International Corp. (SAIC) Backup Tape Data Theft Litig.*, 2014 WL 1858458 (D.D.C. May 9, 2014), involved a break-in to a vehicle and the theft of a GPS unit, stereo, and encrypted backup data tapes containing personal medical information. *Id.* at *1. The court reasoned that

Defendant never articulates why this figure is an "insubstantial risk"—especially when it is backed up by an industry leader's study. *Cf. Driehaus*, 134 S. Ct. at 2341.[3]

Defendant further claims that time and expense for monitoring does not support standing. Memo. at 8.   However, *Ruiz, Krottner, Neiman Marcus, VA Data Theft, Adobe* and *Hannaford* support injury-in-fact based on such considerations.   These decisions far outweigh the handful of questioned decisions[4] cited by CNHS which are based on highly differentiated facts.   Moreover, unlike Defendants' citations, (Memo at 8), Plaintiff has alleged that her personal information has been stolen and will be certainly viewed.  Compl. ¶31, 34, 37. In fact, the necessity for monitoring was strong enough for CNHS to recommend that Plaintiff, at her own cost, undertake such measures.  *Id.* at ¶60; Ex. A to Motion.

Finally, Plaintiff's diminution theories (whether of the value of the services provided or the loss of value of their PII and PHI) supports standing.   Compl. ¶36. That hackers go to great lengths to steal and sell the information itself demonstrates value. *See* T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value"*

---

the thief would not be able to misuse the data without an attenuated chain of events and could have simply sold the other property and discarded the data tapes. *Id.* at *6. By contrast, the hackers here breached Defendant's system (for months) for the purpose of stealing data. *See Adobe*, 2014 WL 4379916, at *9 (distinguishing *SAIC*: the "hackers targeted Adobe's servers in order to steal customer data").

[3] *In re Zappos.com, Inc.*, 2015 U.S. Dist. LEXIS 71195, *23 (D. Nev. June 1, 2015), which involved the loss of credit card data, *re-analyzed* an unquantified increased risk three-and-a-half years after the breach occurred and found no immediacy to the injuries claimed.  Given that account numbers are easily changed, the lack of immediacy and injury-in-fact is understandable. *Galaria v. Nationwide Mutual Ins. Co*., 998 F. Supp. 2d 646, 654 (S.D. Ohio 2014), in which the plaintiffs alleged only that consumers receiving a data breach notification have a fraud incidence rate of 19% in 2011, was criticized by *Adobe*.  There, the court found *Galaria*'s "reasoning unpersuasive – after all, why would hackers target and steal personal customer data if not to misuse it? – and declines to follow it." *Adobe*, 2014 WL 4379916, at *9.

[4] *See* n. 1-3, *supra.*

*of Financial Assets*, 15 RICH. J.L. &TECH. 11 (2009); Compl. ¶34-35.  Indeed, the very existence

of this underground market evidences value. Defendant's own practices further demonstrate value.

It collects extensive personal information from its customers and uses it to develop sophisticated

marketing programs.

This information, this item of distinct value to CNHS and it business and marketing needs,

was placed in Defendant's care.  While in its custody, Defendant had it stolen.  Outside the

technology world, this is akin to a prized family heirloom loaned out to a charity event to draw

participants only to have the heirloom stolen.  Decisions which reject the notion that consumers

would be willing to part with their PII for value (Memo at 9), ignores the fact that, in the

hypothetical, while the consumer would never have sold the heirloom, now that it is stolen, the

charity should be liable for its loss.  Granted, consumers would generally not sell, absent dire

straits, their social security number or medical identity.  Compl. ¶¶ 31, 355. However, this does

not negate the fact that (a) the information belongs to the consumer (b) the information has value

sufficient for complicated phishing scams, (c) the information was entrusted to the care of CNHS

and poorly protected, and (d) Plaintiff has lost control over the right to be the owner, agent or

broker of her own information.  Plaintiff alleged that she has taken great pains to keep her medical

condition confidential.  Compl. ¶¶ 9, 23. She alleges that services should have cost less if the

promised security had not been in place. Compl. ¶36.  Such theory is supported by case law.  *See

In re LinkedIn User Privacy Litig.*, 2014 WL 1323713, at *6 (N.D. Cal. March 28, 2014); *Sony*,

996 F. Supp. 2d at 991; *Adobe*, 2014 WL 4379916, at *15-16.  Injury-in-fact is amply demonstrated

by all nine theories advanced here.

### 2.  *Traceability*

Defendant does not challenge this element.  The harm flowing from compromise and theft

of Plaintiff's PII and PHI was the direct result of Defendant's actions and inactions. *See, e.g.,* ¶¶ 2-4, 13-17, 21-22, 32-33, 54, 109-110, 117, 126 *with Neiman Marcus,* 794 F.3d at 696 (traceability found because defendant "contacted members of the class to tell them they were at risk."); *Adobe,* 2014 WL 4379916, at *10.

### 3. Redressibility

Defendant also does not challenge this element.  Plaintiff's injuries are clearly redressable by a judgment or court-approved settlement providing compensation and injunctive relief. *Neiman Marcus,* 794 F.3d at 697 (lawsuit could redress mitigation expenses and future injuries); *Adobe,* 2014 WL 4379916, at *10 ("the relief sought would redress these injuries").

### 4. Remand, not dismissal, is required

While Plaintiff believes she meets Article III standing requirements, should the Court nevertheless hold that it lacks jurisdiction to hear this case, the Court should remand the matter back to the Circuit Court for Montgomery County, MD.  28 U.S.C. § 1447(c)("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). Defendant need not have removed this case.  It is axiomatic that the Circuit Court has competence to hear state law claims whether procedurally filed as individual or class actions. The insertion of the Class Action Fairness Act ("CAFA") did not "federalize" all state law claims if procedurally pled as a class action. This is especially true given that CAFA has exceptions permitting certain class actions to be prosecuted in state courts.  28 U.S.C. §1332 (d)(1)(D)(3)-(4). Courts regularly remand, and not dismiss, under such circumstances. *See e.g., Gen. Tech. Applications, Inc. v. Exro Ltda,* 388 F.3d 114, 120 (4th Cir. 2004); *Healthtek Solutions, Inc. v. Fortis Bens. Ins. Co.,* 274 F. Supp. 2d 767, 778 (E.D. Va. 2003); *Burns v. Friedli,* 241 F. Supp. 2d 519, 526 n. 5 (D. Md. 2003).  To hold otherwise, claims would regularly be sacrificed on the altar

of gamesmanship.

a.      Plaintiff has pled standing under Maryland state law

The Maryland Court of Appeals has long held that Maryland's *state* courts are not bound

by Article III limitations:

> Even were the federal courts bound, as a constitutional matter, to dismiss a
> collusive suit, the same result would not be mandated under the Maryland
> Constitution since, unlike the United States Constitution, it contains no express
> language limiting the judicial power to "cases" or "controversies." U.S. Const. art.
> III, § 2.

*Reyes v. Prince George's County,* 281 Md. 279, 290 (1977); *see also id.* at 292-94, 298-99.  That

is because unlike in the federal system, in Maryland, a case is justiciable "when there are *interested*

*parties* asserting adverse claims upon a state of facts which must have accrued wherein a legal

decision is sought or demanded." *Id.* at 288 (emphasis added).

Unlike federal courts which reject the "overlap principle" and separate concepts of

jurisdiction, standing and cause of action, in Maryland, the concept of the cause of action figures

prominently.  *State Ctr. LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 499-502 (2014).  The

Supreme Court explained the differences as such:

> [J]urisdiction is a question of whether a federal court has the power, under the
> Constitution or laws of the United States, to hear a case; standing is a question of
> whether a plaintiff is sufficiently adversary to a defendant to create an Art. III
> case or controversy, or at least to overcome prudential limitations on federal-court
> jurisdiction; cause of action is a question of whether a particular plaintiff is a
> member of the class of litigants that may, as a matter of law, appropriately invoke
> the power of the court; and relief is a question of the various remedies a federal
> court may make available.

*Id.* at 500 (quoting *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979)).  A court must simply ask

whether governing law confers on the plaintiff a right to bring the claim to court.  *Id.* at 501-02.

In order to assess this lower form of "standing," state courts look to whether the interest

sought to be protected is "*arguably* within the zone of interests to be protected" by the law in

question.  *Id.* (quoting *120 West Fayette St., LLLP v. Mayor of Baltimore*, 407 Md. 253, 270 (2009)(emphasis in original).  In short, simple injury, the invasion of a legally protected right, is what determines standing in Maryland's state courts.  *Id.* ("For an affected interest to furnish a basis for aggrieved person standing, *the interest must be legally protected*. Thus, just as an impact on a person's property interest affords a basis for standing, an impact on a person's interest arising out of contract, protected from tortious invasion, or founded on a statute that confers a privilege likewise provides a basis for standing.").   By contrast, federal courts *start with* simple injury but then require additionally that such injury be concrete and particularized ("injury in fact"), redressable, *and* causally connected.  *Lujan*, 504 U.S. at 560-61.  The Maryland Court of Appeals has explicitly held that *Lujan*'s test "is not applicable in state courts."  *Nefedro v. Montgomery County,* 414 Md. 585, 592 n.3 (2010).

### 1.   Plaintiff is an interested party with legally protected rights

In order to understand Plaintiff's standing, the Court must undertake a review of the claims brought.  *Lexington Charles*, 438 Md. at 503.  Plaintiff will *briefly* analyze each count here by summarizing the full discussion under Rule 12(b)(6) below:

**Count I, Maryland Consumer Protection Act:**  Defendant committed unfair practices ad defined by Md. Code Ann., Comm. Law § 13-303 by seeking PHI and PII from Plaintiff, and the Class, while failing to provide the promised security measures to protect same while in its custody. Compl. ¶88.  Plaintiff has alleged that this conduct is unfair under *Legg v. Castruccio*, 100 Md. App. 748, 768 (1994) as it caused Plaintiff (and the putative class) unavoidable substantial injury which has no countervailing benefits to her or to competition.

**Count II, D.C. Consumer Protection and Procedures Act**:  Both the D.C. Court of Appeals, and the D.C. Circuit, have recognized that this statute conveys a right to truthful

information, the violation of which confers standing in both "state" and federal court. *Grayson v. AT&T Corp.*, 15 A.3d 219, 249 (D.C. 2011); *Shaw v. Marriott Int'l Inc.*, 605 F.3d 1039, 1042 (2010). Defendant "represented that its services complied with data security measures mandated by industry and federal standards, and thus had a certain characteristic, quality or standard, without an intent or ability to provide the services as offered." Compl. ¶95. Moreover, Plaintiff is an "interested party" with standing because Defendant's conduct also violated HIPAA, HITECH, and the other statutes and common law causes of action. Such *other* violations also serve as a predicate for a CPPA violation.

**Count III, Negligence:** Defendant breached duties to Plaintiff and putative Class by failing to exercise reasonable care in safeguarding and protecting their PII/PHI. Plaintiff alleged that Defendant had a duty to implement appropriate data security processes in order to safeguard the PII/PHI entrusted to it, breached that duty by granting unauthorized third parties access to the PII/PHI, caused private information to be disseminated to the world, and said breach resulted in multiple injuries to Plaintiff and putative Class. Compl. ¶ 98-111.

**Count IV, Breach of Implied Contract:** Plaintiff has alleged that an implied contract existed between Plaintiff and Defendant for the electronic safeguard and access to Plaintiff's PII/PHI in exchange for access to Defendant's healthcare services. Compl. ¶¶ 112-117. Defendant breached the implied contract between Defendant, Plaintiff, and putative class, by failing to safeguard Plaintiff's PII/PHI.

**Count V, Unjust Enrichment:** Defendant unjustly enriched itself by maintaining possession of the portions of Plaintiff's, and putative Class's, payments made for cyber security. Plaintiff has alleged that Defendant's retention of these payments, in light of the egregious data breach, is unjust. Compl. ¶¶ 118-122.

**Count VI, Invasion of Privacy:** Defendant invaded the privacy of Plaintiff and the putative Class. Plaintiff has alleged that allowing unauthorized third parties to appropriate Plaintiff's, and the putative Class's, private life, medical diagnosis, and treatment, constitutes an unreasonable intrusion upon the seclusion of Plaintiff and the putative Class. Compl. ¶¶ 123-126.

## II.     Plaintiff Has Adequately Pled Her Causes of Action

At one time, the law was slow to evolve in connection with technological advancements. However, more and more, experts recognize that information is a valuable commodity:

> PII is now a commodity that companies trade and sell. … PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets. There is a catch, however: companies benefiting from the value of PII bear the burden of protecting the privacy interests attached to PII. In light of technological advancement, which often threatens the security of sensitive information, privacy ranks among the most important issues facing modern society. And for good reason, the consumer privacy interest in PII is in a precarious state. Absent adequate safeguards, the building blocks of an individual's virtual identity become increasingly more vulnerable each time the information changes hands.

Soma, 15 RICH. J.L. &TECH. at 12; *see also* Compl. ¶29 & n.7, ¶31. This commodity is valuable not only to the holder (as it permits the CNHS to more efficiently process and store patient records or permits it to market itself more cheaply to its customer base),[5] but also to the thief who can sell it on the grey market (to data brokers and to pharmaceutical and device manufacturers for marketing of drugs and devices), or on the black market (to identity thieves, illegal immigrants, terrorists, etc.). [6]  Plaintiff's causes of action, some based on law stretching back centuries, are flexible enough to meet the claims levied.

The Fourth Circuit recently held in *Wright v. North Carolina*, 2015 WL 3396799 (4th Cir.

---

[5] "We may use medical information about you to contact you in an effort to raise money for the hospital and its operations." Ex. B to Motion at 5.

[6] Compl. ¶24, 29, 34.

2015) that "[t]o the extent Plaintiffs' claims do 'not fall within the four corners of our prior case law,' this 'does not justify dismissal under Rule 12(b)(6). On the contrary, Rule 12(b)(6) dismissals 'are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development.'" *Id* at *4 (Citations omitted).   The Court continued: "Indeed, as the law 'firm[s] up' in unsettled areas, 'it may be more feasible to dismiss weaker cases on the pleadings;' otherwise, plaintiffs should be given 'an opportunity to develop evidence before the merits are resolved.'" *Id*.   Thus, the *Wright* Court concluded, "a complaint is to be construed liberally so as to do substantial justice," and the complaint should be read "liberally in favor of the plaintiff. " *Id* at *5 (citations omitted).

### A.  Plaintiff Has Adequately Pled an MCPA Claim

The MCPA's purpose is, *inter alia*, to "take *strong protective and preventive steps* to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland. Md. Code Ann., Comm. Law § 13-102(b)(3)(emphasis added). The MCPA prohibits entities from unfair or deceptive trade practices in consumer transactions.  *See* Md. Code Ann, Comm. Law § 13-303 ("A person may not engage in any unfair **or** deceptive trade practice, as defined in this subtitle or as further defined by the Division….")(emphasis added).  The prohibition against unfair and deceptive practices in the MCPA (one of the so-called "Little FTC Acts") was inspired by similarly worded provisions in the Federal Trade Commission Act. *Id.* at § 13-105.

CNHS, relying on *Hibdon v. Safeguard Props., LLC*, 2015 U.S. Dist. LEXIS 89579 (D. Md. July 9, 2015), argues that Plaintiff cannot plead that an "isolated instance of CNHS employees falling victim to deceptive phishing emails represents CNHS's customary practice or operating policy." Memo. at 10.  *Hibdon* improperly grafted an additional prerequisite to the bringing of *any*

MCPA claim—a prerequisite which has never been endorsed by either the Court of Appeals or the Court of Special Appeals.  Without reliance or citation to any prior decision of any court, [7] and only relying on a dictionary, *Hibdon* added the prerequisite that an MCPA claim (whether under the unfairness or deception prongs) required an unstated amount of repetition before it can be deemed a "practice." 2015 U.S. Dist. LEXIS 89579, at *22.

This holding is inconsistent with the express language of the statute which has no repetition or pattern requirement. *Cf. Mayor & Council of Rockville v. Rylyns Enters.,* 372 Md. 514, 570-571 (2002) (statute should be read and construed as a whole within the context of the entire legislative scheme). Neither §13-301 nor §13-303 include any language which could support a requirement that some (undefined) repetition threshold must be met before the MCPA's remedies and protections may apply.  *Cf. Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  In fact, §13-301 uses singular terms throughout strongly supporting the notion that *Hibdon* was wrongly decided:

> Unfair or deceptive trade practices include **any**:
> (1) False, falsely disparaging, or misleading oral or written **statement**
> (2) **Representation** that:
> (i) Consumer goods, consumer realty, or consumer services have **a** sponsorship, approval, **accessory, characteristic, ingredient, use, benefit**, or **quantity** which they do not have;…
> (3) Failure to state **a** material **fact** if the **failure** deceives or tends to deceive;…

Md. Code Ann., Com. Law § 13-301 (emphasis added).

*Hibdon* also contradicts the General Assembly's purpose in passing the bill in the first

---

[7] *Hibdon* did make a passing reference to *Legg* without analysis.  However, in *Legg*, the Court of Special Appeals held that "not every consumer injury is *legally unfair.*'"  *Legg,* 100 Md. App. at 768 (emphasis added).  *Legg* then adopted the three-part test to determine which consumer injury is "legally unfair."  *Hibdon* ignores this very important point of the *Legg* decision.  Thus, by using *Legg* to graft a pattern or repetition requirement, it actually ignores *Legg* and the import of the decision to the MCPA.

place.  *See* Md. Code Ann., Com. Law § 13-102(b). By unnecessarily constricting the scope and

reach of the MCPA, it no longer serves to function as a *supplement* to the common law as it would

now be *narrower* than the common law.  Finally, the legislature is perfectly able to draft language

requiring a minimum number of transactions as a predicate if that is its intent.  *Cf., e.g.,* Maryland

Rent Control Act, Chapter 741 of the Acts of 1974 (only applying to landlords renting four or more

units);[8] Md. Code Ann., Fin. Inst. § 11–502(b)(4)(i)-(ii) (2011)(providing that the subtitle does not

apply to any person who makes 3 or fewer mortgage loans per calendar year).[9]

     Moreover, *Hibdon* is inconsistent with a long line of state and federal court decisions which

have upheld single-transaction claims under the MCPA.  For example, in *Mercedes-Benz of N.*

*Am. v. Garten*, 94 Md. App. 547 (1993), the Court of Special Appeals upheld judgment under the

MCPA in favor of the plaintiff alleging that the salesman misrepresented the features of ***an***

automobile—the subject of a ***single*** transaction. *Id.* at 564. There was no indication that this

salesman, or the dealership, regularly misrepresented features of automobiles. Similarly, in *Price*

*v. Berman's Auto., Inc*., 2014 U.S. Dist. LEXIS 155900, *26-28 (D. Md. Nov. 4, 2014) (Blake, J.),

the plaintiff alleged that in the *sole* auto purchase transaction, the dealership mispresented the

monthly payments on the car loan.  There was no pleading or other indication that this dealership

had a pattern or practice of repeatedly misrepresenting loan payments.  Yet the Court upheld the

MCPA claim.  *Id.* at *30-31; *see also Myles v. Rent-A-Center, Inc.,* 2015 U.S. Dist. LEXIS 88282,

*8 (D. Md. July 7, 2015)(Bredar, J.)(upholding MCPA claim premised on a single rental-purchase

agreement for a used couch).

---

[8] Quoted in *Fenner v. Bruce Manor, Inc*., 409 F. Supp. 1332, 1350 (D. Md. 1976).

[9] In 2012, this statute was specifically amended to remove this limitation, further highlighting the point that the General Assembly can delineate numerical thresholds when it so chooses.  *See* https://legiscan.com/MD/text/SB302/id/628055/Maryland-2012-SB302-Chaptered.pdf

Finally, the holding is also internally inconsistent.  Far from its notation that the MCPA "*supplement[s]* existing federal and state laws which [the General Assembly] found to be inadequate, poorly coordinated and not widely known or adequately enforced," *id.* at *23 n.7 (quoting *Consumer Prot. Div. Office of Atty. Gen. v. Consumer Pub. Co.,* 304 Md. 731, 761 (1985)(emphasis added)), *Hibdon's* new requirement *constricts* the MCPA to something *narrower* than those found in common law.  After all, common law counts do not require repetition before a claim is viable.[10]

To the extent the Court is inclined to consider contracting the broad reach of the MCPA by perpetuating *Hibdon* further, Plaintiff respectfully requests that the Court certify this issue to the Court of Appeals under Maryland Rule 8-305(a) and Courts Article §12-603.

Regardless, the failure to implement safeguards against phishing scams, the failure to properly train staff to recognize such scams, the failure to implement sufficient firewalls to prevent hacks, the failure to properly police its system to timely discover intrusions, was a pattern and practice that existed *for months* while the scammers downloaded patient data for consumers across the State of Maryland.  Compl. ¶18 (18,000 people affected or notified); ¶¶20-22, 53-55. Far from a lone isolated instance, CNHS's actions and inactions required (as will be shown through discovery) a consistent pattern and practice of lax security.  Plaintiff alleged that the hackers had continuous access from July 26, 2014 to December 26, 2014. Compl. ¶14.  Despite the promises of data security (Compl. ¶¶ 41-48), and the requirements under federal law (*id.* at ¶¶ 25 & nn. 4-5, 40-41, 49-51), the information was likely unencrypted and unsecured by passwords or other security measures.  *Id.* at ¶¶ 20, 22, 74-75.  This is especially troubling given that it was public

---

[10] For example, considering that §13-301(9) "replicates common-law fraud." *McCormick v. Medtronic, Inc*., 101 A. 3d 467, 493 (Md. Ct. Spec. App. 2014), and common law fraud does not require repetition or a pattern, the *Hibdon* prerequisite is glaringly problematic.

knowledge that hackers were focusing on hospitals—especially hospitals catering to children.  *Id.*

at ¶¶ 52-53.  As is obvious, social security numbers and other PII/PHI is especially valuable from

children who will not be entering the credit or employment market for upwards of twenty years.

This unfettered, and undiscovered, access to identities of children makes their PII and PHI

especially valuable.  *Accord* Compl. ¶¶ 2,[11] 68, 70-71.

### 1. Plaintiff Has Adequately Pled a Claim Under the Unfair Prong of the MCPA

Binding authority holds that a trade practice is considered unfair (as opposed to deceptive)

and in violation of the MCPA when it causes (1) substantial injury; (2) that is not outweighed by

any countervailing benefits to the consumer or to competition that the practice produces; and (3)

the injury is not the type that a consumer could reasonably have avoided. *Legg v. Castruccio*, 100

Md. App. 748, 768 (1994); *see also Consumer Protection Div. v. Luskin's, Inc*., 120 Md. App. 1,

117 (1998)); *Sager v. Housing Comm'n of Anne Arundel Co*., 957 F. Supp. 2d 627, 642 (D. Md.

2013) (citing *Legg*).  This test for unfairness is the same test that the Federal Trade Commission

("FTC") enunciated in a 1980 policy statement to delineate its authority to regulate unfair business

practices based on consumer injury alone and that is "not moored in the traditional rationales of .

. . deception."  *See Legg*, 100 Md. App. at 767.  The Maryland Court of Special Appeals adopted

the unfairness doctrine outlined in the foregoing three-part test.  *See id*. at 771-73.

The FTC considers data breach enforcement under its unfairness prong further

demonstrating the MCPA's fit for this claim. *See e.g., FTC v. Wyndham Worldwide Corp*., 2015

U.S. App. LEXIS 14839, *16-22 (3d Cir. Aug. 24, 2015).  In *Wyndham,* the Third Circuit upheld

the FTC claim under the unfairness prong of the FTC Act.  Of particular relevance, the Court held

---

[11] Due to an inadvertent error, there are two paragraph 2s and two paragraph 3s in the Complaint. This refers to the first paragraph 2 of the Complaint.

that "[a] company does not act equitably when it publishes a privacy policy to attract customers who are concerned about data privacy, fails to make good on that promise by investing inadequate resources in cybersecurity, exposes its unsuspecting customers to substantial financial injury, and retains the profits of their business." *Id.* at *16.

*a) Defendant's conduct causes a substantial injury*

The injury to the consumer is the primary focus in a MCPA "unfairness" analysis. *Sager,* 957 F. Supp. 2d at 643 n. 14. *Legg* noted that since evidence of consumer injury is not clear-cut in all cases, the FTC test allows a court to look to statutes or other sources of public policy to affirm that a practice is unfair. *Legg,* 100 Md. App. at 769. *Legg* held that where a court relies on public policy to support a finding of unfairness, the policy should be clear and well-established. *Id.* In other words, the policy should be declared or embodied in formal sources such as statutes, judicial decisions, or the Constitution as interpreted by the courts, rather than being ascertained from a general sense of the national values." *Id.* at 769-70 ("Because the legislature or court has already determined that such injury exists, an independent basis need not be proven."). Finally, substantial injury can be shown through "conduct that violates generally recognized standards of business ethics." *Legg*, 100 Md. App. at 770.

Here, Plaintiff has pled a **9.5 times** increased risk of identity theft, medical fraud, lost medical identities, credit fraud, banking fraud, and identity fraud from the data breach.  Compl. ¶¶ 24, 26, 27 and n.6, 37, 69. She has further pled that the increased risk requires increased vigilance, a credit and medical data monitoring programs which come at an additional charge. *Id.* at ¶¶ 61-65.  This is sufficient for "substantial injury" under the MCPA. *Wyndham,* 2015 U.S. App. LEXIS 14839 at *21 ("unfairness claims 'usually involve actual and completed harms,' [but] "they may also be brought on the basis of likely rather than actual injury."). The Court of Special Appeals

specifically held that unwarranted health and safety risks (which hee would include the health and safety of consumer data as well as the risks of identity theft and medical fraud) would support a finding of unfairness. *Legg,* 100 Md. App. at 768. In *Sager*, the court found substantial injury as "the threat, to a rent-paying tenant, of summary ejectment" *if* she failed to mark her rental payments as "for rent." *Sager,* 957 F. Supp. 2d at 643. Moreover, although the consumer injury is clearly stated, Plaintiff has also pled public policy sources such as HIPAA, HITECH, Virginia Health Records Privacy Act (Va. Code. Ann. § 32.1-127.1.1:03), the Maryland Medical Records Act Health-General Article §4-301, and FTC rules and guidelines. Compl. ¶¶ 25 and nn. 4-5, 38, 40-41, 49-51.  Under *Legg*, this is an additional source for "substantial injury."

### 1.  Defendant's Citations are Irrelevant or Inapposite

Defendant mainly relies on its Article III attack in rejecting "substantial injury."  Memo. at 10-11.  For the reasons discussed above, Plaintiff satisfies both Article I and III standing requirements.  Moreover, Defendant's citations do not support their arguments as they are either not analyzing the unfairness prong or are factually distinguishable.  For example, *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333 (2012), analyzed the MCPA's deception prong.  *Id.* at 364 ("The complaints allege that Appellees engaged in a pattern of *deceptive conduct* by failing to provide copies of requested loan documents…")(emphasis added); *see also Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 621 (D. Md. 2014)(relying on *enumerated deceptive* conduct)  It dismissed the count because the MCPA did not cover a lender's failure to provide *duplicate* copies of loan documentation.  *Id.* ("Appellees were not engaged with Appellants in any of the covered activities in §13-303 when the documents were requested.").

The *Polek* plaintiffs sourced their injury on the notion "that they were unable to determine definitely whether [Secondary Mortgage Loan-Credit Provisions Law] violations occurred in their

closings." *Id.* at 365.  In other words, they pled that without the documents, they did not know if they were injured at all.  This is a far cry from the instant complaint.  Notably, *Chambers* held that a "complaint adequately pleads loss, for instance, when it points to some amount that it would take to remedy the loss [the plaintiff] incurred as a result of the respondents' alleged deceptive trade practices." *Chambers*, 43 F. Supp. 3d at 622 (internal quotations omitted).  In *Chambers,* plaintiff failed to quantify the price differential between the car as purchased and the car as it was worth. *Id.* at 623 ("[a] hypothetical price concession is simply not the type of tangible injury appropriately recognized in a private MCPA action.").  Here, Plaintiff specifically pled the monthly cost of monitoring policies, the per transaction cost of credit reports, and the average cost of identity fraud. *Cf.* Compl. ¶¶ 61-65 *with Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 149 (2007) ("it is clear that the petitioners have alleged facts constituting a loss [under the MCPA]. Particularly, the petitioners allege that, as a result of the respondents' misrepresentation or omission, they suffered a loss, *measured by the amount it will cost them to repair* the defective seatbacks.")(emphasis added).

*b)   There are no countervailing benefits to the consumer or competition*

*Legg* noted that "most business practices entail a balancing of costs and benefits to the consumer. [ . . . ] Since many trade practices provide a mixed bag of costs and benefits, the [FTC] will not find that a practice unfairly injures consumers unless it is injurious in its net effect." *See* 100 Md. App. at 768-69.  This prong seeks to balance competing interests as preventing an act that may appear to be unfair to one consumer but that actually benefits Maryland consumers at large was not contemplated by the drafters of the CPA. *Id.* at 772.  There can be no countervailing benefits to consumers or competition to have lax data security which permits easy theft of PHI and PII.  In fact, it would behoove CNHS to have the finest security in place to the extent it (a) prevents loss of reputation or the imposition of regulatory fines, or (b) improves any competition for surgical

services for specialized conditions in children.   *Cf.* Compl. ¶12. In fact, Defendant does not

challenge that Plaintiff has pled facts to sufficiently satisfy this test and therefore concedes it.

> c)   *Plaintiff could not have reasonably avoided the injury*

Plaintiff could not reasonably avoid the data breach as she has no control over

CNHS's internal security measures.   *Legg* noted that the guiding principle of the "not

reasonably avoidable" prong is

> that normally we expect the marketplace to be self-correcting, and we rely on
> consumer choice -- the ability of individual consumers to make their own private
> purchasing decisions without regulatory intervention -- to govern the market. We
> anticipate that consumers will survey the available alternatives, choose those that
> are most desirable, and avoid those that are inadequate or unsatisfactory.

100 Md. App. at 769. Corrective action, in turn, "is viewed as necessary only when consumers are

prevented from effectively making their own decisions. The purpose of such action is to halt some

form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free

exercise of consumer decision making." *Id.*; *see also id.* at 772-73.

Here, the commodification of patient data at hospitals in the area (if not nationwide) is

amenable to judicial notice as something within the Judge's personal knowledge.[12]   No hospital

visit is complete without a visit with administrative staff who enter data into a computerized

system.   Moreover, consumers could not reasonably avoid injury because CNHS had published a

misleading privacy policy that overstated its cybersecurity.  *Cf. Wyndham*, 2015 U.S. App. LEXIS

---

[12] The Federal Rules of Evidence permit this Court to "judicially notice a fact that is not subject
to reasonable dispute because it: (1) is *generally known* within the trial court's territorial jurisdiction; or
(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be
questioned."  Fed. R. Evid. 201(b)(emphasis added). Courts look to a myriad of sources to determine
what is "generally known" – including the individual judge's experience or his own personal knowledge.
*See, e.g., Davenport v. Alexandria*, 710 F.2d 148, 151 (4th Cir. 1983)(experience of living in Alexandria
supported judicial notice of character of Old Town); *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538,
567 (E.D. Va. 2000)(advertisement for auto dealer used to judicially notice character of transaction).

1489 at *18& n.5 (noting no reasonable avoidance based on misrepresentations in security promises) *with* Compl. ¶¶ 41-48. Finally, CNHS fails to challenge Plaintiff's pleading of this factor and thereby waives or concedes it.  Plaintiff's pleading, and Defendant's acts, satisfy the three part test for unfair acts in violation of §13-301 and §13-303 of the MCPA.  *See Legg*, 100 Md. at 773; *Sager* 957 F. Supp. 2d 627 at 642-43.

### B.  Plaintiff Adequately Pleads a CPPA Claim

"The Consumer Protection Procedures Act is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers." *Atwater v. District of Columbia Dep't of Consumer & Reg. Affairs*, 566 A.2d 462, 465 (D.C. 1989).  The Legislature expressed its intent that the CPPA be considered a remedial statute by explicitly stating that "[t]his chapter shall be construed and applied liberally to promote its purpose," D.C. Code § 28-3901 (c); that is, the purpose of "assur[ing] that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices." *Grayson*, 15 A.3d at 244-245. Moreover, "while the CPPA is broad in the conduct it proscribes, even more important perhaps is the array of enforcement mechanisms it contains for the protection of consumers." *Osbourne v. Capital City Mortg. Corp.*, 727 A.2d 322, 325 (D.C. 1999).

Plaintiff alleged violations of D.C. Code §28-3904(a), (d), and (h) as well as D.C. Code §28-3905(k)(2)'s catchall provision which pleads in the violations of other statutes and the common law claims.  Compl. ¶94-96.

### 1.  Plaintiff alleges a "trade practice" under §28-3901(a)(6)

Plaintiff alleges years of surgical visits to CNHS starting in her infancy.  ¶9.  Plaintiff further alleges that CNHS uses its privacy policies as a means of enticing consumers to choose it over other general hospitals. Compl. ¶40.  CNHS, however, claims that the offering of its services

is not a "trade practice" under §28-3901(a)(6) because the Notice of Privacy Practices and Patient Bill of Rights ("Privacy Policy") statements are mandated by law.  Of course, it cites no law in support of the notion that mandated disclosures (which is the sum and substance of many consumer protection laws) cannot serve as the basis for a "trade practice" under the CPPA.  In fact, as discussed above, *Grayson* finds that the CPPA provides consumers with a right to truthful information.  *Grayson*, 15 A.3d at 249.  Assuming, *arguendo*, that a mandated disclosure cannot serve as a "trade practice", CNHS fails to account for the fact that while HIPAA requires *a* notice, it certainly has not drafted (chapter and verse) *the* notice provided by CNHS.  *See* Compl. ¶41-48. In fact, 45 CFR §164.520 only provides generalized topics, some mandatory and some discretionary, leaving it open to the providers to fine-tune the ultimate language to their business and marketing needs. Notably, the language truly mandated by the regulation is the header.  *Id.* at §164.52(a)(3)(b)(i).

The protections of the CPPA apply to a wide range of practices and transactions. *See, e.g., DeBerry v. First Gov't Mortg. & Investors Corp*., 743 A.2d 699, 700-01 (D.C. 1999); *Julian Ford v. ChartOne, Inc*., 908 A.2d 72, 81 (D.C. 2006).  A trade practice is broadly defined as "any act" which, *inter alia,* "provides information" in connection with the sale of consumer services.  §28-3901(a)(6).  "Unlawful" trade practices are enumerated in §28-3904. *DeBerry*, 743 A.2d at 700. And "any act" would include the use of promises drafted and disseminated as part of its privacy policy.  *See id.* at 701 ("'any act... *of providing information about*' or 'offering for. . . sale' consumer credit would seem to be 'a trade practice...'") (emphasis added).

## 2.  Plaintiff has alleged a misrepresentation of fact

Stated succinctly, the facts pleaded support claims that CNHS "represented that its services complied with data security measures mandated by industry and federal standards, and thus had a

certain characteristic, quality or standard, without an intent or ability to provide the services as offered." *Id.* at ¶95. Plaintiff alleges that CNHS misrepresented the nature and extent of its security measures in connection with the provision of its service. Compl. ¶¶40-48. Specifically, she alleges that CNHS promised that the only access and use of her PII and PHI would be under the terms spelled out in the Privacy Policy, *id.* at ¶44, and that her "Past, present, and future information is protected." *Id.* at ¶45. CNS also promises to "make every effort to protect children's rights to a private physician/patient relationship" and that it "will always make every effort to get permission from you to disclose information about your child's care." Ex. B to Motion at 5 of 7. CNHS also claims to "make every effort to help *you be the agent for information* about your child." *Id.* (emphasis added). Plaintiff further alleges that CNHS misrepresented, through vague descriptions, what was actually stolen by the data thieves. *Id.* at ¶66. She further alleges that CNHS misrepresented the true risk from the breach when it implied that there was *no* risk when in fact the risk is 9.5 times higher. *Id.*; *see also* Ex. A to Motion.

Defendant, focusing only on the Privacy Policy, wrongly argues that Plaintiff has failed to plead a misrepresentation of fact which would deceive a reasonable consumer. Memo. at 12-13. In doing so, it seemingly focuses on §28-3904(b) to the exclusion of sub-sections (a). *Id.* at 12 ("The privacy notice does not contain any representations whatsoever (let alone any misrepresentations) concerning the *quality* of CNHS's data security measures.")(emphasis added); *id.* at 13 ("A reasonable consumer would not conclude from these statements that CNHS represented any particular *quality* of data security.")(emphasis added). As discussed above, Plaintiff has alleged three separate mechanisms by which Defendant misrepresented facts. What a "reasonable consumer" would or would not conclude from such promises and misrepresentations are pure questions of *fact* for the jury. *See Saucier v. Countrywide Home Loans*, 64 A.3d 428, 445

(D.C. 2013); *Nat'l Consumer's League v. Doctor's Assocs.*, 2014 D.C. Super. LEXIS 15, *21 (D.C. Super. Ct. Sept. 12, 2014); *Nat'l Consumers League v. Gerber Prods. Co*., 2015 D.C. Super. LEXIS 10, *28 (D.C. Super. Ct. Aug. 5, 2015); *National Consumers League v. Bimbo Bakeries USA*, 2015 D.C. Super. LEXIS 5, *30 (D.C. Super. Ct. Apr. 2, 2015); *see also Wilson Sporting Goods Co. v. Hickox*, 59 A.3d 1267, 1276 (D.C. 2013)("Jurors could consider such testimony in combination with their own reasonable inferences to determine an ordinary consumer's expectations.").[13]

### 3.  False advertising is adequately pled under §28-3904(h)

Plaintiff, relying on the promises made in the Privacy Policy, adequately alleges a violation of §28-3904(h).  Defendant relies on *Grayson*'s analysis of the advertisement prong to argue that without advertisements, a claim under §28-3904(h) must fail.  Memo at 13 (citing *Grayson*, 15 A.3d at 252).  However, CNHS never explains why the glossy multi-paged and illustrated Privacy Policy cannot constitute an "advertisement" under the CPPA.

To the extent that the Privacy Policy does not equate to an "advertisement" it is part of the "offer" for the provision of "services" under §28-3904(h).  That section holds it is a violation of the CPPA to "advertise *or offer* goods *or services* without the intent to sell them as advertised *or offered*." (emphasis added)   It is axiomatic that the Court must analyze a statute in a way that

---

[13] *Floyd v. Bank of Am. Corp*., 70 A.3d 246, 254 (D.C. 2013) does not dictate a different result. There, plaintiff alleged that a domestic toll-free number implied that the customer service call centers were located in the U.S. and came with the protections of the U.S. laws on government intrusion.  The Court, understandably held that a consumer could not reasonably expect that calling a toll-free customer service number necessarily implied speaking with a U.S.-based representative.  Specifically, it held that the "fatal defect in these claims is that appellants have not pointed to *any representation(s)* that the Bank made that was to the effect that, in providing customer service, every Bank call center representative can 'invoke the protection of the laws of the United States to exclude the U.S. Government from unfettered access to consumers' financial records.'" *Id.* (emphasis added). By contrast here, Plaintiff has provide many quotes directly from the Privacy Policy as well as the Data Breach Notice letter.

gives meaning to all the words and does not render any redundant or superfluous.  *National Wlidlife Fed'n v. Gorsuch*, 693 F.2d 156, 172 (D.C. Cir. 1982) ("Under usual rules of statutory construction, use of two different terms is presumed to be intentional . . ."); *State v. Rogenkamp*, 153 Wn.2d 614, 625 (2005) ("Another fundamental rule of statutory construction is that the legislature is deemed to intend a different meaning when it uses different terms."). That "offer" means something different than "advertise" is supported by the fact that the term "offer" is also used in §28-3904(l)("falsely state the reasons for *offering* or supplying goods or services at sale or discount prices") and in §28-3901(a)(7)(discussed above).  The term "offer" means "to give, make, or promise,"[14] where the term "advertise" means "to announce or praise (a product, service, etc.) in some public medium of communication in order to induce people to buy or use it."[15]  Under either definition, Plaintiff has adequately pled her claim under subsection (h).

### 4.  Statutes and common law can serve as predicates for a CPPA claim

 "Among [the CPPA's] purposes is to 'assure that a just mechanism exists to remedy *all* improper trade practices.'"  *Atwater,* 566 A.2d at 465 (quoting §28-3901(b)(1))(emphasis in the original).  "The [CPPA] contemplates that its procedures will be invoked, not simply to enforce its own substantive provisions, but also those of *other consumer protection laws*."  *Id.*  (emphasis added).  The Court of Appeals provides that the procedures specified in the CPPA may be used in cases like the instant matter  "notwithstanding that a given trade practice, at issue in the case, may be governed in whole or in part by another law which has *different enforcement procedures and mechanisms*."  *Id.* at 468 (emphasis added). *Atwater* further recognized that the CPPA "allows other consumer protection enforcement laws to continue side-by-side with this one . . . ."  *Id.*

---

[14] http://dictionary.reference.com/browse/offer?s=t

[15] http://dictionary.reference.com/browse/advertise?s=t

The Court of Appeals has repeatedly and consistently applied these concepts to consumer protection lawsuits instituted by the private bar.  Specifically, in *Osbourne*, the Court held that the "CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices proscribed by § 8-3904, but to *all other statutory* and common law prohibitions."  727 A.2d at 325-26 (emphasis added).  This concept has been adopted by the Court of Appeals repeatedly since then. *Osbourne v. Capital City Mortg. Corp.,* 727 A.2d 322, 325-26 (D.C. 1999); *Dist. Cablevision Ltd. P'shp v. Bassin*, 828 A.2d 714, 723 (D.C. 2003); *ChartOne*, 908 A.2d at 81 ("The protections of the CPPA apply to a wide range of practices and transactions.").

Despite this extensive body of law in the District, CNHS claims that HIPAA as modified by HITECH,[16] is an improper "bootstrap" for a CPPA claim.  Memo. at 14.  However, the commentary accompanying HIPAA and the implementing regulations describes "it as a 'mandatory floor' for consumer protection that other government entities may exceed if they choose.'" *Abbott v. Tex. Dep't of Mental Health & Mental Retardation*, 212 S.W.3d 648, 654 (Tex. App. Austin 2006)(quoting 65 Fed. Reg. 82462, 82471 (Dec. 28, 2000)).  Thus, having HIPAA serve as the standard, the "mandatory floor," for a CPPA violation falls in line with the commentary to the statute. In fact, in analyzing HIPAA's requirements as predicates for state consumer protection claims, courts have held that "state courts routinely apply federal law in state law consumer protection and negligence suits."  *Dickman v. MultiCare Health Sys*., 2015 U.S. Dist. LEXIS 71306, *7 (W.D. Wash. June 2, 2015)(citing *Nevada v. Bank of Am. Corp*., 672 F.3d

---

[16] CNHS does not challenge the use of Virginia Health Records Privacy Act (Va. Code. Ann. § 32.1-127.1.1 :03), the Maryland Medical Records Act Health-General Article §4-301 and common law as predicate violations of the CPPA and thereby waives the argument.

661, 676 (9th Cir. 2012)).[17]

        a.   *Plaintiff has adequately pled the violation of HIPAA*

Whether relying on HIPAA to provide the standard for the CPPA violation, or whether demonstrating that HIPAA itself was violated as a predicate for the CPPA violation, Plaintiff has adequately pled her claim.  In passing HIPAA in 1996, Congress "recognized the importance of protecting the privacy of health information in the midst of the rapid evolution of health information systems . . .The privacy provisions of [HIPAA] . . . create national standards to protect individuals' medical records and other personal information." *DePaolo v. Triad Healthcare*, 2013 Conn. Super. LEXIS 2688, *16 (Conn. Super. Ct. Nov. 26, 2013)(citations and internal quotations omitted).   HIPAA "creates a duty owed by [the hospital] to its patients to maintain the confidentiality of their protected health information." *Farr v. St. Francis Hosp. & Health Ctrs*., 2007 U.S. Dist. LEXIS 72352, *9 (S.D. Ind. Sept. 26, 2007).

Plaintiff alleges that CNHS failed to discover that it had been subject to a phishing scam for five months and waited two more months before notifying Plaintiff and the putative Class.  ¶¶ 2,[18] 14, 57.  Through this scam, employees allowed access to the CNHS system through emails. ¶13.  Phishing comes through personal emails, social media websites, auction sites, online payment processors.  *Id.* at n.1.  By luring the employees into providing access data to criminals, these (apparently untrained) employees opened the information door.  Having data PII and PHI stolen is

---

[17] Defendant relies on a decision under the New Jersey Consumer Fraud Act ("CFA") which dismissed the count for lack of standing and under 11th Amendment immunity. Memo at 14 (*Polanco v. Omnicell, Inc*., 988 F. Supp. 2d 451, 471 n. 24 (D.N.J. 2013)).  Unlike the CPPA, there is no history of *other statutes* serving as a predicate for a CFA claim.  Thus, in dicta, the court noted that reliance on the CFA would not cure the standing defect as HIPAA did not function as a predicate.

[18] Due to an inadvertent error, there are two paragraph 2s and two paragraph 3s in the Complaint. This reference is to the second paragraph 2.

catastrophic to the consumer. That is why, as discussed below, encryption is mandated (with limited exceptions) on all covered entities such as Defendant. CNHS argues instead that a multi-million dollar hospital fell into an exception to an encryption rule. Memo. at 14. Thus, it implicitly admits that the data stolen was not encrypted. *See also* Compl. ¶20-22.

HIPAA provides broad general rules and specific technical requirements. Several of HIPAA's general requirements are relevant here. 45 C.F.R. §164.306 states that "[c]overed entities and business associates **must**….

- *Ensure* the *confidentiality,* integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits.
- *Protect* against any *reasonably anticipated threats* or hazards to the security or integrity of such information.
- *Protect* against any *reasonably anticipated* uses or *disclosures* of such information that are not permitted or required under subpart E of this part.
- *Ensure* compliance with this subpart by its *workforce.*

§ 164.306(a)(1)-(4)(emphasis added).

Here, given the rash of hospital breaches, especially children's hospital breaches, (Compl. ¶52), CNHS should have "reasonably anticipated threats….to the security" of the data and should have "protect[ed] against [such] reasonably anticipated …disclosures of information…." § 164.306(a)(2)(-(3); Compl. ¶53. Simply put, they failed to "ensure the confidentiality" of the information to which they were entrusted by failing to "ensure compliance" by "its workforce." § 164.306(a)(1),(4). In fact, in closing the barn door after the horses got out, CNHS claims to have trained its staff on phishing and implemented unspecified new security enhancements. Compl. ¶53-54. Whether this data breach should have been reasonably anticipated, whether CNHS did enough to "ensure" confidentiality and compliance, will necessitate the fact-finder reviewing the

evidence.  *See Ware v. Bronson Methodist Hosp.,* 2014 Mich. App. LEXIS 2125, *12 (Mich. Ct. App. Nov. 4, 2014)(jury must determine whether the Hospital's security policies and procedures were appropriate by balancing relevant factors).

45 CFR §164.312 provides for technical safeguards.[19]  It states that a "covered entity or business associate **must**….

- Implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access *only* to those persons or software programs that have been granted access rights…" *Id.* at §164.312(a)(1)(emphasis added).

- Implement a mechanism to ***encrypt*** [20] and decrypt electronic protected health information.  *Id.* at §164.312(a)(2)(iv)(emphasis added).  Implement a mechanism to ***encrypt*** electronic protected health information whenever deemed appropriate. *Id.* at §164.312(e)(2)(ii)(emphasis added).

- Implement procedures to verify that a person or entity seeking access to electronic protected health information *is the one claimed*. *Id.* at §164.312(d)(emphasis added).

- Implement technical security measures to *guard against unauthorized access* to electronic protected health information that is being transmitted over an electronic communications network. §164.312(e)(1)(emphasis added).

Defendant implies that encryption is not required of it.  Memo at 14 (citing §164.306(d)(3)(i)).  45 C.F.R. §164.306(b) provides a certain flexibility of approach in implementation.  Thus, a covered entity, like CNHS, "may use any security measures that allow the covered entity or business associate to *reasonably and appropriately implement the standards*

---

[19] "Technical safeguards means the technology and the policy and procedures for its use that protect electronic protected health information and control access to it." 45 CFR 164.304.

[20] "Encryption means the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." 45 CFR §164.304.

*and implementation specifications* as specified in this subpart." §164.306(b)(1))(emphasis added). In order to account for smaller businesses, like solo practitioners or small practices, HIPAA allows the covered entity to use certain factors in deciding which security measures to use. §164.306(b)(2).  These factors are:

- The size, complexity, and capabilities of the covered entity or business associate.
- The covered entity's or the business associate's technical infrastructure, hardware, and software security capabilities.
- The costs of security measures.
- The probability and criticality of potential risks to electronic protected health information.

§164.306(b)(2)(i)-(iv).  Similarly, §164.306(d)(3)(i), relied on by CNHS, permits a covered entity for "addressable" implementation standards to "[a]ssess whether each implementation specification is a *reasonable and appropriate* safeguard *in its environment*, when analyzed with reference to the *likely contribution to protecting* electronic protected health information." (emphasis added).  Given the flexibility exceptions, encryption *is* an "addressable" function.  *See, e.g.,* 45 CFR §164 Appendix A To Subpart C.  However, that does not end the inquiry.

The CNHS network in the Washington, D.C. metropolitan area is significant.  Unlike a solo practitioner, it cannot claim that it lacks the size or complexity to implement HIPAA's encryption requirements. *Cf. Picco v. Glenn,* 2015 U.S. Dist. LEXIS 58703, *20 (D. Colo. May 5, 2015)("federal law and regulations, in particular 45 C.F.R. §§164.105, 164.304, *164.306, 164.308, 164.312,* and 170.210, set forth the types of information that *a hospital* like Defendant VVH is required to record, maintain, and make available.")(emphasis added).  According to its 2014 Annual Report, CNHS had $1,565,063,000 in total assets and $1,052,285,000 in total revenue.[21]

---

[21] http://childrensnational.org/~/media/cnhs-site/files/about/annualreport/annrpt_2014.ashx (2014 Annual Report at 22 of 24).  The Court may take judicial notice of information contained on Defendant's own website. *Ademiluyi v. PennyMac Mortg. Inv. Trust Holdings I, LLC,* 929 F. Supp. 2d 502, 510 (D.

It has an extensive technical infrastructure with specialized hardware and software systems.  Dr. Brian R. Jacobs serves as its Vice President, Chief Medical Information Officer, and Chief Information Officer Executive Vice President, Center for Pediatric Informatics and The Children's IQ Network.[22]  And as discussed above, the probability of an intrusion and the critical nature of the risks to the PHI and PII all militated in favor of implementing HIPAA's safeguards.  Whether CNHS's policies, procedures, and safeguards complied with "reasonable" standard will be a jury question.  *Accord Ware,* 2014 Mich. App. LEXIS 2125, at *12.

Lastly, a "covered entity or business associate **must**….[i]]mplement policies and procedures to *prevent*, *detect*, contain, and correct security violations." 45 CFR §164.308 (emphasis added); *United States ex rel. Sheldon v. Kettering Health Network*, 2015 U.S. Dist. LEXIS 803, *7 (S.D. Ohio Jan. 6, 2015)(§164.308 applies to hospitals).  It is clear, by the passage of five months between intrusion and detection, (Compl. ¶¶14, 56, 57), that CNHS has not implemented sufficiently robust policies and procedures to not only prevent but detect security violations.  Through discovery, Plaintiff will discovery whether Dr. Jacobs and his department

- "[c]onduct[ed] an accurate and thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and availability" of the PII/PHI. §164.308(a)(1)(ii)(A).
- implemented "security measures sufficient to reduce risks and vulnerabilities to a *reasonable and appropriate* level…" §164.308(a)(1)(ii)(B)(emphasis added).
- Levied "appropriate sanctions against workforce members who fail[ed] to comply with the security policies" (assuming any were in place to guard against phishing or unsafe external Sites). §164.308(a)(1)(ii)(C).

---

Md. 2013); *see also Howard v. Gap, Inc*., 2007 U.S. Dist. LEXIS 8510, *15 (N.D. Cal. Jan. 19, 2007)(judicial notice of Gap's annual report proper as it is publicly available, with  easily verifiable information).

[22] *Id.* at 21 of 24.

- Had in place "procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports." §164.308(a)(1)(ii)(D).  It is doubtful that such procedures were in place since it did take five months to discovery the unlawful access.

The proper implementation of existing policies, if any, is also a jury question. *Ware*, 2014 Mich. App. LEXIS 2125, at *15 (the jury can evaluate claim that Hospital failed to enforce its existing security policies).  For the foregoing reasons, Plaintiff adequately states a predicate violation of HIPAA sufficient to support her CPPA claim.

### C. Defendant invaded Plaintiff's privacy by granting unauthorized access to PII/PHI

Defendant unreasonably intruded upon the seclusion of Plaintiff and the Class Members by granting an unauthorized third party access to Plaintiff's PII/PHI, allowed her name and information to be appropriated and publicized. Compl. 123-125. Furthermore, Defendant's actions allowed the private information, medical diagnoses and treatment of Plaintiff and Class Members to be released publically.   Maryland recognizes an action for unwarranted invasion of privacy. *Carr v. Watkins*, 227 Md. 578, 586(1962).  The right to privacy is "the right of the plaintiff to be let alone." *Hollander v. Lubow*, 277 Md. 47, 54, (1976) (quoting W. Prosser, *The Law Of Torts*, at 804 (4th ed. 1971)), *cert. denied*, 426 U.S. 936 (1976).  Certainly a persons' medical information is among the most private types of personal affairs, and the disclosure of this information would be something that most reasonable people would want to avoid. Maryland recognizes four species of this tort.  The elements broadly are:

(1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.
(2) The right of privacy is invaded by
(a) unreasonable intrusion upon the seclusion of another …; or
(b) appropriation of the other's name or likeness …; or
(c) unreasonable publicity given to the other's private life …; or
(d) publicity that unreasonably places the other in a false light before the public ….

38

*E.g., Lawrence v. A.S. Abell Co.,* 299 Md. 697, 700-02 (1984).   Unauthorized third parties intruded[23] upon Plaintiff's privacy when CNHS opened the door to their access.   CNHS further facilitated the appropriation of Plaintiff's name and data and thereby gave unreasonable publicity to her private life and medical condition.   Unlike intrusion, publicity, appropriation and false light[24] can happen unintentionally.   *Bailer v. Erie Ins. Exch.*, 344 Md. 515, 542-544 (1997)(dissent)(distinguishing intentional from unintentional invasion of privacy and discussing relevant case law).

Defendant is incorrect that Plaintiff fails to claim that anyone accessed her information. Memo. at 22. Defendant acknowledged through their notice letter that Defendant disclosed personal information to an unauthorized third party, and that such personal information included the name, identity and medical information of Plaintiff and the Class Members. *Cf.* Compl. ¶¶ 5, 124 *with Neiman Marcus*, 794 F.3d at 693 ("In our case, Neiman Marcus does not contest the fact that the initial breach took place."). In addition, Defendant mistakenly relies on case law that is factually distinguishable from Defendant's reckless violation of Plaintiff's and Class Members' privacy rights. Memo at 22.

Principally, Defendant relies on *Randolph v. ING Life Insurance & Annuity Co.*, 973 A.2d 702 (D.C. 2009), and *SAIC*, 45 F. Supp. 3d 14, where the plaintiffs failed to argue that any information was accessed from stolen physical storage devices. There, the court addressed whether the theft of a laptop (as part of a home burglary) constituted an invasion of privacy to those whose information was contained in the laptop. *Randolph*, 963 A.2d at 705. The court held that the

---

[23] "The intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person. *Mitchell v. Baltimore Sun Co.*, 164 Md. App. 497, 522 (2005).

[24] In fact, recklessness is specifically read into the claim of "false light" invasion.

plaintiffs failed to allege that the sensitive information on the stolen laptop had been accessed, and that the mere theft of a laptop did not constitute an invasion of privacy. *Id*. at 711. Similarly, *SAIC* involved the theft of a GPS, stereo, and several tapes containing PII/PHI from an employee's car. *SAIC*, 45 F. Supp. 3d at 19. *SAIC* held that there was no invasion of privacy because the plaintiff failed to allege that the thief undertook the complicated and unlikely steps which were required to gain access to the personal information. *Id*. at 25. Here, Plaintiff explicitly alleges that her PII/PHI was appropriated by criminals and published to an unauthorized third party over the course of five months. Compl. ¶¶ 2, 124. The invasion of privacy of Plaintiff and the Class Members is more similar to *Adobe*, where the chain of events leading to the plaintiff's data being misused was neither "highly attenuated" nor "highly speculative" but immediate and real. *Adobe*, 66 F. Supp. 3d at 1214.

Despite specifically pleading appropriation and publicity, Compl. ¶¶ 124-25, Defendant broadly proclaims the entire count must plead intentional conduct and fails to do so. Memo. at 22. To the extent that Plaintiff needs to prove intentional conduct for intrusion, Plaintiff has explicitly alleged that Defendant's conduct, the actions of Defendant's employees and Defendant's intentional failure to take the necessary precautions required to safeguard the PII/PHI of Plaintiff and Class Members, or to discovery the intrusion, invaded Plaintiff's privacy. Compl. ¶¶ 2-5, 123-126. *Randolph*, cited by Defendant, explicitly stated that there was "little difficulty agreeing that conduct giving rise to unauthorized viewing of personal information such as a plaintiff's Social Security number and other identifying information can constitute an intrusion that is highly offensive to any reasonable person, and may support an action for invasion of privacy." *Randolph*, 973 A.2d at 711.). *Galaria*, 998 F. Supp. 2d at 662 is inapplicable because Plaintiff has alleged that Defendant's employees intentionally opened the door to unauthorized third parties. Compl. ¶

3. By granting an unauthorized third party access to the PII/PHI of Plaintiff and Class Members, Defendant intentionally invaded Plaintiff's privacy.

Finally, Defendant claims that granting an unauthorized third party five months of access to Plaintiff's personal information, medical diagnosis, and treatment does not constitute dissemination to the public. Memo at 23. As *Adobe*, noted "why would hackers target personal information if not to misuse it?" 66 F. Supp. 3d at 1216; *see also Burton v. MAPCO Exp., Inc.*, 47 F. Supp. 3d 1279, 1280 (N.D. Ala. 2014). Similarly in *Neiman Marcus*, the court found that there is an objectively reasonable likelihood that hackers would disseminate the sensitive information to the public. 794 F.3d at 693. As in *Adobe* and *Neiman Marcus*, the PII/PHI of Plaintiff and Class Members has been disseminated to the public, thereby exposing information crucial for identity theft, credit fraud, and medical fraud.

### D.  Unjust enrichment is adequately pled.

Unjust enrichment is the retention of a benefit which in justice and equity, belongs to another. *Movahedi v. U.S. Bank, N.A.,* 853 F. Supp. 2d 19, 29 (D.D.C. 2012) (citations omitted). The essential elements of unjust enrichment are common across jurisdictions.  "[A] plaintiff states a claim for unjust enrichment when: (1) the plaintiff confers a benefit upon the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Saber Int'l Sec. v. Torres Advanced Enter. Solutions, Inc.,* 820 F. Supp. 2d 62, 76 (D.D.C. 2011) (citations omitted); *Benson v. State*, 389 Md. 615, 651-52 (2005). Damages for unjust enrichment are "based on what the person allegedly has received, not on what the opposing party has lost." *Georgopolis v. George,* 54 N.W.2d 137, 142 (Minn. 1952); *Bank of Am. Corp. v. Gibbons*, 173 Md. App. 261, 268 (Md. Ct. Spec. App. 2007).

The first two unjust enrichment elements are clearly satisfied.  Plaintiff and Class Members

conferred a monetary benefit on Defendant in the form of payments for medical services. These payments covered administrative costs, such as electronic data management services, and Defendant appreciated the monetary benefit by accepting the payments. , under the principles of equity and good conscience, CNHS should not be permitted to retain the portion of the payments made by Plaintiff which covered the administrative costs of electronic data security. CNHS should return the money it unjustly received for protection it failed to provide.

In *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1328 (11th Cir. 2012), the court addressed whether the defendant could equitably retain a monthly insurance premium, which was used to pay administrative costs, after the unencrypted personal information of a health care provider was stolen. The court analyzed the actions of the defendant under the principles of unjust enrichment. *Id.* at 1328. First, the court found that the plaintiff had conferred a benefit to the defendant in the form of monthly premiums. *Resnick*, 66 F. Supp. 3d at 1328. Second, the defendant had retained the benefit in accepting these premiums and using a portion of which to pay for administrative costs, such as cyber security. *Id.*  Finally, the court found that the defendant could not equitably retain portions of the monthly premiums because the defendant failed to adequately implement policies to secure sensitive information. *Id.*

*Resnick* mirrors the facts of the present case in upholding Plaintiff's unjust enrichment claim. Furthermore, Defendant's assertions regarding the contractual relationship are all based on a failure to recognize that such a claim can be pled in the alternative.  FRCP 8(d)(2). Regardless of an underlying contractual relationship, *Resnick* and *Target* still recognized unjust enrichment in the context of personal information disclosed through a data breach.  *Resnick*, 693 F. 3d at 1328; *Target*, 66 F. Supp. 3d at 1178

Contrary to Defendant's argument, Plaintiff has alleged that she conferred a benefit

connected to Defendant's data security measures.  Compl. ¶12.  Defendant, however, claims that Plaintiff is required to establish an *identifiable* amount of her medical bills which are earmarked for data security and that overpayment allegations are insufficient support for a viable cause of action. Memo. at 20. However, in *Resnick*, the court found that alleged facts were sufficiently pled where the plaintiff alleged that "AvMed cannot equitably retain their monthly insurance premiums—part of which were intended to pay for the administrative costs of data security" *Resnick*, 693 F.3d at 1328. Similarly, Plaintiff alleges that "a portion of payments made by Plaintiff and Class Members were used to pay for the administrative costs of electronic data management services and cyber security services." Compl. ¶ 120.[25]

Defendant's arguments that Plaintiff has not alleged Defendant's unjustly retention of a benefit, Memo. at 20, equally fail. Plaintiff has sufficiently alleged that the retention of portions of Plaintiff's payments, which included administrative costs, is unjust when Defendant failed to provide cyber security services. Compl. ¶ 120-122. Furthermore, Defendant fails to cite to any case which finds the retention of such payments as *just*. *See Resnick*, 693 F. Supp. 3d at 1328 (finding the plaintiff had sufficiently pled that AvMed "should not be permitted to retain the money belonging to Plaintiffs" because AvMed "failed to implement the data management and security measures that are mandated by industry standards.") (internal quotations omitted).

Finally, Plaintiff has alleged sufficient facts to plead negligence against Defendant. Therefore, Defendant's argument that Plaintiff's unjust enrichment claim stands or falls with Plaintiff's negligence claim is not only incorrect, but irrelevant. Unjust can be supported by more than the negligence count but by the facts pled.

### E.  Defendant breached the implied contract.

---

[25] The *SAIC* court did not address unjust enrichment at all but instead addressed the plaintiff's claim for loss of value of their insurance premiums. *SAIC*, 45 F. Supp. 3d at 30.

In order to prove an action for breach of implied contract, the plaintiff must prove that (1) defendant owed the plaintiff a contractual obligation and that (2) defendant breached that obligation. *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001) ("It is not necessary that the plaintiff prove damages resulting from the breach, for it is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages."). An implied contract is established not by words but by conduct. *Thomas v. Capital Med. Mgmt. Assocs., LLC*, 985 A.2d 51, 63 (Md. Ct. Spec. App. 2009).

Plaintiff meets the elements of breach of implied contract in the following ways. An implied contract exists here between Plaintiff, Class Members and Defendant. Plaintiff and Class Members provided their PII/PHI to Defendant. Providing the PII/PHI allowed Plaintiff to take advantage of Defendant's healthcare services, while storing the PII/PHI of Plaintiff and the Class electronically was economically efficient for Defendant. Implicit in the contract was the covenant requiring Defendant to take reasonable efforts to safeguard the PII/PHI and to promptly notify them in the event that their information was wrongfully disseminated.

The existence of an implied contract is a factual question that a jury must determine. *Target*, 66 F. Supp. 3d at 1177. In addition, courts have held that an implied contract could be found in factually similar situations to this one. *See, e.g., Target*, 66 F. Supp. 3d at 1177 (plaintiffs plausibly alleged the existence of an implied contract whereby defendant agreed to protect plaintiffs' personal information); *Hannaford*, 659 F.3d at 159. In *Hannaford*, the court addressed whether an implied contract existed between the two parties following the data breach of the defendant's network. The court held that a jury could reasonably find that an implied contract existed between defendant and its customers because it was "necessary to effectuate the contract", and that such an implied contract required the defendant to take reasonable measures to protect the

plaintiff's personal information. *Hannaford*, 659 F.3d at 159.

Here as in *Hannaford*, an implied contract exists between Plaintiff, Class Members, and Defendant. Compl. ¶¶ 113-115. A covenant to safeguard Plaintiff and Class Member's personal information was necessary to effectuate the contract. A person's personal and medical information is highly sensitive, and an implied contract existed providing that such information would be safeguarded. *See, e.g.*, *Hannaford*, 659 F.3d at 159 (stating that when a customer uses a credit card he "intends to provide that data to the merchant only").

Defendant argues that Plaintiff cannot plausibly allege that Defendant made a promise to guarantee data security. Memo. at 17. In this Defendant relies primarily on *Putnam Bank v. Ikon Office Solutions, Inc.*, 2011 U.S. Dist. LEXIS 71593, at *8 (D. Conn. Jul. 5, 2011), as an example of a data security case in which the court found there was no implied contract. However, the implied contract entered into between Plaintiff, Class Members, and Defendant is distinguishable from the lease agreement for office equipment in *Putnam*. The essence of the contract in *Putnam* was for "the lease of office equipment, not the protection of data that would be saved on the equipment", *id.*, while the essence of the contract entered into between Plaintiff, Class Members, and Defendant included, by operation of state and federal law, for the electronic storage and use of personal information. *Id*.   The First Circuit reversed the dismissal of the plaintiffs' implied contract claim, explaining that a "contract includes not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it is made." *Hannaford*, 659 F.3d at 158-59.

Defendant also relies on *Frezza v. Google Inc.*, 2012 U.S. Dist. LEXIS 166003, *3 (N.D. Cal. Nov. 20, 2012), where the court examined whether Google breached an implied contract with

its customers for the responsible handling of customer credit card information. *Id*. at *11. However, this case is irrelevant to Plaintiff's situation because *Frezza* declined even to analyze whether an implied contract existed because any eventual contract was never breached. *Id*. Defendant also argues that Plaintiff has never alleged to have read "any statements promising anything about data security when she made the decision to seek healthcare." Memo. at 18.  Here Defendant relies on *Krottner*, which examined whether there was an implied contract between Starbucks and its employees to safeguard the employee's personal information. The court held that there was no implied contract because the plaintiffs did not allege that: they saw the employee policy agreement, they understood the employment contract as an offer, or that they accepted the offer on its terms. 628 F.3d at 1140. *Krottner* is distinguishable because while the employees did not read the entirety of their employment contract, Plaintiff and Class Members were aware of the Privacy Policy, as they are required to sign one at every medical visit.

Finally, Defendant alleges that Plaintiff's breach of implied contract claim is improperly brought pursuant to a private cause of action under HIPAA. Memo. at 18. This is incorrect. Plaintiff has never alleged a claim under a HIPAA, but has instead alleged that "[n]ot withstanding the obligations imposed on Defendant by its implied contract with Plaintiff and Class Members," Defendant's conduct breached *industry standards* as set out in HIPAA.

### F.  Defendant was negligent in safeguarding the PII/PHI.

Negligence requires that (1) defendant was under a duty to protect the plaintiff from injury, (2) defendant breached that duty, (3) plaintiff suffered actual injury or loss, and (4) that loss or injury proximately resulted from the defendant's breach of the duty. *Patton v. U.S. Rugby Football Union, Ltd*., 851 A.2d 566, 570 (Md. 2004).

Defendant was clearly negligent in the instant case for failing to exercise reasonable care

in protecting the PII/PHI of Plaintiff and Class Members. As further evidence of Defendant's negligence, in its brief Defendant fails to contest that: Defendant had a duty, Defendant breached that duty, or that Defendant was the sole cause of the injury to Plaintiff and Class Members.[26] Instead, Defendant's only claim is that the dissemination of the PII/PHI of Plaintiff and Class Members to an unauthorized third party over the course of five months fails to constitute a "cognizable injury."[27] Memo at 15.

"Injury" is "the invasion of any legally protected interest of another." *Jordache,* 49 Cal. App. 4th at 620 (citing Restatement (Second) Of Torts, §7). An injury is not speculative or contingent simply because future events may affect its permanency or the amount of monetary damages eventually incurred. Restatement (Second) Of Torts, §7.  Multiple courts have found that the disclosure of personal information to an unauthorized third party constitutes a cognizable injury. In *Neiman Marcus*, the court examined facts similar to the negligence exhibited by Defendant. 794 F.3d at 689. The court held that the costs associated with protecting oneself from future identity theft, loss of time and money suffice as an injury. *Id*. at 696.  Courts have also held that at the motion to dismiss phase of the case, determining actual evidence of harm and injury is premature. *Neiman Marcus* noted that at that stage of the litigation, the same stage we find ourselves now, it was plausible to infer that the plaintiffs had shown a substantial risk of harm

---

[26] Defendant only attacks the injury element, thereby waiving any arguments on the remaining elements. *Catawba County, N.C. v. EPA,* 571 F.3d 20, 38 (D.C. Cir. 2009). Plaintiffs properly plead all of the elements of their negligence claim in any event. HIPAA, HITECH, and the state statutes set out the duty.  By failing to comply with those statutory requirements, CNHS breached the duty.  Without such a breach, Plaintiff would not have suffered the harms and losses alleged.

[27] Defendant in its citation of *Randolph* conflates the two concepts of "harm" and "injury". Under the Restatement, those two terms, as well as the term damages, have three different meanings serving three different functions. *Jordache Enterp., Inc. v. Brobeck, Phleger & Harrison,* 49 Cal. App. 4th 609, 620-21 (Cal. App. 2d Dist. 1996). However, given that standing was "easily satisfied," in *Randolph,* the court clearly meant "harm" as "injury-in-fact" perforce includes simple "injury."

from the defendant's data breach. *Id.* at 693; *see also Target*, 66 F. Supp. 3d at 1159 (finding that the defendants "asked to set a too high standard for the [p]laintiffs to meet at the motion to dismiss stage" and that the plaintiffs had alleged sufficient injury).

Defendant's argument relies primarily on the *Randolph* case which, as also discussed above, is distinguishable factually.[28] In *Randolph*, the court found that there was no cognizable injury because the plaintiff failed to allege that his or her identity had been stolen. *Randolph*, 973 A.2d at 705. *Randolph* is distinguishable because unlike a random home burglary for the *purpose of stealing pawn-able merchandise*, here Plaintiff is faced with a targeted and sophisticated phishing scam *for the purpose of stealing data. See Hannaford*, 659 F.3d at 165 (distinguishing a data breach from cases involving inadvertently misplaced or lost data which has not been accessed or misused by third parties). Plaintiffs here allege a quantified increased risk of identity theft, identity fraud and/or medical fraud, as well as other cognizable harms they have suffered.

Finally, law from around the country uniformly holds that the economic loss rule does not apply to the breach of an independent duty that does not arise from commercial expectations. Here plaintiff has alleged the breach of such an independent duty. *See, e.g, Aguilar v. RP MRP Wash. Harbour, LLC*, 98 A.3d 979 (D.C. Sept. 4, 2014) (court recognized that the rule does not bar recovery where a special relationship exists, which constitutes an independent duty); *Heaney v. Quicken Loans, Inc.*, 2014 U.S. Dist. LEXIS 129071, at *15-16 (D. Md. Sept. 16, 2014)(rule applied where plaintiffs "alleged no facts to demonstrate that a 'special relationship' existed between [the parties] that might give rise to an 'intimate nexus'" required to establish that defendants owed a duty to plaintiffs.); *TBI Unlimited, LLC v. Clear Cut Lawn Decisions, LLC*,

---

[28] Defendant also cites factually dissimilar cases. *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 316 (2013) (examining a claim of negligence against an oil company for the release of gasoline at a fueling station); *Horridge v. St. Mary's Cnty. Dep't of Soc. Servs.*, 382 Md. 170, 171 (2004) (addressing a claim of negligence against the local department of social services for the death of a child).

2013 U.S. Dist. LEXIS 162025, at *18-*19 (D.N.J. Nov. 14, 2013) (rule does not apply if it was "reasonably foreseeable" that plaintiff would incur economic loss and plaintiff was not in contractual relationship with defendant.); *Grynberg v. Questar Pipeline Co*., 70 P.3d 1, 11 (Utah 2003) ("[T]he modern focus is not on the harm that occurs but instead is on the source of the duty that was breached."). The principles underlying the economic loss rule include "(1) to maintain the fundamental distinction between tort law and contract law; (2) protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk." *KB Home Ind., Inc. v. Rockville TBD Corp*., 928 N.E.2d 297, 303-304 (Ind. Ct. App. 2010) (citations omitted). None of these principles is implicated where, as here, a plaintiff sues for breaching an independent duty.

Defendant's independent duties to reasonably protect Plaintiff's personal information and to timely notify them of the breach arise from the common law duty of reasonable care, from HIPAA, from the state data statutes, and by virtue of the "special relationship" between the parties. Defendant, citing to *Aguilar*, alleges that Plaintiff's and Class Members' injury is barred under the economic loss rule. However, *Aguilar* found that the economic loss rule applied because there was *not* a "special relationship" between the parties. 98 A.3d at 985. In *Aguilar*, the employer/employee relationship was insufficient to confer an obligation to ensure that the plaintiffs' economic expectations were met. *Id*. Here, Plaintiff and the putative Class have entrusted highly sensitive information to Defendant and state and federal statutes have placed a "special relationship" over their transaction. It is more akin to the doctor-patient relationship that *Aguilar* stated would give rise to the "special relationship". *Id*. at 984. The inquiry "focus[ed] instead on the likelihood that the negligent conduct in question would cause the particular injury

suffered by the plaintiff, thus maintaining strong limits on liability while still allowing meritorious claims to proceed by examining the special relationship between the parties." *Id*.; *see Heaney v. Quicken Loans, Inc.,* 2014 U.S. Dist. LEXIS 129071, at *15-16 (D. Md. Sept. 16, 2014)(rule applied where plaintiffs "alleged no facts to demonstrate that a 'special relationship' existed between [the parties] that might give rise to an 'intimate nexus'" . . .)).

Courts have held that an analysis of the economic loss rule is premature in the Motion to Dismiss stage.  *Target*, 66 F. Supp. 3d at 1173 ("application of economic loss rule to [p]laintiff's District of Columbia negligence claims is premature."). The examination of the economic loss rule would be a factual question requiring further record development. *In re Michaels Stores Pin Pad Litig.*, 830 F. Supp. 2d 518, 519 (N.D. Ill. 2011).

<u>CONCLUSION</u>

For the foregoing reasons, should the Court not find Article III standing, it should remand this matter to the Circuit Court for Montgomery County.  Should it find Article III standing, it should uphold Plaintiff's claims *in toto*.

October 16, 2015                    Respectfully submitted,

**REZVANI VOLIN P.C.**

By: <u>/s/  Tracy D. Rezvani</u>
Tracy D. Rezvani (#464293)
1050 Connecticut Avenue, N.W.
Tenth Floor
Washington, D.C. 20036
Tel: (202) 350-4270 x101
Fax: (202) 351-0544
trezvani@rezvanivolin.com

Kevin I. Goldberg
**Goldberg, Finnegan & Mester, LLC**
8401 Colesville Road

Suite 630
Silver Spring, Maryland 20910
Tel: (301) 589-2999 ext. 102
Fax: (301) 589-2644
kgoldberg@gfmlawllc.com

Mila F. Bartos
**Finkelstein Thompson LLP**
James Place
1077 30th Street, N.W., Suite 150
Washington, D.C. 20007
Tel: (202) 337-8000
mbartos@finkelsteinthompson.com

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2015, I filed the foregoing with the Clerk of Court

using the CM/ECF system, which will automatically send email notification of such filing to all

counsel of record.


*/s/ Tracy D. Rezvani*
Tracy D. Rezvani

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| FARDOES KHAN, *et al.*, | |
| Plaintiffs, | Case No. 8:15-CV-02125-TDC |
| vs. | |
| CHILDREN'S NATIONAL HEALTH SYSTEM, | Judge Theodore D. Chuang |
| Defendant. | |

[Proposed] **ORDER**

Upon consideration of the Motion to Dismiss, and all responses and replies thereto, it is

hereby ORDERED that the Motion is DENIED.


Dated: _____, 2015                    _____

                                                                    Chuang, J.