**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

| | |
|---|---|
| FARDOES KHAN, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> CHILDREN'S NATIONAL HEALTH SYSTEM, <br><br> Defendant. | Case No. 8:15-CV-02125-TDC <br><br> Judge Theodore D. Chuang |

<u>**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**</u>

**INTRODUCTION**

The arguments raised in Plaintiff's response do not change the conclusion that she has failed to allege facts both to support Article III standing and to state a claim upon which relief can be granted. The cases cited by Plaintiff in support of Article III Standing are all distinguishable because, unlike this case, they all involved alleged facts that supported an inference that financial harm in the form of payment card or other financial fraud was "certainly impending." Similarly, the various arguments that Plaintiff made with respect to her claims on the merits do nothing to change the conclusion that she simply has not, and cannot, allege facts that would be sufficient to satisfy all of the required elements of any of her claims.

Stripped of its speculative and conclusory allegations, the complaint only plausibly alleges that, as the result of Children's National Health System ("CNHS") falling victim to a criminal "phishing" attack, certain CNHS employees' email accounts containing some patients' private information—possibly, but not necessarily, including Plaintiff's private information—were temporarily compromised and therefore vulnerable to criminal hackers. These facts do not support Article III Standing or any cause of action on the merits.

**ARGUMENT**

## I. PLAINTIFF HAS NOT ALLEGED FACTS SUFFICIENT TO SUPPORT ARTICLE III STANDING.

In her response, Plaintiff raises four main arguments why she claims to have standing despite not having suffered any actual harm as a result of the security incident. First, she points to data breach cases in which courts found that allegations of future injury involved injuries that were "certainly impending" to support standing. Second, she argues that the mere increase in the risk of future identity theft, standing alone, is sufficient to confer standing. Third, she argues that expenses incurred to mitigate future harm can qualify as injury in fact sufficient to confer standing. Fourth, she points to other abstract "injuries" that she claims give rise to standing. Each of these arguments lacks merit, for the reasons discussed below.

### A. This case is more similar factually to cases in which courts have held potential future injuries are not sufficient to confer standing than to the cases cited in Plaintiff's response, which involved "certainly impending" future injuries.

Plaintiff cites a number of data breach cases that she characterizes as "recogniz[ing] standing even where no actual misuse [of private information] has occurred." (P. Br. 9.) However, to the extent that they were decided after the Supreme Court's decision in *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013), these cases are distinguishable. All of them involved future financial losses relating to actual or threatened use of credit card numbers, such that anyone whose credit card information was exposed was plausibly at imminent risk of fraud.

Indeed, two of the cases cited by Plaintiff that were decided after *Clapper* involved allegations that data exposed as part of the data breach had already actually been used to commit mass credit card fraud. *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 690 (7th Cir. 2015) (9,200 cards involved in the breach were subsequently used fraudulently, including cards belonging to each named plaintiff); *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d

1154, 1157-58 (D. Minn. 2014) ("Indeed, many of the 114 named Plaintiffs allege that they actually incurred unauthorized charges; lost access to their accounts; and/or were forced to pay sums . . . because the hackers misused their personal financial information."); *accord Anderson v. Hannaford Bros. Co.*, 659 F.3d 151, 155 (1st Cir. 2011) (decided before *Clapper*) ("Plaintiffs allege that Hannaford customers, including the plaintiffs, experienced more than the 1,800 unauthorized charges.").

In the other cases cited by Plaintiff that were decided after *Clapper*, the plaintiffs had alleged facts supporting the strong inference that credit card information had been stolen for the purpose of committing financial fraud, making financial loss sufficiently "certainly impending" to support standing. *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1206, 1215 (N.D. Cal. 2014) ("Adobe subsequently disclosed that the hackers were able to use Adobe's systems to decrypt customers' credit card numbers, which had been stored in an encrypted form."); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 955, 963-64 (S.D. Cal. 2014) (finding that plaintiffs had Article III Standing where credit card and other financial information had been exposed and where the company had admitted that the incident "may have had a financial impact on our loyal customers," but nonetheless dismissing claims for damages on the merits due to the plaintiffs' failure to allege cognizable harm); *Moyer v. Michaels Stores, Inc.,* No. 14 C 561, 2014 WL 3511500, at *5-7 (N.D. Ill. July 14, 2014) (finding that "allegation that [a putative class member] incurred fraudulent credit card charges" made the risk of injury "sufficiently imminent" to confer standing, but dismissing claims for failure to allege cognizable harm).

By contrast, this case does not involve the theft of credit card numbers or other information that could easily be used to commit imminent financial fraud, and the facts alleged

in the complaint do not plausibly support the conclusion that misuse of Plaintiff's information has already occurred or that misuse is imminent. In fact, the notice letter that was incorporated by reference in the complaint states that an investigation revealed no evidence that Plaintiff's or anyone else's private information was improperly accessed during the incident. As a result, this case is much more similar factually to those cases in which courts have found the allegations of potential future injury insufficient to give rise to Article III Standing. *See* D. Br. 6-9; *Polanco v. Omnicell, Inc.*, 988 F. Supp. 2d 451, 469 (D.N.J. 2013) (dismissing case and not crediting allegations of lost data that were "directly contradicted by the December 31, 2012 [notice] letter from [defendant]" on which complaint was based); *Strautins v. Trustwave Holdings, Inc.*, 27 F. Supp. 3d 871, 881 (N.D. Ill. 2014); *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 20 and n. 2 (D.D.C. 2014).

> **B.**  **Allegations of a mere "increased risk" of harm are not sufficient to support Article III Standing, absent facts to support that the risk of harm is imminent.**

Plaintiff next argues that her alleged increased risk of identity theft is enough to confer standing because she has alleged "'substantial risk' arising from the 9.5 times increased risk of future fraud." (P. Br. 10.) But allegations that fraud is "more likely" as a result of the challenged incident do not satisfy the applicable standard. Rather, Article III requires that the plaintiff be at risk of fraud or other harm that is certainly impending. *See Clapper,* 133 S. Ct. at 1148. For that reason, other courts have rejected the idea that the mere allegation that a data breach makes future fraud more likely is sufficiently imminent harm to give rise to standing. *See, e.g., SAIC*, 45 F. Supp. 3d at 25 ("[Plaintiffs'] claim that they are 9.5 times more likely than the average person to become victims of identity theft. . . . But as *Clapper* makes clear, . . [t]he degree by which the risk of harm has increased is irrelevant—instead, the question is whether the harm is certainly impending."); *Galaria v. Nationwide Mut. Ins. Co.*, 998 F. Supp. 2d 646, 654

(S.D. Ohio 2014) ("[Plaintiffs' allegation that] they are 9.5 times more likely than the general public to become victims of theft or fraud . . . sheds no light as to whether theft or fraud meets the 'certainly impending' standard."); *Green v. eBay Inc.*, No. CIV.A. 14-1688, 2015 WL 2066531, at *5 (E.D. La. May 4, 2015) ("[The allegation that plaintiffs] are approximately 9.5 times more likely than other people to suffer identity fraud . . . is irrelevant—the true question is whether the harm is certainly impending.").

### C.      Even cases cited by Plaintiff make clear that mitigation expenses do not qualify as actual injury-in-fact if the underlying harm is not certainly impending.

Plaintiff also asserts that "inconvenience, unfairness, mental distress and out-of-pocket expenses for mitigation . . . suffice to confer standing." (P. Br. 9-10.) But even the Seventh Circuit's decision in *Remijas*, a case on which Plaintiff relies heavily, followed the well-established rule that "[m]itigation expenses do not qualify as actual injuries where the harm is not imminent." *Remijas*, 794 F.3d at 694. The other case cited by Plaintiff, *In re Dep't of Veterans Affairs (VA) Data Theft Litig.*, No. MDL 1796, 2007 WL 7621261, at *3 (D.D.C. Nov. 16, 2007), was decided before the Supreme Court issued its decision in *Clapper*, where the Supreme Court made clear that a plaintiff cannot manufacture standing by spending money to mitigate a risk that is not certainly impending.

In short, unlike the cases cited in Plaintiff's response involving the theft of credit card information, Plaintiff's alleged future harm is speculative, not certainly impending.

### D.      The other categories of "injury" that Plaintiff argues she suffered are not sufficient to support Article III standing.

Plaintiff argues that her "loss of value" theory confers standing because having one's private information stolen in a data breach is akin to having one's family heirloom stolen while on loan to a charity. (P. Br. 11-12.) Plaintiff cites no cases that actually accepted her loss of

value theory, and in fact many courts have rejected the theory. [1] *See, e.g., SAIC,* 45 F. Supp. 3d at 30; *In re Zappos.com, Inc.*, No. 3:12-CV-00325-RCJ-VP, 2015 WL 3466943, at *3 (D. Nev. June 1, 2015); *see also Remijas*, 794 F.3d at 695 ("The plaintiffs also allege that they have a concrete injury in the loss of their private information, which they characterize as an intangible commodity. . . This assumes that federal law recognizes such a property right. Plaintiffs refer us to no authority that would support such a finding. We thus refrain from supporting standing on such an abstract injury, particularly since the complaint does not suggest that the plaintiffs could sell their personal information for value.").

Plaintiff also suggests that an alleged violation of a consumer privacy statute is enough to confer standing, even absent economic harm. (P. Br. 8.)[2] But, as discussed in Part II, below, Plaintiff has failed to allege the violation of any such statute. *See Remijas*, 794 F.3d at 695-96 (noting that a state consumer protection statute does not confer standing where plaintiff does not allege facts to support the elements of a claim under the statute).

---

[1] In any event, Plaintiff's analogy does not fit the alleged facts. For one thing, an heirloom, as opposed to data, is a physical object that can be located in only one place at a time. The harm from the theft of an heirloom flows from the rightful owner's loss of its possession and use. The harm from the theft of data flows only from its misuse by another, if that ever occurs. Moreover, Plaintiff does not allege that her data was stolen. To use Plaintiff's analogy, she alleges that an employee of the charity temporarily left the heirloom in an unlocked room, but later discovered the error and locked the door, with no apparent loss or damage to the heirloom.

[2] The assertion that a statutory violation can confer Article III standing even when no injury in fact has resulted from the violation is a doubtful proposition, as reflected by the comments of numerous Justices during oral argument held recently in *Spokeo v. Robins. See* Transcript of Oral Argument at 17:18-18:7, 24:1-14, 26:19-27:14, 31:10-33:12, 37:25-38:11, 43:5-21, 44:5-46:5, 54:2-16, 54:24-58:22, *Spokeo v. Robins*, No. 13-1339 (Nov. 2, 2015), http://www.supremecourt.gov/oral_arguments/argument_transcripts/13-1339_6j36.pdf. In any event, the question is not presented here, since Plaintiff has not alleged facts sufficient even to establish that CNHS committed a violation of a statute.

Finally, Plaintiff argues that CNHS has only challenged five of her nine theories of injury in fact. (P. Br. 10-12.) However, beyond making this general assertion, Plaintiff has not explained how any of the other theories would be sufficient to confer standing in this case.

## II. PLAINTIFF'S CLAIMS ALSO FAIL ON THE MERITS.

Even if Plaintiff were correct that the mere possibility of future identity theft, or the other abstract injuries she articulates, were sufficient to confer standing, the complaint would still have to be dismissed because she has also failed to allege facts sufficient to state a claim upon which relief can be granted. CNHS therefore requests that the complaint be dismissed with prejudice. *See Willingham v. Global Payments, Inc.*, No. 1:12-CV-01157-RWS, 2013 WL 440702, at *8 (N.D. Ga. Feb. 5, 2013) (dismissing a complaint with prejudice under Rule 12(b)(6) where plaintiff had also failed to allege facts sufficient to support Article III standing).

Notably, in many of the very cases cited by Plaintiff in support of her standing arguments, the courts ultimately found that the complaint should be dismissed anyway for failure to allege an injury sufficient to state a claim on the merits. *See Krottner v. Starbucks Corp.*, 406 F. App'x 129, 131 (9th Cir. 2010); *Ruiz v. Gap, Inc.*, 380 F. App'x 689, 690 (9th Cir. 2010); *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 640 (7th Cir. 2007); *Moyer*, 2014 WL 3511500, at *7; *McLoughlin v. People's United Bank, Inc.*, No. CIVA 308CV-00944 VLB, 2009 WL 2843269, at *8 (D. Conn. Aug. 31, 2009); *Caudle v. Towers, Perrin, Forster & Crosby, Inc.*, 580 F. Supp. 2d 273, 282 (S.D.N.Y. 2008); *see also Sony*, 903 F. Supp. 2d at 963 (S.D. Cal. 2014) (dismissing damages claims). The same conclusion is necessary here.

### A. *Hibdon v. Safeguard Properties* **mandates dismissal of Plaintiff's MCPA claim, and Plaintiff is incorrect in arguing that** *Hibdon* **was wrongly decided.**

In support of the proposition that Plaintiff has failed to allege a violation of the MCPA, CNHS cited the recent decision of *Hibdon v. Safeguard Properties, LLC*, No. CIV. PJM 14-591,

2015 WL 4249525, at *8 (D. Md. July 9, 2015), which recognized that a single incident of negligence is not sufficient to constitute a trade practice under the MCPA.

In response, Plaintiff argues that *Hibdon* wrongly decided that a trade practice refers to a business's operating policies or customary practices. (P. Br. 18-21.) But Plaintiff does not cite any cases that have criticized or declined to follow *Hibdon*. Moreover, Plaintiff mischaracterizes *Hibdon* as requiring "an unstated amount of repetition" before a trade practice can exist. (P. Br. 19-20.) That is not what *Hibdon* held. Rather, *Hibdon* held that "trade practice" refers to a business's operating policies or customary practices, as opposed to, *e.g.*, the negligent acts of the business's employees. *Hibdon,* 2015 WL 4249525, at *8 ("While it may be that Safeguard's agents were indeed the ones who committed the property destruction and property removal, it is equally plausible that they were merely negligent in leaving open Burns's rear sliding glass door after they completed their property preservation activities, thereby facilitating the entry of unknown third parties who committed the property destruction and property removal."). Among other bases for its holding, the *Hibdon* court correctly reasoned that such an interpretation was necessary to prevent the MCPA from subsuming, as opposed to supplementing, traditional tort law. *Id.* at 7-8. Here, Plaintiff alleges negligent conduct in failing to prevent a criminal phishing attack, not a trade practice.

Plaintiff also cites to cases that Plaintiff argues "upheld single-transaction claims" under the MCPA. (P. Br. 20.) However, none of these cases involved allegations, like those at issue in this case, that a single act of alleged negligence can constitute an unfair trade practice. Rather, they involved single transactions that the courts found were indicative of an actual trade practice rather than an act of negligence.

Even if failing to prevent the criminal phishing attack could somehow be characterized as a "trade practice," Plaintiff has failed to address the other deficiencies in her MCPA claim, including the failure to assert a "substantial injury." Plaintiff asserts that an increased risk of identity theft and credit monitoring costs satisfies the MCPA's "substantial injury" requirement for unfair trade practice claims. (P. Br. 23.) But the speculative risk of future harm that Plaintiff alleges is precisely the type of "conjectural or potential" injury that courts have rejected as satisfying the MCPA's injury requirement. (D. Br. 10-11.) Plaintiff asserts that public policy considerations can, under certain circumstances, satisfy the substantial injury requirement for unfairness claims. (P. Br. 23-24.) But Plaintiff does not explain why any public policy consideration makes CNHS's conduct unfair in this case. And, more importantly, Plaintiff does not argue, because she cannot, that public policy considerations can negate the actual injury or loss requirement common to all MCPA claims brought by private consumers. (D. Br. 10-11.)[3]

**B.**    ***CNHS's privacy policy cannot form the basis of Plaintiff's DCCPPA claim because it does not constitute a "trade practice" and contains no misrepresentations.***

Although the definition of a "trade practice" under the DCCPPA is different than under the MCPA, as pointed out in CNHS's opening brief, Plaintiff has also failed to allege a "trade practice" under the D.C. statute's definition of the term, which is "any act which does or would

---

[3] Plaintiff's reliance on *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015), a Federal Trade Commission enforcement action, in support of her private MCPA claim, is misplaced. (*See, e.g.,* P. Br. 22-23.) As Plaintiff notes, the FTC may bring an enforcement action under the FTCA when injury to consumers is "likely," as opposed to "completed." (P. Br. 23.) By contrast, the MCPA requires private consumers to allege "actual injury or loss." (D. Br. 10-11.) *See also Legg v. Castruccio*, 100 Md. App. 748, 757 (1994). Furthermore, the FTC in *Wyndham*, unlike Plaintiff in this case, alleged that "hackers obtained payment card information from over 619,000 consumers, which . . . resulted in at least $10.6 million in fraud loss." *Wyndham*, 799 F.3d at 242. Additionally, *Wyndham*, unlike this case, involved alleged misrepresentations of objective facts, including statements that the defendant "use[d] 128-bit encryption" and "maintain[ed] 'fire walls'," that the FTC claimed were false. *Id.* at 241.

create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease, or transfer of consumer goods or services." (*See* D. Br. 11-12.)

In her response, Plaintiff asserts that the privacy policy constitutes a "trade practice" because CNHS uses its privacy policy "as a means of enticing consumers to choose it over other general hospitals." (P. Br. 27.) Plaintiff alleges no facts in the complaint that would support this implausible assertion. Indeed, the substance of the privacy policy is not unique to CNHS, but instead is a disclosure that all hospitals must provide by federal regulations promulgated under HIPAA. (*See* D. Br. 11-12.) It is nonsensical for Plaintiff to argue that the privacy policy differentiates CNHS from other hospitals, let alone that CNHS uses it "as a means of enticing consumers," and Plaintiff has not alleged any facts that would make this assertion plausible.

Plaintiff also argues that the privacy policy nonetheless constitutes a "trade practice" because CNHS has some latitude in choosing its language. (P. Br. 28.) But latitude in selecting the specific language does not change the fact that CNHS is required by federal regulations to distribute the privacy policy in the first place, nor does it change the fact that the substance of the privacy policy is set by regulation. Plaintiff does not allege, nor could she, that CNHS's privacy policy deviates from what applicable regulations require. Moreover, Plaintiff has not plausibly alleged any facts that would support the conclusion that any language unique to CNHS's privacy policy was chosen with the intention of enticing patients to select CNHS over other hospitals.

Plaintiff next argues that CNHS's privacy policy contains misrepresentations regarding data security. (P. Br. 28-29.) But Plaintiff simply ignores the privacy policy's express warnings that data breaches are possible and that data security cannot be guaranteed. (*See* D. Br. 12-13.) Instead, Plaintiff quotes several aspirational phrases regarding privacy, which cannot plausibly

be read as guarantees regarding data security, especially in light of the express warnings regarding the possibility of data breaches contained in the same document. (P. Br. 28-29.)

Plaintiff also appears to assert that CNHS's notice letter contained misrepresentations. (P. Br. 29-30.) In particular, Plaintiff asserts that the notice letter "misrepresented the true risk of the breach" and "what was actually stolen." (*Id.*) But Plaintiff does not, and cannot, allege that any particular statement in the notice letter was false.

Plaintiff next argues that CNHS's privacy policy constitutes either an advertisement or an offer for purposes of the DCCPPA. (P. Br. 30-31.) However, even assuming that a federally mandated notice can be characterized as an advertisement or offer, which it cannot, Plaintiff has failed to also allege that CNHS had the "unlawful intent" to not provide services as advertised. (D. Br. 13-14.) Plaintiff's failure to allege CNHS's unlawful intent is dispositive of the false advertising claim, even if the privacy policy could plausibly be construed as an advertisement or offer despite the fact that it is a federally mandated disclosure.

## C.     *The DCCPPA does not provide a remedy for HIPAA violations and, in any event, Plaintiff does not allege a HIPAA violation.*

As an alternative to her DCCPPA claim predicated on CNHS's privacy policy, Plaintiff argues that she can state a DCCPPA claim based solely on CNHS's purported violation of federal HIPAA regulations or Maryland and Virginia statutes. (P. Br. 31-41 & n. 16.) But, as set forth in CNHS's opening brief, the DCCPPA—a District of Columbia statute—does not provide a private right of action (and statutory damages) based on the alleged violation of HIPAA or other laws of jurisdictions other than the District of Columbia. (D. Br. 14-15.)

Plaintiff cites cases that she characterizes as holding that the DCCPPA provides a private right of action for the violation of "all" consumer protection statutes. (P. Br. 31-32.) But the authorities Plaintiff cites recognize that the DCCPPA's private right of action extends only to "an

action seeking relief from the use of a trade practice *in violation of a law of the District [of Columbia].*" D.C. Code § 28-3905(k)(1)(A) (emphasis added). *See, e.g., Atwater v. D.C. Dep't of Consumer & Regulatory Affairs*, 566 A.2d 462, 465-67 (D.C. 1989); *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 723 (D.C. 2003).[4]  Indeed, Plaintiff cites no case where a court allowed a DCCPPA claim to proceed based solely on an alleged violation of HIPAA or any other federal law or other state's law.  Plaintiff argues that "state courts routinely apply federal law in state law consumer protection and negligence suits." (P. Br. 32-33.)  But the cases Plaintiff cites did not involve the DCCPPA and, in any event, analyzed only whether federal question jurisdiction was satisfied, not whether the plaintiff had stated a claim.  *See Dickman v. MultiCare Health Sys.*, No. C15-5193 BHS, 2015 WL 3477178, at *3 (W.D. Wash. June 2, 2015); *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 676 (9th Cir. 2012).[5]

Even if a violation of HIPAA could support a DCCPPA claim, Plaintiff has not alleged any violation of HIPAA.  In her response, Plaintiff points to no well-pleaded facts establishing that CNHS violated any of HIPAA's general requirements, but to the contrary, suggests that "[t]hrough discovery, Plaintiff will discovery [sic] whether" any violation in fact occurred. (P.

---

[4] The limitation on the DCCPPA's private right of action acknowledged in Plaintiff's authorities is consistent with the DCCPPA as a whole, which distinguishes trade practices violating D.C. law from those violating the laws of other jurisdictions.  For example, the DCCPPA authorizes the Department of Consumer and Regulatory Affairs to "provide full remedy" for a "trade practice *in violation of any law of the District of Columbia,*" D.C. Code § 28-3903(a)(13) (emphasis added), but authorizes the Department to dismiss cases where "any violation of law which may have occurred is of a *law not of the District of Columbia*[,]" D.C. Code § 28-3905(d)(1) (emphasis added).  Where the "trade practice complained of may, in whole or in part, be a *violation of law other than a law of the District of Columbia* . . . the Director may in writing so inform the . . . officials of the District, the United States, or other jurisdiction, who would properly enforce such law." D.C. Code § 28-3905(c) (emphasis added).

[5] Plaintiff also asserts that she can base her DCCPPA claim on a violation of the common law. (P. Br. 31-32.)  But, as set forth in this section and in CNHS's opening brief, Plaintiff has not stated any common law claims.

Br. 37.)  But the pleading standards require the Plaintiff to plead facts sufficient to state a plausible claim for relief *before* being permitted to conduct discovery.  They do not allow the sort of fishing expedition that Plaintiff proposes.

The court in *Sheldon v. Kettering Health Network*, a case that Plaintiff herself relies on, dismissed a federal False Claims Act claim purportedly predicated on a violation of HIPAA (as amended by HITECH).  No. 1:14-CV-345, 2015 WL 74950, at *3 (S.D. Ohio Jan. 6, 2015).  There, the court noted "[t]here is no case law that suggests that an isolated privacy breach or discrete series of related breaches constitute a violation of the HITECH Act."  *Id.*  The court also noted the general nature of HIPAA regulations: "The HITECH Act requires hospitals to implement a system to protect [electronic information]; it does not require covered entities to use a particular [electronic-information] product or vendor or to run a specific type of monitoring report."  *Id.* at *4.  The court therefore dismissed the claim on the ground that the plaintiff failed to allege facts establishing the violation of any HIPAA requirement, and was not entitled to the inference of a HIPAA violation based on the occurrence of a data breach.  *Id.* at *5-6.  The court's reasoning in *Sheldon* applies equally here.

Here, Plaintiff asserts that HIPAA requires hospitals like CNHS to encrypt data, and speculates that CNHS did not do so.  (P. Br. 34-37.)[6]  But Plaintiff cites no authority holding that HIPAA requires encryption of the employee emails at issue in this case, and no such requirement exists.  (*See* D. Br. 14-15.)  The authority Plaintiff does cite notes only that HIPAA regulations apply to hospitals, and does not suggest that "addressable" HIPAA requirements, such as encryption, are mandatory for any covered entities.  *See Picco v. Glenn*, No. 12-CV-02858-RM-MJW, 2015 WL 2128486, at *1 (D. Colo. May 5, 2015).

---

[6] Plaintiff asserts that CNHS "implicitly admits that the data stolen was not encrypted."  (P. Br. 34.)  CNHS makes no such admission.

Finally, Plaintiff argues that whether CNHS "did enough" under HIPAA to prevent the data breach is a question of fact. (P. Br. 33-35.) But the case Plaintiff relies on involved only a common law negligence claim. *See Ware v. Bronson Methodist Hosp.*, No. 307886, 2014 WL 5689877, at *5 (Mich. Ct. App. Nov. 4, 2014) appeal denied, 498 Mich. 867 (2015). Plaintiff's DCCPPA claim is predicated on CNHS's purported violation of HIPAA, not that CNHS was generally negligent, and Plaintiff has failed to allege any HIPAA violation. *See Sheldon*, 2015 WL 74950, at *5-6.

### D.     *Plaintiff's alleged harm is not sufficient to support a negligence claim.*

Plaintiff argues in her response that she has adequately pleaded the damages element of her negligence claim because, according to Plaintiff, "multiple courts have found that the disclosure of personal information . . . constitutes a cognizable injury." (P. Br. 47.) In support, Plaintiff cites two cases that she characterizes as allowing negligence claims to proceed based on allegations of harm that are similar to those alleged in this case. (*Id.* 47-48.) But neither case that Plaintiff cites suggests that speculative injury based on the risk of future identity theft, such as Plaintiff alleges in this case, is sufficient to state a negligence claim.

Plaintiff's reliance on *Remijas* is misplaced because that case analyzed only standing, and did not reach any claim on the merits. *See Remijas,* 794 F.3d at 697. As set forth above, several courts, including the Seventh Circuit, have held that, while the risk of future identity theft may be sufficient to confer standing where the harm is sufficiently imminent, such speculative future harm is still not sufficient to state a negligence claim. (*See supra* 7 (collecting cases).)

Plaintiff's reliance on *Target* is also misplaced. In *Target*, in contrast to this case, "many of the 114 named Plaintiffs" alleged that they had already suffered actual injuries, including "unauthorized charges; lost access to their accounts; and/or [that they] were forced to pay sums .

. . because the hackers misused their personal financial information." *Target Corp.,* 66 F. Supp. 3d at 1157-58. Here, Plaintiff does not allege that she or anyone else has suffered any actual injuries as a result of the data breach.

For the same reason, Plaintiff has failed to distinguish *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702 (D.C. 2009), where a negligence claim was dismissed in a data breach case for failure to allege cognizable injury. (P. Br. 48.) As Plaintiff notes, "the court [in *Randolph*] found that there was no cognizable injury because the plaintiff failed to allege that his or her identity had been stolen." (*Id.*) Like the plaintiff in *Randolph*, Plaintiff in this case also fails to allege identity theft, and her negligence claim therefore fails for the reasons set forth in *Randolph* and numerous other cases. *See Randolph*, 973 A.2d at 708 (collecting cases).

Even if Plaintiff had otherwise alleged the elements of a negligence claim, her claim would be barred by the economic loss doctrine. In her response, Plaintiff does not dispute that the economic loss doctrine applies to her negligence claim. Instead, Plaintiff argues that a "special relationship" exception to the doctrine saves her claim. (P. Br. 48-50.) In particular, Plaintiff asserts that a special relationship arises from the patient-hospital relationship and from the laws and regulations regarding data privacy. (*Id.*) But Plaintiff cites no case finding a "special relationship" under the circumstances alleged, and in fact, courts that have considered this precise issue have found that, for purposes of the economic loss doctrine, no "special relationship" exists between a hospital and a patient with respect to economic losses resulting from data breaches. *Paul v. Providence Health Sys.-Oregon*, 237 Or. App. 584, 592-93 (2010) ("[P]laintiffs here have failed to identify any such heightened duty of care to protect against economic harm arising out of the relationship between themselves as patients and defendant as a health care provider. . . To the extent they argue that federal and state laws protecting the

confidentiality of health information establish that duty, we disagree.  Although we agree that those statutes and rules establish standards of conduct, any violation of those standards does not give rise to a negligence per se claim for economic damages in the absence of a special relationship that protects against that type of injury. . . [P]laintiffs have failed to allege a legally sufficient claim for negligence as a result of the economic damages that they have allegedly incurred (or will incur) in protecting against the increased risk of identity theft that they face as a result of the theft of their medical records.")  *aff'd on other grounds*, 351 Or. 587 (2012).

### E.      *Plaintiff has not successfully distinguished the cases cited by CNHS which support the conclusion that the implied contract claim should be dismissed.*

In its opening brief, CNHS cited several cases where courts dismissed implied contract claims predicated on allegations that are indistinguishable from what Plaintiff alleges here.  (D. Br. 16-18.)  Plaintiff's attempts to distinguish those cases each fall short of the mark.

In her response, Plaintiff tries to distinguish *Putnam Bank* by arguing that, in that case, data privacy was "not the essence of the contract."  (P. Br. 45.)  But, in this case, data privacy is likewise not the essence of the contract—the essence of the contract is the provision of medical services in exchange for fees.

Plaintiff attempts to distinguish *Frezza* by asserting that, in that case, the court "declined to analyze whether an implied contract existed."  (P. Br. 45-46.)  This assertion is incorrect.  The court in *Frezza* did analyze whether an implied contract existed, and it determined that the defendant's accepting the plaintiff's private information did not give rise to an implied contract:

> The most plaintiffs allege is that by providing their financial data to Google they entered 'into an implied contract with Google.'  This conclusory statement does not show that Google made any indication that it adopted [particular industry data security standards] in its dealings with plaintiffs.  As such, plaintiffs have not alleged that Google was bound by the specific obligation [regarding data security] it allegedly breached.

*Frezza v. Google Inc.*, No. 12-CV-00237-RMW, 2012 WL 5877587, at *4 (N.D. Cal. Nov. 20, 2012) (citation omitted).

Plaintiff's attempt to distinguish *Krottner* also fails. *Krottner* dismissed an implied contract claim because, there, plaintiffs failed to allege that they read the documents allegedly containing promises regarding data security. *Krottner*, 406 Fed. App'x at 131. Plaintiff argues that *Krottner* is "distinguishable because . . . Plaintiff and Class Members were aware of the Privacy Policy, as they are required to sign one at every medical visit." (P. Br. 46.) This argument fails for two reasons. First, alleging that Plaintiff was required to sign the privacy policy is not the same as alleging that she read or relied on any promises made in the policy. The complaint nowhere alleges that Plaintiff actually read the privacy policy or any other documents. Second, if Plaintiff did read the privacy policy, then her implied contract claim fails for a different reason: The privacy policy does not contain any promises regarding data security, and it isn't silent on the issue either—it specifically disclaims any guarantee by CNHS regarding data security. (*See* D. Br. 13.)

Plaintiff also argues that the existence of an implied contract is a factual question. (P. Br. 44 (citing *Target Corp.*, 66 F. Supp. 3d at 1177).) This assumes, however, that plaintiffs "have plausibly alleged the existence of an implied contract as well as its terms." *Target Corp.,* 66 F. Supp. 3d at 1177. Here, Plaintiff does not plausibly allege an implied contract, and therefore there is no factual question for a jury to decide.

Plaintiff cites two cases where courts allowed an implied contract claim to proceed. (P. Br. 44-45.) But neither case involved HIPAA or analyzed whether a similar pre-existing legal obligation precluded the plaintiff's implied contract claim. And neither case involved a privacy policy or other document that specifically disclaimed a guarantee of data security.

Finally, as noted in CNHS's opening brief, the statements made in the privacy policy amount at most to a promise to perform CNHS's pre-existing legal obligations imposed by federal law, and therefore could not give rise to an enforceable contract. (*See* D. Br. 18.) In her response, Plaintiff does not dispute this independent basis for dismissal of her implied contract claim, and therefore, that claim must be dismissed.

> **F.** **Plaintiff's reliance on <u>Resnick v. Avmed, Inc.</u> in support of her unjust enrichment claim is misplaced because <u>Resnick</u> is distinguishable and because more recent decisions have called <u>Resnick</u> into question.**

In her response, Plaintiff notes that the Eleventh Circuit, applying Florida law, once allowed an unjust enrichment claim to proceed in a data breach case, and asks this Court to do the same. (P. Br. 42-43 (citing *Resnick v. Avmed, Inc.*, 693 F.3d 1317, 1328 (11th Cir. 2012)).) However, *Resnick* is not controlling authority in this case, and it is distinguishable in any event.

As an initial matter, the Eleventh Circuit's decision in *Resnick*, has been called into question by subsequent decisions of other federal courts. Recently, for example, the Seventh Circuit noted in *dicta* that it was "dubious" that allegations similar to those in *Resnick* (and this case) could support an unjust enrichment claim. *See Remijas*, 794 F.3d at 694-95 ("[Plaintiffs] appear to be alleging some form of unjust enrichment as well: Neiman Marcus sold its products at premium prices, but instead of taking a portion of the proceeds and devoting it to cybersecurity, the company pocketed too much. This is a step that we need not, and do not, take in this case.") (citing but declining to follow *Resnick*, 693 F.3d 1317, 1328).

Moreover, the court in *Resnick* did not address whether a plaintiff's unjust enrichment claim was precluded by the existence of an actual contractual relationship, as exists here. Two years after *Resnick* was decided, another federal court, also applying Florida law, dismissed an unjust enrichment claim brought in a data breach case on the ground that the quasi-contract

unjust enrichment claim was precluded by the existence of "a valid, express contract governing the subject matter of the dispute." *Sony,* 996 F. Supp. 2d at 984 (quotation marks and citation omitted). Here, Plaintiff asserts that an unjust enrichment claim may be pleaded in the alternative to a contract claim. (P. Br. 42.) "But a claim of unjust enrichment may only be pleaded in the alternative where one of the parties asserts the contract governing the dispute is invalid." *Persaud v. Bank of Am., N.A.*, No. 14-21819-CIV, 2014 WL 4260853, at *13 (S.D. Fla. Aug. 28, 2014). *See also Sony*, 996 F. Supp. 2d at 984 ("Plaintiffs contend their unjust enrichment claims are properly plead in the alternative to their breach of contract claims. The Court, however, does not agree."). Here, there is no dispute that the parties had a contractual relationship governing the exchange of medical services for fees, and therefore Plaintiff's unjust enrichment claim must be dismissed.

Finally, *Resnick* is factually distinguishable. An important fact underlying the Eleventh Circuit's decision in that case was that the plaintiff alleged to have suffered actual identity theft as a result of the data breach. *Resnick*, 693 F.3d at 1322 ("Plaintiffs have both become victims of identity theft.'). This provided a factual basis for the required element of an unjust enrichment claim that the plaintiff suffer a detriment as a result of the defendant's conduct. (*See* D. Br. 19-20.) By contrast, Plaintiff has not alleged to have suffered any harm as a result of the phishing attack at issue in this case.

### G. *None of the arguments asserted by Plaintiff in support of her invasion of privacy claim have merit.*

Plaintiff repeatedly asserts in her response that she has alleged the required elements of her invasion of privacy claim but, tellingly, points to no well-pleaded allegations supporting these assertions. (*See* P. Br. 38-41.) In particular, Plaintiff asserts that CNHS "acknowledged through their notice letter that [CNHS] disclosed personal information to an unauthorized third

party." (P. Br. 39.) This is false. To the contrary, the notice letter stated that there was "no evidence that the information in the emails has been misused or even accessed." (D. Br. Ex. A.) And besides asserting that CNHS "intentionally invaded Plaintiff's privacy," Plaintiff fails to explain how CNHS's actual alleged conduct—falling victim to a phishing attack—could constitute the intentional tort of invasion of privacy. (*See* P. Br. 39-41.)

Plaintiff also attempts in her response to distinguish *Randolph* and *SAIC*, two cases in which invasion of privacy claims based on similar allegations were dismissed. (P. Br. 39-40.) In particular, Plaintiff asserts that, whereas the plaintiffs in *Randolph* and *SAIC* failed to allege that their private information had been accessed by an unauthorized party, "Plaintiff explicitly alleges that her [private information] was appropriated by criminals and published to an unauthorized third party." (*Id.* at 40.)

*Randolph* and *SAIC* are not distinguishable. In those cases, the courts found it fatal to invasion of privacy claims that the plaintiffs did not allege that any unauthorized person accessed their private information, even though the plaintiffs did allege that the defendants' conduct made the plaintiffs' private information vulnerable to such unauthorized access. *See Randolph,* 973 A.2d at 711-12; *SAIC*, 45 F. Supp. 3d at 28-29. In both *Randolph* and *SAIC*, the plaintiffs alleged that criminals stole computer equipment containing the plaintiffs' private information, but did not allege that the criminals actually accessed the private information. *Id.* Likewise, here, the complaint, stripped of its speculative and conclusory allegations, alleges only that certain email accounts containing private information were compromised, but does not allege that Plaintiff's private information was contained in those accounts or, even if it was, that any unauthorized person accessed it.

Plaintiff argues that the "invasion of privacy of Plaintiff and the Class Members is more similar to *Adobe*." (*See* P. Br. 40.)  This argument lacks merit since invasion of privacy was not even one of the claims addressed in *Adobe*.

Finally, Plaintiff argues that she can state a claim for invasion of privacy without alleging intentional conduct, at least, possibly, for varieties of the invasion of privacy tort constituting appropriation of another's name or likeness, unreasonable publicity of another's private life, or unreasonably placing another in a false light before the public.  (P. Br. 39, 40-41.)  As an initial matter, this argument fails because the only authority Plaintiff cites—a *dissent* from an opinion that held that intrusion upon seclusion requires intentional conduct—does not specifically discuss any form of the tort besides intrusion upon seclusion, and certainly does not support the notion that CNHS could be liable for negligently failing to prevent an invasion of privacy intentionally committed by a third party.  *See Bailer v. Erie Ins. Exch.*, 344 Md. 515, 542-44 (1997).  Moreover, even assuming that there exists a form of the invasion of privacy tort that does not require intentional conduct, Plaintiff does not explain how any such form even remotely fits the alleged facts.  Plaintiff does not allege that anyone actually appropriated her name or likeness, publicized her private life, or placed her in a false light before the public.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice.

Dated: November 16, 2015   BAKER & HOSTETLER LLP

By: */s/ Eliabeth A. Scully*
   Elizabeth A. Scully (Bar No. 27402)
   Washington Square, Suite 1100
   1050 Connecticut Avenue, NW
   Washington, D.C. 20036-5304
   Tel: 202.861.1698
   Fax: 202.861.1783
   escully@bakerlaw.com

   Paul G. Karlsgodt *Pro Hac Vice*
   1801 California Street, Suite 4400
   Denver, CO  80202
   Tel: 303.861.0600
   Fax: 303.861.7805
   pkarlsgodt@bakerlaw.com

   Douglas L. Shively *Pro Hac Vice*
   1900 E. 9th Street, Suite 3200
   Cleveland, OH  44114
   Tel: 216.861.6486
   Fax: 216.696.0740
   dshively@bakerlaw.com

   *Attorneys for Defendant Children's National Health System*

## CERTIFICATE OF SERVICE

I electronically filed on November 16, 2015, the foregoing *Defendant's Reply in Support of its Motion to Dismiss the Complaint,* with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following:

Tracy D. Rezvani
Rezvani Volin P.C.
1050 Connecticut Avenue, N.W., 10th Floor
Washington, D.C. 20036
trezvani@rezvanivolin.com

Kevin I. Goldberg
Goldberg, Finnegan & Mester, LLC
8401 Colesville Road, Suite 630
Silver Spring, MD 20910
kgoldberg@gfmlawllc.com

Mila F. Bartos
Finkelstein Thompson LLP
James Place
1077 30th Street, N.W., Suite 150
Washington, DC 20007
mbartos@finkelsteinthompson.com

Counsel for Plaintiff.

*/s/ Elizabeth A. Scully*
Elizabeth A. Scully (Bar No. 27402)
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, D.C. 20036-5304
Tel: 202.861.1698
Fax: 202.861.1783
escully@bakerlaw.com

*Attorneys for Defendant Children's National Health System*